**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**STATESVILLE DIVISION**

| | |
|---|---|
| BAYPORT HOLDINGS, INC.; DENVER PROPERTY PARTNERS LLC, KEVIN W. LAFONE, ROBERT EUGENE WATSON, HEATHER W. O'BRIEN and AKIBA J. GREEN, <br><br>       Plaintiffs, <br><br>   vs. <br><br><br> FIRST NATIONAL BANK OF PENNSYLVANIA, <br><br>       Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 5:24-cv-165 <br><br>    **COMPLAINT** |

# Jurisdiction

## Diversity

1.   Both Plaintiff and Defendant are citizens of different states as enumerated below. Each of Plaintiff's claims below exceed $75,000.

## Federal Question

2.   Plaintiff provides for jurisdiction a valid Federal Question under the Clayton Act §4.

3.   Plaintiff provides for jurisdiction a valid Federal Question under the RICO Act § 1962(c).

4.   Plaintiff provides for jurisdiction a valid Federal Question under RICO Act 1962(d).

# Venue

5.   One Plaintiff resides in Iredell County North Carolina within the Western North Carolina Federal District, Statesville Division

1

## Parties

6. Denver Property Partners ("DPP") filed their articles of organization on April 25, 2008, NCSOSID# 1040334.[1]

7. Bayport Holdings Inc. ("Bayport"), was the operating company doing business as Denver Defense NCSOSID # 1150608.[2]

8. First National Bank of Pennsylvania (FNB) acquired Yadkin Valley Bank on or about March 17, 2017. FNB's principle place of business is F.N.B. CORPORATION ONE NORTH SHORE CENTER, 12 FEDERAL ST. PITTSBURGH PA 15212.


# **PART ONE FACTS**

## Denver Property Partners LLC

9. Denver Property Partners LLC ("DPP") would have a membership with a strong financial portfolio spread across several North Carolina Banks in excess of seven million dollars.

10. DPP sought to build the largest indoor shooting range in North Carolina.

11. In 2008, DPP purchased the land for this construction project ("Range Property").

12. In 2013, DPP owed $297,726.26 in liens on the Range Property valued at $1,200,000, including a Carolina Trust Bank ("CTB") purchase deed of trust recorded for up to $714,000 at a 5% interest rate.

13. On September 10, 2010, DPP sold part of the Range Property, so CTB released $439,058.68 from its original lien of $714,000 upon the Range Property.

---

[1] Mo134
[2] Mo672

14. After that McMickle, Kurey & Branch, LLP DPP's attorney placed a lien upon the land up to $250,000, but its balance was only $60,000 with 0% interest rate applied to it.

15. In early 2013, DPP's Range Property's appraised value was approximately $702,000.

16. In July 2013, Yadkin bank marketed 504 and other SBA loans to both established and start-up businesses.

## SBA Loans

These loans are guaranteed by the U.S. Small Business Administration (SBA) to help small businesses increase their viability and borrowing power. For businesses that qualify, they may offer longer terms and lower down payments than most conventional loans. To learn more about SBA loans and determine if your business qualifies, please talk with a commercial banker at any of our branch locations.

17. And Yadkin continued to market SBA loans on its website until its merger with FNB on or about March 17, 2017.

## SBA Lending

As a small-business owner, you probably don't think to ask about a government-backed loan programs when you walk into the bank. At Yadkin Bank, we can offer qualifying businesses a number of financing options, and we make the process simple. For more information, contact us at 1-855-935-6722.

More Information

### DPP's Range Construction Project Budget

18. On or about March 1, 2013, Robert Watson ("Watson"), as Member Manager of DPP, began sketching a plan for an indoor shooting range with DPP's project Property.

19. DPP's plan was to build to suit the Range Property for Bayport Holdings ("Bayport"), who would lease from DPP and operate the business of Denver Defense.

20. DPP's Construction was in three phases:

3

    1)      Site preparation;

    2)      Constructing the building;

    3)      Constructing the range inside the building and installing range equipment.

21.    Watson expected that, with equity partners in his indoor shooting range project, DPP could pay off the project property's two Deeds of Trust, and its land equity could then serve as the project's down payment.

22.    If DPP's Membership paid off the Range Property's existing liens of $230,726.26 due to CTB and $60,000 due to McMickle, Kurey & Branch, the Range Property's unencumbered equity would provide a 20% down payment on a $3,750,000 loan if financed 80% Loan to Value.

23.    Watson continued to develop the business plan for an indoor shooting range, and in the ensuing months acquired Craig Norfolk ("Norfolk"), Kevin Lafone ("Lafone"), Robert Hosey ("Hosey"), Heather O'Brien ("O'Brien"), and Akiba Green ("Green") as equity partners. (Collectively, with Watson, the "DPP Membership")

24.    DPP needed a construction loan for a total project cost ("TPC") of $3.75 to $3.9 million.

25.    Through August and September of 2013, Watson and Norfolk developed DPP's construction budget and Bayport's financial plans and business projections for the indoor shooting range to present to several banks for financing.

26.    DPP estimated that it needed $3,000,000 in site preparation, building construction and equipment costs ("Range Construction Project").

27.    DPP also expected that any interim loan interest from bridge or construction loans were budgeted into DPP's Range Construction Project either as its own line item or within the contingency amount.

28.    DPP decided to expand its number of range lanes, which increased the Range Construction Project budget.

4

## Bayport

29. Bayport would own and run the range called Denver Defense, which provided a class 3 retail gun store and pistol & rifle rental shooting lanes.

30. Bayport business plan required an inventory mix of $400,000 debt-financed and $200,000 cash-financed inventory to maintain its MaxInv level of $600k to attain proforma revenues. (and Bayport startup cash of $200,000)

31. Therefore DPP/Bayport sought out a lender to provide approximately $3,400,000 in a conventional 80/20 loan using DPP's Range Property's equity as its borrower's contribution.

32. DPP applied at several banks for a conventional 80/20 loan planning to use the Range Property equity for the down payment for no out-of-pocket cost for construction other than $297,726.26 to pay off the Property's existing liens.

33. DPP expected a 20% Borrower's Contribution ("BC") on $3,750,000, which was $750,000.

34. DPP had to provide its $297,726.26 to pay off its land's liens plus another $48,000 so that its cash plus the Range Property equity would pay for its $750,000 BC.

35. In late 2013, DPP had approximately $346,000 in cash available to pay for its downpayment, but still had to raise the additional Bayport $200,000 inventory cash and any later unforeseen Bayport start-up expenses.

36. Initially drafting those budgets, Norfolk had calculated the shooting range construction project at total cost of $3,958,000.00 accompanied with a Bayport loan of $200,000.00 for the shooting range's inventory.

37. DPP sought out several banks including CTB, Aquesta, Wells Fargo and Yadkin to fund their Range Construction Project estimating a total project cost of $3,958,000 and a Bayport start-up or long-term inventory loan of $200,000 for a total of $4,158,000.

5

38.  Later Norfolk would increase Bayport's Long Term Inventory loan ("LT Inventory") amount to $400,000 and use the original $200,000 inventory number as the cash portion for a total inventory mix of $600,000 ("MaxInv").

## Yadkin's Special Relationship

39.  DPP's members had a special relationship with Yadkin Bank as some members had been banking with Yadkin since 2008 when it was Piedmont bank.

40.  On May 20, 2009, some of the members of DPP along with several other individuals had created Catawba Property Partners ("CPP") 3   as a real estate holding company for which held its commercial property right next door to Yadkin Bank's Cornelius, NC Branch.

41.  Concurrently with DPP's shooting range plans, CPP closed its commercial property loan with Yadkin Bank to "refinance OOCRE from another institution." 4

42.  On August 28, 2013, Sandee Hansen-Locke ("Hansen") from Yadkin Bank provided a commitment letter to CPP for 85.43% loan to value ("LTV"), $2,092,912.50 at 3.6% interest over 84 months with one final balloon payment to "refinance OOCRE from another institution". 5

43.  On September 19, 2013, Yadkin provided CPP its $2,092,912.50 conventional loan from just simple personal and business financials and an appraisal.

44.  DPP expected a conventional construction loan from Hansen at 20% BC just like the previous month when Hansen gave an 85.43%  / 14.57%  loan to CPP days earlier.

45.  Hansen took the same CPP underwriting that included all of the Guarantors' personal financial information and applied it to DPP's Range Construction Project loan's underwriting.

---

[3] NCSOSID# 1098430
[4] Mo884
[5] Mo1072

6

46.    On or about October 3, 2013 Hansen drafted her 1016980 (6980) Credit memo originating a conventional $3,400,000 loan providing an interest rate of 5% on a DPP $3,000,000 loan for "Construction to perm loan to build a shooting range for Bayport Holdings, LLC DBA Denver Defense" and a $400,000 loan for long-term inventory financing.[6]

47.    In October 2013, Yadkin knew DPP/Bayport's projected Gun Range was a special use building.

48.    Hansen estimated DPP's TPC at $3,750,000 in her October 3, 2013 6980 Credit Memo.[7]

49.    Hansen's 6980 loan terms were, "18 [$12,500] monthly payments of Interest only followed by 41 [$19,798.67] monthly payments of P&I followed by 1 payment of all outstanding principal and accrued Interest."[8]

50.    Yadkin provided a twenty-year amortization for its October 3, 2013 6980 five-year balloon loan for DPP's Range Construction Project loan.[9]

51.    Also in Hansen's 6980 credit memo, Hansen used Norfolk's new LT Inventory of $400,000.[10] "[t]o establish a working capital line of credit for Bayport Holdings, LLC DBA Denver Defense".[11]

52.    Yadkin's loan here to DPP made DPP's closing costs a total of $338,726.26 consisting of:

    1) Carolina Trust Bank $230,726.26;
    2) McMickle, Kurey & Branch $60,000;
    3) $48,000 difference from DPP Range Property's equity and BC of $750,000

53.    Under Yadkin's October 3, 2013 loan to DPP, Yadkin assumed DPP would pay in cash at any overage from Yadkin's $3,750,000 TPC.

---

[6] Mo2261
[7] Mo2261
[8] Mo2261
[9] Mo2261
[10] Mo313
[11] Mo2261

7

54. On or about October 10, 2013, Hansen's concealed from DPP that her previous two attempts at a DPP Range Construction Project conventional loan at 20% BC had failed Yadkin loan committee scrutiny.

55. Later Self-Help, an SBA Certified Development Company ("CDC") would note in its credit memo that Yadkin's original 6980 loan "exceeds the Lender's [Yadkin's] conventional advance rate for this type of property."[12]

56. Yadkin's considering and relying upon personal financials for DPP's commercial loan still required Yadkin to disclose the negative credit results from DPP's two failed loan attempts under Regulation Z.

57. Yadkin was not going to give DPP a conventional loan despite DPP's down payment paying off the existing liens and triggering at least $660,000 in Range Construction Project equity.

58. The difference from CPP was that Yadkin would require DPP to provide a larger BC over 20% for Yadkin to approve a conventional construction loan for the Range Construction Project.

59. Hansen knew that DPP would find another bank for its 20% BC conventional construction loan if she did not act to prevent DPP from going to another bank.

60. Instead of disclosing to DPP that Hansen's base underwriting for DPP failed Yadkin's conventional loan requirements, Hansen represented to DPP that a reduced BC through an SBA 504 loan would fit better for DPP's needs and reduce DPP's BC.

61. Hansen's actions were not supported by any Yadkin policy, regulation or guideline intended to protect either Yadkin or DPP/Bayport.

---

[12] Mo1241

## Yadkin's First 504 Loan to DPP

62.  So, Hansen spoke with Craig Norfolk on October 11, 2013 about reducing DPP's Borrower's Contribution from 20% down to 15% by using the SBA program.

63.  Hansen offered DPP an advanced draw of $500,000 as a bridge loan to Yadkin's upcoming SBA loan that Yadkin would provide in two weeks.

64.  Hansen's suggestion also would have a better chance to pass Yadkin's loan committee meeting as Yadkin's exposure would be at least 30% less with subordinate SBA financing while maintaining a first lien position on DPP's real estate collateral.

65.  Hansen then explained to DPP that an 85/15 structure would reduce its BC from $750,000 on a $3,750,000 project cost down to $562,500[13], representing $187,500 in reduced BC and increased available cash for Bayport's inventory and working capital.

66.  Hansen also represented to DPP that her 85/15 SBA loan required more time for SBA approval.

67.  Hansen did not discuss that the 5% reduction in BC would ultimately be replaced by $1296.75 (SBA $731.25 + CSA $78 + CDC $487.50) more in fees per month (not principle or interest) if they chose the SBA option instead of paying the additional $48,000 in downpayment. ($48,000 cash at closing or 37-months vs. the additional $263,240.25 for DPP to pay in the SBA's 20-year term).

68.  DPP still sought out other banks for its Range Construction Project and Bayport inventory conventional loan and Hansen knew this fact.

## SBA's Loan Programs

69.  At all times relevant, Yadkin held itself out as a lender that provided SBA loans including both under the 7A and 504 programs.

70.  At all times relevant to this action, Yadkin had a dedicated 504 loan department.

---

[13] *See* Mo2435

71. However, Hansen did not discuss with DPP whether Yadkin would use the SBA 7A or the 504 program to offset Yadkin's loan exposure for DPP's Range Construction Project loan.

72. At no time did Hansen discuss with DPP or Bayport the increased cost of using Yadkin's 504 program or its impact on Bayport's cash liquidity during repayment.

73. From DPP's understanding, Yadkin's 504 program was authorized by Section 504 of the Business Investment Act (15 U.S.C §§ 695-697g, as amended), and provided Yadkin's customers with small businesses under five million long-term financing in the form of a "504 Loan" that involved the acquisition, lease, improvement of or renovation of a major fixed asset under 13 C.F.R §§120.2(c), 13 C.F.R. §§ 120.800-120.991.

74. For DPP to qualify for a 504 loan, it first had to apply for a conventional Yadkin loan as it had in early August of 2013.

75. Next, Yadkin as a Third-Party Lender ("TPL") determined if DPP's loan could be made without SBA involvement and should have discussed that fact with DPP.

76. If Yadkin could provide DPP and Bayport a conventional loan without SBA involvement, the SBA would procedurally deny Yadkin's 504 application because the loan did not pass the "Credit Not Available Elsewhere" test under 13 C.F.R §120.101.

77. If Yadkin as a TPL could approve the Borrower's requested loan, but only with SBA 504 subordinate financing, Yadkin would then instruct and assist DPP's SBA application for a 504 Loan through a Certified Development Company ("CDC").

78. If a CDC submitted DPP's application and the SBA approved, then the CDC would be authorized to issue a Debenture Guarantee for take-out financing for between 30-40% of DPP's project costs, applied to Yadkin's interim construction loan.

79. The SBA would rely upon Yadkin's and the CDC's certifications before giving its final approval to close and guarantee the Debenture unless Yadkin or the CDC failed to disclose or misrepresent material facts to the SBA regarding the Project or the Borrower of the 504 Loan under 13 CFR § 120.96.

80. An SBA-authorized debenture was an investment backed by the full faith and credit of the United States that is packaged with other Debentures and sold to an investor at the time of closing DPP's permanent project financing.

81. But before that happens, as here, Yadkin would receive notice of the Debenture's approval and Yadkin would then provide DPP an interim Range Project Construction loan to substantially complete DPP's Range Project under SBA SOP 50 10 5(f) Subpart C, Chapter 1(IV)(B).

82. After DPP's Range Construction Project was complete and Yadkin's interim loan was fully disbursed, only then could Yadkin apply for the SBA's Debenture's proceeds to reimburse Yadkin for the SBA's portion of the 504 loan.[14]

83. Only with Yadkin's interim financing fully disbursed (or any remaining amount escrowed to complete minor portions of the project e.g. retainage) and with all other conditions and requirements of the SBA authorization met would the Debenture move to the sale phase under 13 CFR §120.961.

84. A substantiative requirement of the SBA that must occur before the Debenture Sale is that under 13 CFR §120.892, Yadkin must certify to the CDC and the SBA, and the CDC must certify to the SBA, that since the date of DPP's application, there have been no "unremedied substantial adverse change" in the condition of the small business.

---

[14] SOP on fully disbursed

85. The SBA relied upon Yadkin's and the CDC's certifications before giving its final approval to close and guarantee the Debenture.

86. Unless Yadkin failed to disclose or misrepresent material facts such as its planned noncompliant bridge loan to DPP, the SBA would approve the Project and the Borrower of the 504 Loan under 13 CFR § 120.96.

87. Only with all SBA conditions met would the SBA transfer the proceeds of DPP's Debenture sale to Yadkin to pay off the SBA's portion of DPP's interim loan.

88. Then, with the 504 proceeds applied to Yadkin's interim financing loan, DPP's permanent financing of the project consisted of:

   (1) DPP's expected Borrower's Contribution / Down Payment that should have been 15% of the total project cost,

   (2) the Self-Help's 504 Loan consisting of the proceeds of the Debenture sale that ranged from 30-40% of DPP's total project cost and was collateralized by a *second* lien position on the Range project property, and

   (3) Yadkin's TPL that covered the remaining Range Construction Project cost of 50%, and was collateralized by a *first* lien position on the project property under 13 CFR § 120.801(c), §120.900, §120.920.

### Yadkin's Advance Draw Loan to DPP

89. In October 2013, Hansen concealed from DPP that Yadkin's SBA 504 loan funding wasn't approved or immediately available.

90. Instead of directly providing DPP a Range Construction Project loan in full, Yadkin offered and later provided DPP a "Draw" or Bridge" loan, injecting borrowed cash into starting the Range Construction Project on October 25, 2013 with Loan 6980.

91. Yadkin promised DPP that if it took this Draw Bridge loan for $500k, Yadkin would provide DPP's Range Construction loan in two weeks.

12

92. To the DPP membership, on Oct 12, 2013, at 3:23 PM, Craig Norfolk wrote: ". . . For the $500k loan, I think they just want to see the appraisal well over $500,000 so they are covered. For the big loan, the land will be collateral and everything will be consolidated into the big loan i.e. whatever funds we have used from the $500,000 loan will be considered draw money for the big loan. If they only give us $200,000 next week that will be enough to work with until the big loan is approved."[15]

93. At the time DPP accepted Hansen's terms for DPP's $500,000 advance draw, Hansen's prior DPP loan requests had failed to provide DPP a conventional 80/20 loan, but Hansen failed to disclose this to DPP.

94. Also undisclosed to DPP at this time, Yadkin had not approved any SBA required TPL loan to DPP.

95. Moreover, undisclosed to DPP at the time, no one had applied to the SBA for a DPP 504 loan.

96. In Yadkin's First SBA 504 loan, Yadkin offered and DPP replied upon Yadkin's promise to provide:

   (1) an 85% financing loan of a $3,918,000 TPC[16] with a $587,700 BC (instead of 6980's costs a total of $338,726.26, DPP was now using the Range Property for full credit towards its BC by paying off the $297,726.26 liens at closing).

   (2) a $400,000 Bayport Inventory loan,

   (3) an advance draw of $500,000.00 ("6980") to start grading, and

   (4) complete construction project funding ("First 504") in two (2) weeks.[17]

97. Carolina Trust Bank even commented on Hansen's draw offering incredulously as CTB did not have enough of DPP's required underwriting even to make DPP a loan term sheet.

98. Hansen's actions here were not supported by any Yadkin policy, regulation or guideline intended to protect either Yadkin or DPP/Bayport.

---

[15] Mo168
[16] Mo2262
[17] Mo167, 168

13

99.  In Yadkin's First SBA loan, DPP expected that the $500,000.00 advance would be considered a draw against the First SBA loan that Yadkin promised DPP it would provide in two weeks after its $500,000.00 advance.[18]

100.  DPP also relied on Yadkin's and Hansen's October 11, 2013 promise of an 85% financing First SBA loan because Yadkin had just provided the same for CPP only a month earlier.[19]

101.  DPP expected to pay off its Range Property's first and second lien and present the property unencumbered as part of its down payment when Yadkin's First SBA loan closed in two weeks.

102.  DPP relied on Yadkin's promise that the First SBA loan would be available in two (2) weeks after the $500,000.00 advance because Hansen had promised such to Norfolk and Lafone.

103.  At all relevant times, Hansen assured the DPP Membership that they did not need to go to another bank, because Yadkin would handle their financing needs.[20]

104.  So, based upon each bank's disclosures to DPP, the DPP Membership chose to bank with Yadkin instead of Carolina Trust because of Yadkin's offerings.

105.  At all relevant times, Yadkin Bank was aware of the Partners' financial positions because they had reviewed each partner's personal financial statements as part of the Range Project's underwriting.

106.  Yadkin concealed from DPP and its Partners that the promised, two-week funding for DPP's project would be contingent on an SBA loan approval.

107.  In October 2013, Yadkin had not even applied for any SBA loan.

---

[18] Mo168
[19] Mo1072
[20] Mo167

## Yadkin's Advance Draw Invalid as a Bridge Loan

108.  DPP chose to take Yadkin's $500,000 advance now on Hansen's promise that the remaining Range Construction Project loan money would be available in two weeks, and that their BC would be reduced through SBA participation.

109.  Hansen knew on October 17, 2013 from the Range Property title work that Hansen's advance draw on Yadkin's upcoming DPP 504 loan would pay off not only CTB's lien, but also the $60,000 attorney's lien. Her email to the DPP membership, "Question/problem with the title work. I think it just needs some clarification. We are good with the $500" demonstrates such knowledge.[21]

110.  Because of the lack of DPP/Bayport cash in their respective business plans Yadkin reviewed, Hansen should have told DPP that a Yadkin $500,000 advance draw on a future unapproved construction loan only prevented DPP from going to another Bank with its portfolio.

111.  Yadkin knew or should have told DPP that any $500,000 advance Draw on the Range Property without a downpayment of $297,726.26 would not qualify as a bridge loan in a later 504 project, as it was violative of SBA SOP 50 10 because the funds had been used for non-project purposes with Watson's attorney fee lien to McMickle.

112.  Hansen should have disclosed to DPP that, with the promise of full funding in two weeks though no 504 loan and no conventional loan had been approved, meant that Hansen's advance draw was fraudulent as an offer for a bridge loan on DPP's Range Construction Project.

113.  Hansen now knew or should have known that the under SOP 50 10, the SBA would deny incorporating Yadkin's October 25, 2013 advance draw loan into the project, though Hansen had convinced DPP take the $500,000 on the premise that it would. The SBA confirmed this fact on or

---

[21] Mo712

about May 22, 2014 to Self-Help, stating "This note does not qualify as interim financing or bridge financing per SOP 50 10 (F)."[22]

114. Now Hansen not only knew that her conventional 80/20 loan had failed Yadkin's credit committee, but also that the 504 loan, as promised, would fail too.

115. Since Hansen chose not to use Yadkin's dedicated and experienced SBA department, she was free to ignore the material fact that DPP was not going to get either a Yadkin Conventional or 504 loan after she provided DPP an advanced draw on an unapproved, non-existent future loan.

116. Despite these concealed facts from DPP, Hansen proceeded originate, authorize and and service DPP's Range Construction Project loan herself starting with her advanced draw loan of $500,000.

117. Hansen's actions here were not supported by any Yadkin policy, regulation or guideline intended to protect either Yadkin or DPP/Bayport.

## Advance Draw Closing

118. On October 25, 2013, Yadkin provided DPP with a $500,000 advance draw as a 90-day promissory note citing "the stated purpose of the note is to 'finance upfront costs for development of property'". [23]

119. Yadkin's commitment letter stated, "The Bank is very pleased to have this opportunity to do more business with you, and looks forward to seeing the results of your project."[24]

120. DPP justifiably relied upon Yadkin's assertions that its 6980 Advance Draw was an interim or bridge loan for Yadkin's Range Construction Project loan.[25]

---

[22] MO1244
[23] Mo89, 1244
[24] Mo88
[25] Mo168, *see* Mo708

16

121. DPP justifiably relied upon Yadkin's assertions that Yadkin would pay off its 6980 Advance Draw with DPP's Range Construction Project loan. 26

122. And, DPP justifiably relied upon Yadkin's assertions that Yadkin would provide DPP's Range Construction Project loan in two weeks or November 13, 2013.

123. Therefore, since DPP saw the $500,000 closing on October 25, 2013 as a draw, DPP was not surprised that they did not have to provide their expected down payment of $297,726.26 at that time.

124. Instead, DPP gave Yadkin $500,000 of its range property equity through a Deed of Trust[27], though it only needed to provide $100,000 in equity for an 80/20 loan, or $75,000 in equity for an 85/15 loan. DPP was comfortable extending Yadkin this excess equity at the October 25, 2013 closing because it would be providing the same in two weeks anyway with the closing of full construction funding.

125. Hansen did not fully explain to DPP how DPP's $297,726.26 downpayment still applied at the SBA closing or how DPP was to calculate equity and BC without an appraisal.

126. DPP expected that its $297,726.26 downpayment would be due in full when closing Yadkin's upcoming 504 loan in two weeks.

127. In further consideration of the $500,000.00 advance, DPP's Members executed personal guarantees in favor of Yadkin Bank, and each was enumerated by name on the Note.28

128. Although William J. McMahon ("McMahon") did not join DPP until April 1, 2014, Yadkin later produced a personal guarantee executed by McMahon dated October 25, 2013.29

---

[26] Mo167
[27] MO19
[28] pEx's 1-6, Mo838, Mo89
[29] Mo (pEx#2)

129. Nor did McMahon's name appear enumerated among DPP as a guarantor on the Loan 6980 Note dated October 25, 2013.

130. Bayport also did not appear enumerated among the guarantors on the Loan 6980 Note dated October 25, 2013.

131. At the October 25, 2013 closing:

    (1) Yadkin refinanced DPP's loan from CTB,
    (2) Yadkin paid off the McMickle Lien for $60,000, and
    (3) Yadkin gave $202,641.79 in cash to DPP to start its Range Construction Project;
    (4) DPP owed $297,726.26 at the next loan's closing to preserve its Range Property equity of $702,000.

132. Hansen's $500,000 advance draw on an upcoming, unoriginated loan in two weeks was void of any Yadkin policy, exception, regulation or previous contract.

133. Hansen's concealment that her 6980 Draw Bridge was not SBA compliant and would be a standalone loan that permanently altered DPP's expected equity contribution through its capture of the Range Property's equity.

134. Not DPP, Bayport or their guarantors had outside counsel or assistance to provide any insight to this transaction. As DPP/Bayport was dependent on Yadkin where Hansen gave her voluntary assumption of a duty to advise, counsel, and protect the DPP and its collateral captured in 6980, through her upcoming 7028 loan structure.

135. Hansen's actions here asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

136. Yadkin's and Hansen's actions here created a special relationship between the Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP from its wrongful assertion

18

outside of any banking policy or loan it regularly offered to the public that 6980 qualified as a Bridge loan for a later unapproved 7028 construction loan.

## Pay As You Go Equity

137. Yadkin's willingness to provide, and DPP's willingness to accept, an advanced draw on a future Yadkin loan demonstrated that DPP had a special relationship with Yadkin Bank.

138. Moreover, DPP executed this draw in reliance upon and reposing a special confidence in Yadkin that it would provide DPP's full Range Construction Project loan at a later date than this closing.

139. DPP executed this draw in reliance upon, and reposing a special confidence in Yadkin as evidenced by DPP giving Yadkin its full Range Property collateral before receiving its full Range Construction Project loan at a later date.

140. In doing so, DPP yielded a first position deed of trust on its property worth $702,000 when it only needed to provide equity of $75,000 on an 85/15 loan, or $100,000 on an 80/20 loan.

141. Yadkin believed that if DPP had paid off liens of $297,726.26 at the Project loan closing, then it would be able to provide the Range Property's full equity amount towards any required BC.

142. Yadkin did not request this amount from DPP at any time during the Range Construction Project.

143. But Yadkin not requesting this amount from DPP showed that Yadkin had a special relationship with DPP outside of Yadkin Bank policies.

144. Hansen required DPP to maintain its own records of BC expenditures for DPP to submit to Hansen. She would solely adjudged what qualified as BC outside of any Yadkin bank policy, contract or FDIC regulation for any loan.

145. Hansen had effectively forced DPP's view from a single down payment into her pay as you go ("PayGo") view of what would now be an ongoing BC for DPP. And for Yadkin to provide DPP its 504 loan as promised, DPP had to go along with Hansen's PayGo.

19

146. This PayGo view allowed Hansen to manipulate what cash DPP provided towards the project for two reasons:

    1) By denying certain DPP expenses, Hansen could now increase DPP's BC or bank fees to adjust for changes in the project's risk or to reduce Yadkin's LTV, and;

    2) It induced DPP to continue out-of-pocket funded construction even before any construction loan was approved because DPP expected these expenses were going towards its yet-provided BC, and;

    3) By DPP investing deeper into its Range Construction project, DPP viewed each expense as BC while Yadkin contrarily viewed each DPP expense as it would become too costly for DPP to abandon the project when Hansen offered her lower LTV loans later.

147. Hansen intended to confuse DPP's view of BC avoiding DPP's actual downpayment to disguise DPP's increased BC overall.

148. DPP's expectation was that since it provided Yadkin its Range Property collateral dollar for dollar for the $202,273.74, this cash was still DPP's equity, but DPP provided it to Yadkin in good faith for the upcoming SBA loan in two weeks.

149. Further confusing DPP was that under Efird's November 2013 appraisal, Hansen proscribed to DPP that it had only $160,000 of Range Property equity because of Yadkin's advanced draw.

150. Yadkin would require DPP to pay its portion of the Range Construction Project TPC at closing, but DPP was unclear from Hansen's assertions what that amount would be:

    1) DPP's original downpayment of $297,726.26 triggering the Range Property equity of $660,000, or

    2) Hansen's ongoing project costs added to Hansen's equity calculation of $160,000.

151. Hansen's actions here were not supported by any Yadkin policy, regulation or guideline intended to protect either Yadkin or DPP/Bayport.

152. Hansen's PayGo requirements here asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

153. Yadkin's and Hansen's PayGo requirements here created a special relationship between the Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP from its wrongful assertion that 6980 qualified as a Bridge loan for a later unapproved construction loan required an ongoing downpayment that only she adjudge any expense's validity.

## DPP Relied Upon Two Week Promise

154. Following the closing of the loan that represented the $500,000.00 advance, DPP began to enter several contracts that represented over two-million dollars in development costs.

155. On Yadkin's promise of an upcoming Range Construction Project Loan, DPP executed Canipe Constructions AIA contract to construct the Range Property building that would become the gun range.[30]

156. And on Yadkin's promise of an upcoming Range Construction Project Loan, DPP executed Capital City's Range HVAC specialty air handler contract for the Range Property building.[31]

157. On November 1, 2013, justifiably relying upon Yadkin's promises, DPP ordered a Builder's risk insurance policy to start site construction on DPP's Range Construction Project.[32]

158. On November 1, 2013, Bayport received its FFL to sell firearms.[33]

---

[30]

[31] Mo687

[32] Mo714, Mo439 (paid for the policy)

[33] Mo2428

159. On November 1, 2013, DPP paid McDowell $6,600.00 for erosion control engineering prior to grading the Range Property.

160. On November 4, 2013, DPP paid William E. Bruce $8,900 for the Range's building plans.

161. On November 4, 2013, Yadkin orders its first Range Construction Project appraisal from Effird.[34]

162. On November 5, 2013, justifiably relying upon Yadkin's promises, DPP paid $61,720.64 as a downpayment on the Range's targeting equipment contract of $617,205.43.[35] DPP's targeting contract contained only $130,355.29 or 21% of the contract that was itemized for targets and controls.[36]

163. DPP justifiably relied on Yadkin's promises when DPP took its 6980 cash of $202,641.79 from its closing and applied it solely to its Range Construction Project contracts such as grading[37] and building contracts for targeting[38], and range HVAC[39].

164. And DPP even applied for its water and sewer service by paying $6000 for the permit.[40]

165. But because after spending for site construction and committing to several building construction contracts, DPP could not afford to pay off the now-existing $500,000.00 advance to go to another bank and still pay another BC plus 33% of Bayport's inventory.

## BEFCOR As CDC for Yadkin's First 504 Loan to DPP

166. In November 2013, Hansen provided BEFCOR (a preferred SBA CDC) Yadkin's recalculated 6980 advance draw loan underwriting that calculated Yadkin's DPP's 504 loan with a TPC of $3,918,000 as:

---

[34] Mo989
[35] Mo441
[36] Mo441
[37] Mo 436-38
[38] Mo441
[39] Mo650
[40] Mo442

22

4. 85% LTC/LTV – the borrowers will have 15% equity in the deal with some of the equity being from the land that they have owned for more than one year. The cash equity in the deal is actually equal to $332,750. However what is not showing is the inventory of firearms and ammunition that they have already purchased and will be what is going to be sold once the gun range opens. The equity will be required to go in first probably toward the ventilation or targeting equipment. This is within policy and can be supported by the appraisal that has been received. [41]

167. Here Yadkin knew DPP had owned the Range Property for more than one year, but at the October 25, 2013 closing it learned that DPP owned it since 2008.

168. DPP's Range Construction Project combined with Bayport's inventory cash requirement expectation was $546,000 plus any Bayport startup costs.

169. Instead of taking data from DPP's and Bayport's business plans and proformas, Yadkin unilaterally deviated from them and proposed cash at closing of $500,000 plus 20% equity of $783,600 ($81,600) or a total cash required to close of $581,600 from:

The following scenarios have Borrower putting $400,000 in cash equity plus 20% of the appraised value as equity. There will be an interest reserve account of $100,000 funded by the Borrower at or before closing. There is a request for a $100,000 line of credit for inventory. NOTE: if the customer meets or exceeds projections, the Line of Credit might need to be increased. The increase will only occur if and when projections are exceeded and they are turning the inventory. Line of Credit would have a 50% SBA guarantee.

170. Yadkin also knew that after Yadkin's advance draw, Bayport was actively seeking to create its initial inventory based upon Bayport's business plan requiring $400,000[42] in long term credit and $200,000 in cash inventory for a MaxInv of $600,000.

171. Yadkin's statement here showed it anticipated DPP's equity applied at closing or "to go in first" as reinforced by an undefined Yadkin policy that allowed Hansen to encourage DPP to continue to

---

[41] Mo2265 pg.10
[42] *See* Mo2264

spend its own money after DPP spent the $202,273.74 on site construction while waiting on Yadkin's 504 loan.

172. On November 22, 2013, BEFCOR requested DPP's financials indicating Yadkin had underwritten and approved its 504 TPL loan to DPP.[43]

173. Yadkin's underwriting for an SBA 504 loan that included Hansen's 6980 Draw Bridge loan created special relationship between Yadkin and DPP as Yadkin engaged in egregious or outrageous conduct toward DPP from its wrongful assertion that 6980 qualified as a Bridge loan and representing to BEFCOR, a third-party bank on behalf of DPP/Bayport.

174. Yadkin transmitted its information to BEFCOR by both email and U.S. mail.

175. DPP never received any Yadkin Commitment Letter supporting BEFCOR's assertion of an approved Yadkin TPL loan.

176. On November 22, 2013, Yadkin received Efird's appraisal.[44]

177. On November 23, 2013, BEFOR requested source of additional equity required to close.[45]

178. Since both Yadkin and BEFCOR used personal financial statements to underwrite its loans, both failed to provide its denial of a 504 loan to DPP as required under Regulation Z.

179. DPP was expecting Yadkin to provide DPP's Range Construction Project loan any day.

180. On November 25, 2013, DPP entered into Canipe's primary AIA contract for constructing the Range Property building for $1,851,000.[46]

181. On December 17, 2013, Hansen emailed DPP that

---

[43] Mo723
[44] Mo988
[45] Mo716
[46] Mo1223

24

"[t]he chief credit officer is on board with us and we will be taking it back to loan committee Thurs [12/19/13]. I don't have the final details yet as we are still ironing them out. I will let you know once we do."[47]

182. DPP sought out other banks at this time for its Range Construction Project such as Aquesta, Wells Fargo and Carolina Trust Bank.[48]

183. Hansen knew and Yadkin concealed from DPP that the advance draw would never be consolidated into an SBA 504 loan, because its proceeds were not a bridge loan and were used for unqualified purposes under SOP 50 10 5(f).

184. Upon information and belief, BEFCOR denied or withdrew Yadkin's 504 loan for DPP because of Hansen's 6980 Draw Bridge loan was actually a cash-out refinance on DPP's already owned property.

185. Hansen's actions here were not supported by any Yadkin policy, regulation or guideline intended to protect either Yadkin or DPP/Bayport.

## Change in Range Property Ownership Status

186. BEFCOR denying or withdrawing Yadkin's 504 loan for DPP prompted Hansen to change DPP's land ownership from already owned to "To be purchased" on December 18, 2013 and conceal this fact from DPP.



187. Hansen had no authority to change DPP's Range Property Ownership to be Purchased after BEFCOR 504 denial, just to induce another CDC to take Yadkin's 504 loan with DPP.

---

[47] Mo307
[48] Mo172,173,176

188. Hansen's actions here asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure by changing its land ownership that might provide a loan as a land purchase instead of a refinance just to seek 504 loan approval.

189. Yadkin's and Hansen's actions here created a special relationship between the Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP outside of any policy, regulation, or exception from its wrongful assertion that DPP no longer owned its own land it had already started construction on with Yadkin's 6980 Draw Bridge loan just to seek 504 loan approval.

## Stand By for a Yadkin Loan

190. It was not until December 27, 2013 before Yadkin discussed DPP's Range Construction Project loan when Norfolk spoke with Jeff Cramer ("Cramer") who would was responsible for underwriting any loan Hansen negotiated with DPP.

191. Yadkin would provide a conventional Range Construction Project loan "around $1,935,000 total after paying off original $500,000 loan".[49]

192. This was $929,300.00 less than Yadkin promised DPP when it accepted the $500,000.00 Loan 6980.

193. In his December 27, 2013 email, Norfolk reiterated the "statements that were made by Sandee [Hansen] to me on numerous occasions such as 'we [Yadkin] would not have made the $500k loan and not follow through with the big loan' and 'you [DPP] do not need to check with another bank' and 'it looks like the funding will be $3,100,000 and line of credit for inventory $200,000'. . . I [Norfolk] also told him [Cramer] we were grossly misled by Yadkin Bank's statements/assurances and made financial decisions based on these assurances."[50]

---

[49] Mo177
[50] Mo177

194. Norfolk emailed the DPP membership that "Yadkin is having an attorney put together the offer letter and my guess is we will not even see it until Sandy [Hansen] gets back, this is another delay."[51]

195. Yadkin would not extend this 55% TPC loan's commitment letter until January 3, 2104 claiming Yadkin's loan amount at $2,185,000 representing a TPC of ~$3,973,000.[52]

196. There was no Bayport start-up inventory loan included.

197. As of January 3, 2014, DPP had spent $200,818.18 out of its $202,641.79 Advance Draw cash from its October 25, 2013 closing.

198. DPP did not have the financial resources to take Yadkin's 55% construction loan offer on January 3, 2014.

199. DPP had to decline Yadkin's offer as DPP's BC would have been $1,483,000 and Bayport's total inventory of $600,000 in cash would have totalled an impossible $2,083,000 based upon DPP's financials Yadkin already had.

200. Yadkin knowingly extending an offer of credit that DPP could not provide the adequate cash to complete was not sound or responsible banking policy.

201. Yadkin knowingly extending an offer of credit that DPP could not provide the adequate cash to complete was not in good faith.

202. Hansen's actions here were not supported by any Yadkin policy, regulation or guideline intended to protect either Yadkin or DPP/Bayport.

203. On January 10, 2014, DPP construction progressed, but now DPP ran out of money and Norfolk emailed the membership looking for more cash before DPP would be insolvent,

---

[51] Mo177(Emphasis added)
[52] Mo983

27

"We are up against a wall here guys. We have an interest payment on the $500k due [on 6980] and we have the grading bill due. Just brainstorming here... will Yadkin redo the land loan for another 30 days so we can resubmit through SBA, and if they do, would they allow for an additional $50k - $100k cash out to cover our gap until the SBA process can be complete?"[53]

### Advance Draw Loan Renewal

204. On January 23, 2014, Yadkin demanded from DPP $8,263.89 for its 90-day 6980 Advance Draw 90-day extension.[54]

205. It took until February 24, 2014, for DPP to renew its 90-day 6980 Advance Draw loan under Yadkin's First Change in Terms Amendment costing DPP $8,263.89.[55]

206. In Loan 6980's first Change in Terms Agreement, the maturity date was extended to April 23, 2014.

207. As with the original Loan 6980 Note, in Loan 6980's first Change in Terms Agreement, McMahon is not enumerated among the Partners as a guarantor on the loan.

208. As with the original Loan 6980 Note, in Loan 6980's first Change in Terms Agreement, Bayport did not appear enumerated as a guarantor on Loan 6980.

209. All Partner's signed Yadkin's first Change in Terms Agreement for Loan 6980 with the exception of Heather O'Brien.[56]

210. Yadkin Bank improperly relied upon an electronic, typed signature in place of O'Brien's handwritten signature even when Yadkin used no electronic signatures for any loan documents.

211. O'Brien never consented to Electronic Signatures under the United States' Electronic Signatures and Records Association Act.

212. McMahon did not sign Yadkin's first Change in Terms Agreement for Loan 6980.

_____

[53] Mo183
[54] Mo183
[55] Mo20
[56] (pEx #9)

28

213. Bayport did not sign Yadkin's first change in Terms Agreement for Loan 6980.

214. DPP continued with its search for alternative financing to Wells Fargo and CTB.

215. However, at that time, neither could provide a loan without a $500,000 downpayment to pay off Yadkin's Advance Draw lien.

216. Yadkin's renewal requirement here coupled with the 6980 Draw Bridge Loan concealment asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

217. Yadkin's renewal requirement here coupled with the 6980 Draw Bridge Loan concealment here created a special relationship between the Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP from its wrongful assertion that 6980 still qualified as a Bridge loan for a later unapproved construction loan.

218. On January 28, 2014, new DPP member William McMahon provided Yadkin with his personal financial statement as an answer to Yadkin requesting more cash equity in the project.[57]

Hansen's January 30, 2014 Credit Memo

219. On January 31, 2014, undisclosed to DPP, Hansen issued a new 7028 draft Credit Memo for DPP's loan to "Finance construction costs related to future development of the property as Denver Defense, a shooting range. . . in good standing at the time of loan underwriting (10/17/2013)."[58]

220. Hansen used the BEFCOR submitted TPC and associated DPP figures for Yadkin's memo to support the CDC Self-Help's 504 underwriting for a DPP loan.

---

[57] Mo1141, *See* Mo745
[58] Mo2224

221. Yadkin's undisclosed 7028's loan amount was split 50% $1,871,600 Yadkin and 35% $1,310,050 Net Debenture59 from the] SBA.

222. Yadkin's new 7028 loan to DPP represented a revised TPC of $3,743,000 primarily derived from reduced targeting and HVAC contract values.60

223. All previous 2013 Yadkin loan documents had DPP's prior TPC at $3,958,000.

224. Hansen's 7028 loan terms now were, "18 [$8,110.27] monthly payments of Interest only (total amount computed during construction and before back funding by SBA) followed by 47 [$12,559.45] monthly payments of P&I followed by l payment of all outstanding principal and accrued interest."61

225. Yadkin's 7028 P&I did not disclose or include SBA's 35% loan value, which DPP also owed $9,549.03 monthly, both loan payments now totaling $22,107.48 monthly.

226. Both Yadkin and SBA loans had a twenty-year amortization, but the SBA loan would be 20 years P&I with additional monthly charges attached.

227. Yadkin also did not disclose to Bayport that its 7028 financing package eliminated any start-up inventory loan, endangered Bayport's long term inventory financing plan.

228. Likewise, even without the Bayport start-up inventory loan, Hansen's new 7028 memo here indicated that its Financial Reporting was Outside of Policy #70 and that its R/E amortization exceeds policy #160.62

---

59 TPC excludes all Gross Debenture charges – Why??
60 Mo699, 700 -
61
62 Mo 2224 pg.11

229. But Hansen did certify that this loan would pay off the Advance Draw loan and Yadkin's TCE stating on the front page of her memo, "The existing $500,000 loan will be paid out with loan proceeds bringing exposure to $5,577,043 and once SBA pays down loan exposure will be $4,266,993."[63]

230. Not DPP, Bayport or their guarantors had outside counsel or assistance to provide any insight to Yadkin's Credit Memo here. As DPP/Bayport was dependent on Yadkin where Hansen gave her voluntary assumption of a duty to advise, counsel, and protect the DPP and its collateral captured in 6980, through her upcoming 7028 loan structure.

231. Hansen's actions in her Credit Memo asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

232. On February 6, 2014, DPP's BC spent was approximately $13,000 without any Range Property equity.

Stand By for Another Yadkin Loan– The N.C. Rural Loan

233. On February 7, 2014, Hansen delivered to DPP a Terms Sheet that, upon information and belief, resulted from the January 3, 2014 contemplated offer since both intended to use subordinate financing through NC Rural Center.

234. Yadkin's N.C. Rural Center subordinating term sheet provided for a first lien DPP Range Construction Project loan of $2,210,000 or 68% TPC loan with N.C. Rural Center's subordinate amount at $390,000 or 12% TPC for the total loan of $2,600,000 on Yadkin's reduced TPC of $3,250,000.

---

[63] Mo2224 pg.1, pg.13 ("Loan amount $3,181,550 Total Exposure $*after payoff $5,7956,543" yet SBA payoff would be $150,000 less than the credit memo specified)

235. Yadkin's revised Range Construction Project TPC was lower at $3,250,000 by subtracting out 6980's Advance Draw Loan's $500,000.

236. Yadkin's N.C. Rural Center subordinating loan assumed 6980's Advance Draw would remain in first lien position as there were not enough loan funds to pay off the Advance Draw and remove the 6980 lien.

237. DPP could not accept Yadkin's N.C. Rural Center term sheet here as DPP could not support a debt structure with a $1,198,000 BC inclusive of paying off Yadkin's 6980's $500,000 plus Rural's Term Sheet's 20% $650,000 and an inventory of $600,000 in cash.

238. Yadkin knowingly extending an offer of credit that DPP could not provide the adequate cash to complete was not sound or responsible banking policy.

239. Yadkin knowingly extending an offer of credit that DPP could not provide the adequate cash to complete was not in good faith.

240. Hansen's actions here were not supported by any Yadkin policy, regulation or guideline intended to protect either Yadkin or DPP/Bayport.

## People's Bank Loan Offer

241. Two weeks later Peoples Bank (Peoples) provided DPP a commitment letter.[64]

242. On February 20, 2014, Peoples Bank provided DPP a Terms Sheet offering to fund $2,700,000.00 of the project.[65]

243. Peoples promised a $2,700,000 loan as an 80% of a $3,375,000 TPC.

---

[64] Mo881
[65] Mo881

244. This amount represented that DPP would have a BC of $675,000 yet no mention of why the $400,000 drop in DPP's Original 6980 TPC of $3,750,000 to complete the project or the budgeted TPC of $3,918,000 from all the other Yadkin loans.

245. Inevitably DPP would have to pay the $400,000 to finish the project elevating their BC from $675,000 to $1,075,000 plus paying off Yadkin's first lien of $500k.

246. DPP could not provide the cash to close both the additional BC, lower TPC difference and Bayport's inventory.

## Yadkin's SBA 504 Loan – Self-Help as CDC

247. DPP alerted Hansen about People's Bank term sheet to DPP.

248. The next day on February 21, 2014, Yadkin had Self-Help expedite DPP's 504 application using BEFCOR's submission and $3,918,000 TPC for Yadkin's new application.

249. Janet Brown of CDC Self Help stated to the DPP Membership in her email, "I can use your existing [Yadkin] Personal Financial statements, the attached [SBA 413] PFS does not need to be filled out."[66]

250. Watson replied, "Janet said if we get the stuff back Monday, she could give us an answer in about 3 days if all the papers are complete. I think this is the same stuff we turned in last time[.] If they approved she said the SBA should approve."[67]

251. This exchange occurred despite Yadkin's assertion that DPP would not be able to apply for 504 financing for six months following the BEFCOR attempt under 13 CFR § 120.193.[68]

---

[66] Mo1060
[67] Mo1060
[68] Mo1060, Mo183, 13 CFR § 120.193)

33

## DPP's Second 6980 Renewal

252.  On February 24, 2014, DPP had to pay Yadkin $8,263.89 to renew 6980's 90-day Advance Draw in a change in terms agreement where Hansen waived DPP's late fee of $500.

253.  On Yadkin's renewal of 6980, a Yadkin employee typed in Heather O'Brien's signature without her knowledge or consent.69

254.  DPP considered its two 6980 loan payments as interim interest for DPP's Range Construction Project.

255.  Yadkin's second 6980 renewal requirement here coupled with the 6980 Draw Bridge Loan concealment asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

256.  Yadkin's second 6980 renewal requirement here coupled with the 6980 Draw Bridge Loan concealment here created a special relationship between the Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP from its wrongful assertion that 6980 still qualified as a Bridge loan for a later unapproved construction loan.

## Self-Help 504

257.  On February 24, 2014, DPP had now paid approximately $22,000 out of its $297,726.26 downpayment that would allow the Range equity of $660,000 to cover DPP's BC.

258.  Or, DPP had paid $390,832.20 in BC out of Yadkin's $587,700 BC.

---

69 Deposition of Heather O'Brien June 17, 2021, pg.4," A. The loan number? 6980. Q. And on page 2 there's a signature there . . .Is this your signature? A. It's a stamp. So, no.", Mo876 pg5 ref Mo830pg48, "The evidence provides qualified support for the proposition that the questioned signature on document Q1 is a copy of a mechanically placed signature rather than a copy of a handwritten signature." *See* Mo1186 *for its second use of this typed signature on 3/25/14.*

259. However, Hansen had figured DPP's BC at $587,700 from her October 2, 2013 email intending a Yadkin loan about $3,000000 making DPP's TPC $3,750,000.70

260. On February 28, 2014, Hansen wrote the DPP membership about the information collection progress,

> "According to what Janet [Brown of Self-Help] told you 3 days from when she has everything. She has all the tax returns and financials she just needs the SBA forms from everyone except Kevin. He needs to have a memo with explanation and paperwork showing he is good. . . If you get them to me Monday ill [sic] scan them over to her. She has the most important stuff tax returns, PFS, projections and my credit analysis. She just needs the forms to finish up."71

261. DPP's business plan submitted to the Yadkin stated,

> "Currently, the equity in the Denver Defense project (including Bayport Holdings, Inc. and Denver Property Partners, LLC) is approximately $555,000.00. This includes $455,000.00 in capital and equity already injected in the company by our current LLC members, and approximately $100,000 in research and development costs related to the project."72

262. Yadkin provided DPP's construction budget and Bayport's proforma to Self-Help.

263. On March 1, 2014, Heather W. O'Brien executed an SBA form 413 Personal Financial Statement (PFS) with her 2013 financial information.73

264. Although later in Self-Help's March 18, 2014 transmittal, it instead provided to the SBA, Heather W. O'Brien's unsigned Yadkin Bank 2012 financials.74

265. On March 14, 2014, Canipe issues a bill for grading and the site's soil testing.75

---

70 Mo709
71 Mo1077
72 Mo1171 pg. 124
73 Mo1187
74 Mo1173 pg. 73
75 Mo480 (paid on 4/21/14)

266. On March 18, 2014, concealed from DPP, the CDC Self-Help issued its DPP Credit Memo transmittal including its exhibits.76

## Self-Help's Loan

267. On March 20, 2014, undisclosed to DPP, the CDC Self-Help resolved at its Board of Directors Meeting that DPP's

> "[a]pplication for [a Gross] debenture guaranty and sale [was] in the total amount not to exceed $936,000.00, maturing upon such date, bearing interest at such rate, and having such terms and conditions as may be prescribed".77

268. So, the CDC Self-Help never changed its position that the SBA would not reimburse Yadkin Bank's interim loan more than a net debenture amount of $910,053 even after both Yadkin and SBA closings.78

269. On or about March 25, 2014, Self-Help collected its own personal and financial information from DPP's membership for certain 1244 Application prescreen items while DPP's construction continued.79

270. However, undisclosed to DPP, Yadkin provided documentation stating that, "On Friday, March 28, 2014, the Bank Loan Committee (hereafter referred to as the Committee) of Yadkin Bank met for a special meeting via conference call for Denver Defense Partners, LLC."

271. At that undisclosed meeting Yadkin declared DPP's 7028 "Loan amount for the bank is $1,871,500; the SBA loan Is [a Net Debenture of] $1,310,050 for a total of $3,181,550. Equity Is $561,450 which makes the total project $3,743,000."80

---

76 Mo1171, *also in transmittal to SBA* Mo1173-74
77 Mo1366 *emphasis added,* Mo2360
78 Mo1305-06
79 Mo 2044-53, 1210-14
80 Mo2215

36

272. Although the Yadkin Credit Committee never executed the meeting minutes, Hansen proceeded as though the Credit Committee authorized her loan on March 28, 2014.

273. Hansen's actions here were not supported by any Yadkin policy, regulation or guideline intended to protect either Yadkin or DPP/Bayport.

274. Hansen issued DPP a 7028 Commitment Letter backdated to March 27, 2014, a day prior to the Loan Committee's approval for a $3,743,000 TPC which did not match any terms from Self-Help's disclosures to Yadkin.[81]

275. On March 29, 2014, Hansen provided DPP a March 27, 2014 Yadkin 504 Commitment letter to DPP where the TPC now was $3,743,000 and provided a 5.2% interest rate[82] on Yadkin's $1,871,500 (50%) loan with an SBA portion of $1,310,050 (35%) [Net Debenture] loan.[83]

276. Yadkin stated that this March 27. 2014 loan was not a ten-year but five-year loan with a twenty-year amortization.[84]

277. So DPP in five years, under this Yadkin loan commitment, would pay another Yadkin ½% origination fee of $8,335.22 to renew their outstanding 7028 loan balance of $1,667,044.43.[85]

278. The DPP membership executed Yadkin's March 27, 2014 five-year Range Construction Commitment Letter.[86]

279. Not DPP, Bayport or their guarantors had outside counsel or assistance to provide any insight to this five year commitment letter. As DPP/Bayport was dependent on Yadkin where Hansen gave her

---

[81] Mo924, This committee would never approve any Hansen Loan to DPP greater than 50% on either TPC of $3,743,000 or $3,243,000 at 56.6% and higher.
[82] Higher than SBA Mo1244 quoted rate from missing Commitment Letter to Self-Help.
[83] Mo824
[84] Mo824
[85] *See* Mo824
[86] Mo824

voluntary assumption of a duty to advise, counsel, and protect the DPP and its collateral captured in 6980, through her upcoming 7028 loan structure.

280. Hansen's actions here asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

281. Yadkin's and Hansen's actions here created a special relationship between the Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP from its wrongful assertion that 6980 qualified as a Bridge loan later incorporated into Yadkin's construction loan.

282. When Hansen submitted DPP's executed March 27, 2014 Yadkin Commitment Letter for a five-year term, Self-Help requested Hansen to correct the term to ten years.

283. On March 31, 2014, undisclosed to DPP, Self-Help received its form SBA 912 with false information and execution purporting to be Heather O'Brien's Statement of Personal History.[87] Here her middle name became "Alice" with a new social security number and signed as the same false signatures from the Yadkin documents.[88]

284. Hansen's actions providing and transmitting to Self-Help Heather O'Brien's Statement of Personal History falsely executed by email and U.S. Mail were at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

285. On April 2, 2014, undisclosed to DPP, Self-Help's Loan Officer Janet Brown stated that Yadkin's November 22, 2013 Effird Appraisal that stated that the DPP Range Property's "Fair Market Value

---

[87] Mo1191
[88] SSN#

Stated in Attached Appraisal: $3,865,000.00 . . . is 103% of the estimated value stated in the loan authorization and is therefore acceptable under SBA guidelines." 89

286. Now that Self-Help had approved collateral value, Janet Brown completed its 1244 application's Exhibit 2 - "ELIGIBILITY INFORMATION REQUIRED FOR 504 SUBMISSION NON PCLP" form.90

### Self-Help's 504 Application – Land Ownership

287. Under Self-Help's credit memo, DPP's Range Construction Project TPC was $3,938,000.00 consisting of a Yadkin Loan of $1,969,000.00 (50% TPC), an SBA loan of $1,378,300.00 (35% of TPC) and a BC of $590,700.00 (15% of TPC).91

288. Self-Help could only derive this TPC from Yadkin's November 2013 BEFCOR application as Hansen's TPC in her January 30, 2014 Memo was $3,743,000.92

289. Hansen continued to misrepresent DPP's Range Property ownership to induce Self-Help as indicated on Self-Help's March 18, 2014 credit memo for DPP's 504 loan.93

| | Amount |
|---|---|
| Purchase Land | $680,000 |

290. And Self-Help's supplement dated May 19, 2014 claimed a land purchase, not an improvement to existing land already owned:94

---

89 Mo1098 pg.3
90 Mo1195
91 Mo1173
92 This TPC was not supported from Hansen's request to DPP to alter its project costs to a TPC of $3.743. Lafone testimony contradicting Mo1173 pg.112
93
94 Mo1226 pg.2

| Use of Loan Proceeds | Amount |
|---|---|
| Purchase Land | $660,000.00 |
| Purchase Land and Improvements | $0.00 |
| Purchase improvements | $0.00 |
| Construct a Building | $1,851,000.00 |

## Self-Help and Yadkin's Draw Loan

291. Self-Help knew of DPP's $500,000 Draw Bridge loan, but omitted these requested facts in its credit memo.

292. And Self Help intentionally left section one empty regarding "If any project assets are already owned by the borrower, provide purchase amount & date".[95] Where a CDC intentionally left this blank, the SBA required the CDC to "reconcile [it] with a purchase contract".[96] Yet, DPP already owned the Range Property.

| If any project assets are already owned by the borrower, provide purchase amount & date: | | |
|---|---|---|
| Assets | Amount | Date |
| Disclose terms of any pre-project financing (including lender, amount financed, and maturity) and specify whether that financing will be taken out with 504 funds for this project or re-financed by the third-party lender: | | |

293. There was also a lien on the property disclosed on pg77 of the credit memo transmittal where Heather O'Brien's (non-joint) personal financial statement indicated Denver Property Partner's mortgage of $225,000. This was CTB's lien on the Range Property that Yadkin paid at the October 25, 2013 6980 closing.

294. Self-Help's Credit Memo provided that the Yadkin Loan was a ten-year term at 5% with a P&I payment of $12,995.

---

[95] Mo 1171 pg.1
[96] Mo1229 #5

295. The SBA portion had a twenty-year term at 3.25% with a P&I payment of $10,156. Both loans were amortized at twenty years.

296. Self-Help's Credit Memo estimated DPP's monthly payment paid through Bayport was $23,150 for two loans, not three.

### DPP's Down Payment

297. From Yadkin's information, Self-Help's Credit Memo also provided that DPP's BC was $590,700 where Self-Help incorrectly stated from DPP's own business plan97 that, "Denver Defense **has already raised** $555,000.00 from investors in exchange for an equity position in the business. The borrowers have sufficient liquid assets to cover the remaining portion of the equity injection."98 (Emphasis added)

298. Not any of this $555,000 Self-Help asserted DPP had **"already raised"** was in available cash for a BC down payment as indicated by all of Self-Help's and Yadkin's attached financial statements to the credit memo's transmittal.

299. Likewise, no DPP submission to Yadkin of its financial or Bayport pro forma business plan had showed this equity or liquidity.

300. The fact that DPP had such liquidity did not reconcile with Yadkin's October 10, 2013 rejection of DPP's conventional DPP loan for the whole project and startup inventory.

---

97 Mo1173, pg 119 of Self-Help's SBA transmittal "Denver Defense **has projected** a bank loan of approximately $3,068,000 (approximately 75% of the project's appraisal [$4,090,666]) and an additional $500,000.00 from investors in exchange for an equity position in the business."

98 *Contra* - Mo1171 pg. 124 "Currently, the equity in the Denver Defense project (including Bayport Holdings, Inc. and Denver Property Partners, LLC) is approximately $555,000.00. This includes $455,000.00 in capital and [sweat] equity already injected in the company by our current LLC members, and approximately $100,000 in research and development costs related to the project."

301. In Self-Help's undisclosed credit memo, Yadkin's 6980 conventional "loan requested exceeds the Lender's conventional advance rate for this type of property."99

302. Yadkin's claim that DPP's construction loan requested exceeds the Lender's conventional advance rate for this type of property for an 80% loan knowing Yadkin would alter the loan's disbursements to make DPP's loan 78/22 was at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

## DPP's Range Building

303. Even Yadkin knew that a gun range required specialized equipment to operate and that equipment was permanently attached to the building as indicated in Efird's November 22, 2013 appraisal.

304. Yadkin knew as early as October 2013 and Self-Help knew as early as March 18, 2014 and should have disclosed to DPP that its application deemed DPP's Range Property as special use and DPP only qualified for a 20% BC not 15%.

305. Yadkin proclaimed the following that DPP's $3,918,000 TPC gun range building was a:

   3. Specialized Building – the building being specialized can be debated. The items that make it specialized are the target range equipment and the HVAC system. All building need HVAC in today environment and this one is just better than most put into buildings of this size (right at 20,000 square feet). The target equipment can be removed and the building can be used for other purposes. The location of the building is Denver, Lincoln

306. Yadkin concealed from DPP that its Range Property was a special use or specialized building at all times during its loan servicing and subsequent foreclosure. 100

---

99 Mo1173 pg.2

100 Mo212 pg6 states, ("Property Use  Special Purpose Other" from SBA Valbridge Appraisal requested 8/6/18 Mo1910 ordered 7/11/18) Mo1908, 1952, Mo1901 ("Since the building is special use, it would require total re-design or a highly specific buyer."), Mo 950 November 27, 2017 2:00 PM Oots to Hunter email ("It's a special use building that would require a lot of modification to be repurposed."), Mo2265 ("The items that make it specialized are the target range equipment and the HVAC system."), Mo810 (Loan required title insurance endorsement: Commercial Environmental Protection Lien)

307. On April 2, 2014, undisclosed to DPP, Janet Brown certified that 1) the Borrower has been in operation for 2 years or less and 2) the Project involves a limited or single-purpose building or structure.[101]

308. Therefore, DPP's Range Construction Project qualified for an SBA 504 loan, just not at 35% because Self-Help's 504 application intentionally chose to answer the following question in their SBA Application Eligibility Information form pg.4 : "If the Project involves a limited or single-purpose building or structure, There is an additional Borrower Contribution of at least 5%"[102]

If the Project involves a limited or single-purpose building or structure,
- There is an additional Borrower Contribution of at least 5% (above the minimum 10%)
- the Debenture will finance no more than 35% of the Project and
- at least 50% of the Project financing will be from state or local government, banks or other financial institutions, foundations or other not-for-profit institutions, or seller (provided seller subordinates its interest to the debenture). YES☒ NO☐

If the Borrower has been in operation for 2 years or less (or there is a change in ownership of the applicant business) and the Project involves a limited or single-purpose building or structure,
- the Borrower Contribution is at least 20%
- the Debenture will finance no more than 30% of the Project and
- at least 50% of the Project financing will be from state or local government, banks or other financial institutions, foundations or other not-for-profit institutions, or seller (provided seller subordinates its interest to the debenture). YES☒ NO☐

309. DPP never had any knowledge that its Range Construction Project BC would be 20% of the TPC.

310. Nor did Yadkin ever provide this BC or SBA information in any future Yadkin Commitment Letter for DPP's loans.

311. Yet Yadkin's 20/30/50 loan was the template Hansen adhered to manipulate DPP's resulting loan before the SBA's closing a year later in 2015.[103]

312. Again here Yadkin's concealing that DPP's construction loan BC was 20% of the TPC was at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

---

[101] Mo1195 pg.4
[102] Mo1195 (Certification: Special Use), *see* 1241 pg.1 - This was a special use property and a start-up reducing SBA qualified loan to 30%.
[103] Mo1387

313. Also, on April 2, 2014 in Self-Help's SBA application under EX2 – Eligibility Information, Janet Brown certified that "[t]he Borrower Contribution is cash or property that is part of the Project Property and is not derived from an SBA business loan program."[104]

314. Yadkin's concealing that DPP's construction included approximately $202,000 of 6980's loan funds for preliminary site construction to Self-Help by email and U.S. Mail was at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

315. By the end of 2014, Brown's certification would for a second reason be no longer be true, as on December 19, 2014, Hansen would divert $50,000.00 from Bayport's 8289 (SBA 7a Express) Inventory Line of Credit (LOC) and transfer it as a substitute for Yadkin's 7028 Construction Loan funds in Yadkin's final construction draw.[105]

## Yadkin's Backdated January 30, 2014 Credit Memo with Reduced DPP's TPC

316. Upon information and belief, Hansen changed her January 30, 2014 Credit memo to reflect adjusted DPP TPC and other loan underwriting figures she had requested.

317. On March 26, 2014, Hansen requested DPP update its TPC to a lower figure based on Effird's appraisal to further reduce Yadkin's loan amount to DPP.

318. In response, Norfolk and Lafone finalized an updated Business Plan and Business Projections to provide to banks for underwriting DPP's Project.

319. DPP revised project cost to be $3,743,000.00.[106]

---

[104] Mo1195
[105] Mo2233
[106] Mo763

44

320. Previous to Hansen's advance Draw, DPP expected if it paid its Range Property liens of $297,726.26, DPP would have the full $660,000 equity available to pay Yadkin's 15% BC of $561,450 with $98,550 in spare equity to use for Bayport's inventory loan.

321. Alternatively, a 20% DPP BC of a $3,743,000 TPC was $748,600.

322. This meant to DPP that if paid its Range Property liens of $297,726.26, then DPP's additional cash at closing would be $88,600.

323. In December 2013, Hansen crafted her new budget making DPP's TPC $3,743,000 from Effird's November appraised value of $660,000 of the Range Construction Project.

324. Based upon Hansen's promise of a 15% BC, DPP expected its 15% to be $561,450 on a TPC of $3,743,000.

325. Hanen required DPP to change its TPC according to her appraisal and construction documents.

326. Hansen's actions requesting DPP/Bayport to alter its TPC and sales figures and receiving them was Hansen asserting a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

327. Hansen kept track of DPP's construction progress and expenses through her own AIA spreadsheet contained on Yadkin's CRM system or other software with the file titled, "Commercial Const Line – Denver Defense – 6 – 6 – 14.xls".

328. Hansen crafted her AIA construction reporting spreadsheet with a total budget of $3,083,000 in construction costs (82.36% of a $3,743,000 TPC) not including the Range Property appraised value of $660,000. (2.36% of TPC was $88,334.80)

329. Hansen's AIA reflected an 85% loan on a $3,627,058.80 TPC. Alternatively, Hansen's AIA reflected an 80% loan on a $3,853,750.00 TPC.

45

330. Yadkin's undisclosed 7028's loan amount was split 50% $1,871,600 Yadkin and 35% $1,310,050 Net Debenture107 from the SBA.

331. Yadkin's new 7028 loan represented a revised TPC of $3,743,000 primarily derived from reduced targeting and HVAC contract values.108

332. All previous 2013 Yadkin loan documents had DPP's prior TPC at $3,958,000.

333. Hansen's 7028 loan terms now were, "18 [$8,110.27] monthly payments of Interest only (total amount computed during construction and before back funding by SBA) followed by 47 [$12,559.45] monthly payments of P&I followed by l payment of all outstanding principal and accrued interest."109

334. Yadkin's 7028 P&I did not disclose or include SBA's 35% loan value, which DPP also owed $9,549.03 monthly, both loan payments now totalling $22,107.48 monthly.

335. Both Yadkin and SBA loans had a twenty-year amortization, but the SBA loan would be 20 years P&I with additional monthly charges attached.

336. Yadkin also did not disclose to Bayport that its 7028-financing package eliminated any start-up inventory loan that endangered Bayport's long term inventory financing plan.

337. Likewise, even without the Bayport start-up inventory loan, Hansen's new 7028 memo here indicated that its Financial Reporting was Outside of Policy #70 and that its R/E amortization exceeds policy #160.110

---

107 TPC excludes all Gross Debenture charges – Why??
108 Mo699, 700 -
109 Mo2224 pg.2
110 Mo2224 pg.11

46

338. But Hansen did certify that this loan would pay off the Advance Draw loan and Yadkin's TCE stating on the front page of her memo, "The existing $500,000 loan will be paid out with loan proceeds bringing exposure to $5,577,043 and once SBA pays down loan exposure will be $4,266,993."[111]

| Proposed Collateral: | | • 1ˢᵗ D/T on 4.494 acres on Hwy 16, Denver, NC and all improvements. • UCC-1 filing on all business assets | | | | | Owner Occupied | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Yes | No |
| | | | | | | | XXX | |
| Appraised Value: | $3,865,000 | Tax Value: | | Cost Value: | $3,743,000 | Other Value: Internal Evaluation | | |
| Appraisal Date: | 11/2013 | Tax Value date: | | Cost Date: | Feb 2014 | Other Value Date: | | |
| LTV: | 83% | LTV: | | LTV: | 85% | LTV: | | |

The subject property a 4.494 acre improved commercial lot on Hwy 16 in Denver. The land is owned by Denver Property Partners, LLC with the intention of building a shooting range. Bayport Holdings, LLC DBA Denver Defense is the operating company that will own the range.

339. Hansen's actions providing and transmitting to Self-Help by email and U.S. Mail her credit memo falsely asserting the Draw Bridge loan would be incorporated into the SBA 504 loan executed was at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

340. Yadkin unsigned March 28, 2014 Credit Committee Meeting Minutes stated:

**Denver Property Partners, LLC:**

Loan amount for the bank is $1,871,500; the SBA loan is $1,310,050 for a total of $3,181,550. Equity is $561,450 which makes the total project $3,743,000. The only comment was from Joe Towell and wants to make sure there is enough liability insurance in case of an accidental shooting death. George Searle moved the Committee to approve the loan as presented with the verification of adequate liability insurance. Ed Shuford seconded the motion. The motion unanimously carried.

Yadkin's Alternative Structure

341. On April 9, 2014, Watson spoke with Hansen and then stated to the DPP membership,

"Yakon [sic] has [offered DPP] a loan without SBA for about $2,7m. Take out the $500k for the property that would leave us about $2.2m to build the project[.] The only thing we would be short is for the inventory about $500k. This would give us 3 months to get inventory $ together[.] If we don't have an answer for SBA in the next couple of days how do ALL feel going forward with just Yakon.[sic] I am fear the wheel are going to come off the cart

---

[111] Mo2224 pg.1, pg.13 ("Loan amount $3,181,550 Total Exposure $*after payoff $5,7956,543" yet SBA payoff would be $150,000 less than the credit memo specified)

47

if we don't get this project going with customers. Kevin, can you ask George if Yakon [sic] goes this route we can go back to the SBA??"112

342. DPP was unable to proceed with this structure.

343. On April 14, 2014, Self-Help and Yadkin, but not DPP, received Coastal Environmental Consulting Inc.'s Soil Reliance Letter (environmental impact report) that the Range Construction Project had passed its Phase I environmental testing, which was independent of DPP's earlier engineer's soil test.113

344. On April 21, 2014, Based upon discussions with Hansen, Lafone emailed the membership that they,

". . . have all worked very hard, and undergone some difficult circumstances to be where we are right now . . . BUT to close the loan, SBA and Yadkin are going to require us to show 15% equity in the project. At this time, we are short somewhere between $100k and $150k."114

345. Not DPP, Bayport or their guarantors had outside counsel or assistance to provide any insight to Yadkin's PayGo reconciliation. As DPP/Bayport was dependent on Yadkin where Hansen gave her voluntary assumption of a duty to advise, counsel, and protect the DPP and its collateral captured in 6980, through her upcoming 7028 loan structure.

346. Hansen's actions here asserted a complete dominance over DPP/Bayport's finances and future operations by falsely demanding cash equity outside of DPP's downpayment altered its capital structure, corrupted their repay ability under their own business plan and forever altered its proforma sales plans by irrevocably draining Bayport's starting capitol inventory to make that BC cash payment.

---

112 Mo764
113 Mo1204, Mo2024
114 Mo313

48

347. Yadkin's and Hansen's actions here created a special relationship between the Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP from its wrongful assertion that 6980 qualified as a Bridge loan for a later unapproved construction loan and DPP owed more BC that it rightfully should have owed.

348. Hansen's action demanding cash equity beyond a downpayment was at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

349. Yadkin's last disclosed BC to DPP was on or about October 17, 2013 where Hansen discussed the change in 6980 to subordinate financing becoming 7028.115

350. On April 21, 2014, Yadkin's BC required to close 7028 was approximately $587,700.116 This represented a Range Construction Project TPC of ~$3,913,000.

351. On April 21, 2014, DPP had already paid $68,817.68 towards DPP's downpayment or $410,153.73 in BC.

352. Undisclosed to DPP, Yadkin had changed DPP's BC to $561,450 after January 31, 2014 with Hansen's updated 7028 Credit Memo.117

353. DPP's actual remaining BC out of $561,450 on April 21, 2014 was $151,296.27.

### SBA's Problem

354. "On Sat, May 3, 2014 at 9:33 AM, Robert Watson wrote [to the DPP membership] : I was talking to Craig about holding up [the Range Construction Project]. We still have the yakon [sic] bank deal [January 3, 2104 55% TPC Yadkin loan commitment letter] in place if the SBA has a problem. Instead of 15% invested it would be 20 % [under January 3, 2104 55% TPC Yadkin loan

---

[115] *See* Mo 712

[116]

[117] Mo 2224

commitment letter]. We would have to make up the difference or sell the 8%. I think we should keep on moving forward. Craig said he feels the SBA is still a go with the couple of question asked[.] What's everyone opinion."[118]

355.  "On May 3, 2014, at 10:40 AM, Akiba Green wrote:  need explanation...why is there ANY question? What are they asking?  I also think if we HAVE to go with a non-SBA loan, we sell the 8% to help make up the difference, but with everything Craig has gone through to get this done and his conversations with SBA what is the problem?"[119]

356.  On May 5, 2015, Norfolk emailed the DPP membership, "[Self-Help's] Requested information has been sent to SBA on Kevin and me.  Janet does not see any issue with this part of the process.  She did say she believes the loan will be approved however sometimes it takes longer than the 3-7 days that they have been told to tell everyone.  I am concerned that approval could take until later this week or even next week.  Does anyone want to revisit getting block in and going to work on the walls?  We are missing out on some good weather and not going to work will become harder to explain to our [future range] members."[120]

### Range Construction Delay

357.  On May 5, 2015, Norfolk emailed the DPP membership responding to Green's question on restarting the Range Construction Project, "To answer Akiba's questions concerning if we move forward this week what are the costs and when will we have to pay for them:

This is what has been completed or on site and not paid for:

| | |
|---|---|
| Footers | $25,000 |
| Underground Electric | 8,000 |
| Sewer Hookup | 4,000 |

---

[118] Mo765
[119] Mo765
[120] Mo314

| | |
|---|---|
| Misc. | 5,000 |
| Ballistic Frames | 11,000 (on credit card) |
| Architect | 13,000 |
| Attorney | 3,500 (on credit card) |
| Attorney | 5,800 (need to discuss) |
| Total Owe Now excluding frames and attorney | $55,000 |
| Blocks will be on site Tuesday. Cost: | |
| Order block, have delivered | $80,000 (probably have to pay 1/2 in June and 1/2 in July) |
| Labor to put up block | 80,000 (same pay schedule) |
| Floors | 50,000 (same pay schedule) |
| Grading | 5,000 (June)"[121] |

## Yadkin's Draw Bridge Loan Third Renewal

358.  On May 9, 2014, undisclosed to DPP, Yadkin sends Self-Help a letter concerning DPP's 6980 Advance Draw Loan stating, "Denver Property Partners, Inc. currently has a loan with Yadkin Bank in the amount of $500,000 that matured on April 23, 2014. The Bank has not renewed the loan as we are working on an SBA loan that we hoped would close by the end of May and would pay the loan out."[122]

359.  Yadkin never envisioned their 6980 bridge or interim loan with only 90-day revolving interest terms as a permanent stand-alone construction loan.[123]

360.  Neither did DPP when it accepted Yadkin's promises on what they thought was a $500,000 advance draw that would be paid off from the actual construction loan that Yadkin would provide in two weeks on November 13, 2013.

361.  DPP intended to delay payment of this third 6980 renewal so it would be incorporated into 7028 and then DPP would own no renewal fee.

---

[121] Mo314
[122] Mo1228
[123] 6980 purpose letter compare to later false orig letter

51

362.    On May 12, 2014 at 9:28 A.M. Norfolk emailed the DPP membership, "I will call Janet later today

on SBA loan.  In the meantime, please review updated trailing email for costs.  We need to discuss

paying these at our meeting this Wednesday.  If we do a cash call, it reduces our amount needed at

closing.  The $55,000 needs to be paid by no later than this Friday.  These bills can not be put off

any longer.  You can figure out what each person needs to pay by Friday based on %s.  If anyone

asks can these bills wait until closing THE ANSWER IS NO."[124]

363.    Also, on May 12, 2014, Self-Help submitted its amended 1244 transmittal documentation with

responses from Yadkin.   Among Self-Help's cost documentation Exhibit 14 to Self-Help's

Electronic Credit Memorandum, page one details DPP's updated "Capital Costs Associated with

Construction".[125]  It indicated that DPP's TPC had changed to $3,743,000 instead of the original

transmittal's page 112 stating TPC was $3,958,000[126].  And Exhibit 14 included Yadkin's 6980

$500,000 draw loan to DPP as a construction cost extended to DPP on October 25, 2013.[127]

SBA Identifying Yadkin Loan Problems

364.    Also included in Self-Help's amended 1244 transmittal was Heather Alice O'brien's personal history

not corresponding to any DPP member.[128] Finally attached to Self-Help's application was "Ex 2

Eligibility Information" citing DPP's BC at 20% and SBA's loan no more than 30%.[129]

365.    Previously, Yadkin's January 31, 2014's undisclosed 7028's loan amount was split 50% $1,871,600

Yadkin and 35% $1,310,050 Net Debenture from the SBA.[130]  However, Self-Help's March 20,

---

[124] Mo314
[125] Mo1223
[126] Mo 1173 pg.112
[127] Mo1223
[128] Mo1220 pg.4
[129] Mo1195 pg.4
[130] Mo2224

52

2014 undisclosed debenture restricted the SBA's loan not to exceed $936,000.[131] And Self-Help's undisclosed April 2, 2014 certification further restricted SBA's loan to a maximum of 30% TPC.[132] This made DPP's undisclosed BC 20% of its $3,743,000 TPC or $748,600 due at closing in Self-Help's May 12, 2014 amended 1244.

366. On or about May 16, 2014, undisclosed to DPP, the SBA issued Self-Help a first "Screenout" after it submitted its 1244 Debenture request. [133] The SBA identified several problems addressed in the "Screen-Out Checklist".

    1) Clarify the difference between the AIA Construction Contract and the amount allocated in the credit memo and 1244.

    2) What was the purpose of the $500,000 note included in the cost documents? Additionally, this note has expired. If this note is being refinanced in any way, the extension is required.

    3) A term of 5 years is not acceptable for a 20 year debenture.[134]  The bank loan requires a minimum 10 year maturity.

    4) Complete the section on page 1 regarding project assets already owned by the applicant. It appears they already own the land.[135]

    5) The land allocation does not reconcile with a purchase contract and the land appears to be encumbered with a $500,000 loan. Provide clarification on how the land figure was derived.

367. Yadkin's policy about changing material terms to a commitment letter at this loan amount required the Yadkin Credit Committee to approve those changes.

368. Instead, on May 19, 2014, Hansen responded to the SBA's Screenout #3 to correct its DPP Commitment letter from a five-year term to a compliant ten-year term by contacting Norfolk.

---

[131] Mo1366
[132] Mo1195 pg.4
[133] Mo1229
[134] Mo 824
[135] Mo 1171 pg.1

369. After talking with Hansen, Norfolk who then emailed the membership, "I just talked to Janet again and Sandee. Bob just needed to get one of the financial sheets updated. Sandee sent it in. Going from 5 to 10 years matches what SBA requires. Janet sent it in incorrect to start with. EVERYONE - Please send an email back to Sandee asap saying you are ok with the 10 years. This will not cause the review period to start over. It is usual for SBA to request updates, additional information, etc. The questions verify that it is in the underwriting stage which is good. Janet does not see any issues. She believes approval is coming but can not say when."[136]

370. Hansen did not collect signatures for her modified ten-year commitment letter for a TPC of $3,743,000. Not one DPP member signed this commitment letter. Hansen took the signature pages from DPP's March 27, 2014 five-year commitment letter[137] and placed them under the modified new ten-year commitment letter[138] and mailed or emailed it to Self-Help who then emailed[139] it to the SBA.

371. Among Hansen's slipsheeted execution page was Heather O'Brien's invalid typed not handwritten signature.

372. Yadkin did not use any electronic signatures for its loan documentation at anytime relevant to any loan in this action.

373. Hansen's actions slipsheeting her modified ten-year commitment letter or otherwise falsifying its execution, transmitting to Self-Help by email and U.S. Mail, was at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

---

[136] Mo315
[137] Mo824
[138] Mo825
[139] Mo1232

54

374. And on May 19, 2014, Hansen emailed to Self-Help the following letter attached to DPP's 6980 January 23, 2014 renewal with Heather O'Brien's typed signature to Self-Help regarding Screenout item #2 stating that, "Denver Property Partners, Inc. currently has a loan with Yadkin Bank in the amount of $500,000 that matured on April 23, 2014. The Bank has not renewed the loan as we are working on an SBA loan that we hoped would close by the end of May and would pay the loan out. If the SBA loan does not close by month end the Bank will renew the existing loan for an additional 90 days."140

375. Undisclosed to DPP, on or about May 19, 2014, Justin Tart responded to the first Screenout as follows: "

　　1) Clarify the difference between the AIA Construction Contract and the amount allocated in the credit memo and 1244.
　　[Response] We have amended the project structure in the credit memo[141] and 1244[142] to align the construction amount with the AIA Construction Contract. This has reduced contingency to $163M, which remains acceptable at 8.8% of the construction amount. We have provided an amended credit memo, draft authorization, supplemental, and 1244, which reflect the adjusted structure. **The only thing that has changed in the draft authorization, supplemental[143]. and 1244 is the project structure.**

　　2) What was the purpose of the $500,000 note included in the cost documents? Additionally, this note has expired. If this note is being refinanced in any way, the extension is required.
　　[Response] As shown in the Ex 16 Appraisal[144] submitted with the application this piece of land was originally purchased in 2008 for $1.2MM and financed through Carolina Trust

---

140 Mo1228
141 Mo2019
142 Mo1225
143 Mo1226 dated 5/19/14
144 Mo1112

55

bank. In October 2013, the borrowers took out a $500M note with Yadkin Bank (the TPL for this deal) which paid off the existing note[145] and left them with $500M in debt on the land. This note is being refinanced through this project. We have provided the extended note. In the amended note, payment is due on 4/23/2014 with 30 days to pay. The bank is hopeful that they can close before 5/23/2014, but have written a letter stating their intention to extend the note if necessary, which we have also included.[146]

3) A term of 5 years is not acceptable for a 20 year debenture. The bank loan requires a minimum 10 year maturity.

[Response] We have included an updated commitment letter from the Third Party Lender with a minimum of a 10-year maturity.[147]

4) Complete the section on page 1 regarding project assets already owned by the applicant. It appears they already own the land.

[Response] This section has been completed in the amended Credit Memorandum.

5) The land allocation does not reconcile with a purchase contract and the land appears to be encumbered with a $500,000 loan. Provide clarification on how the land figure was derived.

[Response] As shown in the Ex 16 Appraisal submitted with the application this piece of land was originally purchased in 2008 for $1.2MM and financed through Carolina Trust bank. In October 2013, the borrowers took out a $500M note with Yadkin Bank (the TPL for this deal) which paid off the existing note and left them with $500M in debt on the land. This property was purchased for the sole purpose of this project, and because it was purchased more than two years ago, we have used the appraised value to derive the land figure. As shown in the Ex 16 Appraisal the property "As Is" (the land) is valued at $660M, which is the amount we have used in the project structure."[148]

---

[145] Self-Help omitted the second lien for Attorney's fees of $60,000 - Mo 1062
[146] Mo1228
[147] Mo825
[148] Mo1229

376. On May 20 2014 Lafone reported to Hansen that DPP's equity position claimed was $548,138.22.[149]

377. But, Yadkin still requested DPP produce an accounting for $551,000, which would not include any Range Property equity.

378. Undisclosed to DPP, Yadkin would then later add the $160,000 equity Yadkin attributed to DPP's Range Property back to the $551,000, resulting in a total BC of $711,000.00.[150]

379. Yadkin never responded to Lafone's equity position submission until September of 2014.

380. On May 22, 2014, undisclosed to DPP, the SBA issues its second Screenout[151] citing:

1) The project costs as presented are not eligible, specifically the $500,000 note. Evident by the Settlement Statement the note was used to refinance loans with Carolina Trust Bank ($230,726.26) and McMickle , Kurey & Branch, LLP ($60,000), as well as provide the borrower with $202,641.79 in cash. Additionally, the stated purpose of the note is to "finance upfront costs for development of property". This note does not qualify as interim financing or bridge financing per SOP 50 10 (F), and therefore must be removed from the project.

2) Provide an amended 1244 to account for the aforementioned changes.

3) Provide an amended Authorization to account for the aforementioned changes.

381. The next day on May 23, 2014, undisclosed to DPP, after Yadkin approved of the TPC change, Justin Tart of Self-Help redrafts DPP's debt structure and reduces the TPC to $3,243,000 by $500,000 in the SBA Credit Memo.[152]

382. Undisclosed to DPP, Yadkin's 50% was now $1,621,5000 and the SBA would fund only $1,050,050 or a 32.69% net debenture.  This was not what Self-Help's board proclaimed on March 20, 2014

[149] Mo317
[150]
[151] Mo1244
[152] Mo1241

57

stating that its "[a]pplication for [a Gross] debenture guaranty and sale in the total amount [was] not to exceed $936,000.00"153

383. This second amendment did not disclose to DPP that its 15% BC was not also reduced to $486,450, but remained $561,450 now 17.3% of the TPC.

384. Self-Help altered the SBA's position from 35% to 32.6% by removing Yadkin's 6980 Advance Draw loan based upon Yadkin agreeing to maintain its first position 6980 Draw Bridge loan..

385. Compliance with Brown's previous 504 Certification required a further depreciation of the SBA's participation in DPP's Range Construction Project loan from 32.6% to at or below 30%.154

386. Undisclosed to DPP, Tart followed his SBA credit memo submission with his amended 1244155 and draft authorization. He emailed the following in response to the SBA's second Screenout:156

    1) "We have removed the $500M note from the project and adjusted the structure accordingly. Yadkin will continue to hold the existing land note separate from the 504 project. We have provided an amended credit memorandum which shows the new structure. The land line item is for $160M which represents the equity put into the project by the borrowers. The land has been appraised in the submitted Appraisal at $660M, they have a $500M note on the property, so we are counting the difference ($160M) as equity. This will put the SBA in 3rd position but the TPL is in 1st and 2nd making it acceptable. [157] Coverage margins have decreased due to the land being entirely financed on a 10-year term but DSCR remains acceptable at above 1.0x for both projected ears [sic].

    2) We have provided an amended 1244 to account for the adjusted project structure.[158]

---

153 Mo1366
154 Mo1195 pg.4
155 Mo1243,1231
156 Mo1244
157 No documentation provides support for this contention. No disclosure to DPP denying funding Yadkin's 6980 Advance Draw with this loan.
158 Mo1244

58

3) We have provided an amended Authorization to account for the adjusted project structure.[159]

387. When Tart finally transmitted his amended 1244, he selected on the form that Self-Help used the SBA's Abridged Submission Method (ASM) for its 504 application on May 27, 2014.160

## Yadkin Concealed SBA Removing 6980

388. Also on May 27, 2014, Norfolk emailed the DPP membership that

"Janet called me this morning. She rushed out of the office Friday and forgot her phone so she did not have it the entire weekend. She said that Sandee was restructuring the loan for 10 years and hopefully will get this paperwork today from Sandee and then it will be sent to Sacramento. . .Janet said she believes we are in the final stage of the process and now they are basically making sure all t's are crossed and i's are dotted. From her experience, the process is nearing the end and we should hear something in the next day or two, certainly this week. She expects approval based on what she knows. Janet says she knows this has been frustrating for everyone but she really thinks we are close."161

389. Janet never mentioned to Norfolk anything that Self-Help told the SBA in its Screenout response that Self-Help "removed the $500M note from the project and adjusted the structure accordingly."162

390. Hansen's concealments of the circumstances and facts surrounding her 6980 $500k Draw Bridge loan's removal was at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

391. Yadkin removing 6980's $500,000 draw loan from DPP's TPC did not remove Yadkin's first lien position on the Range Property collateral.

392. Likewise, Hansen did not disclose the removal of the 6980 Draw Bridge loan from the Debenture funding to DPP.

---

159 Mo2012
160 Mo1231
161 Mo194
162 Mo1244

393. Nor did Hansen mention any restructuring of DPP's debt as removal of Yadkin's 6980 Draw Bridge loan with Yadkin, which was a material term of DPP's agreement.

394. Yadkin policy required signature authorization on a credit memo detailing such material term changes.

395. Hansen made no such credit memo for removing 6980.

396. Yadkin provided no such authority for removing 6980.

397. Despite this momentous change in the project's TPC, Hansen crafted on May 27, 2014 a Commitment Letter that still reported a total project cost of $3,743,000, continuing to conceal that her $500,000 loan 6980 was faulty. This letter reported:

| | |
|---|---|
| **Loan Amount:** | $3,181,550.00<br>Yadkin Bank 56.68%-$2,121,500<br>SBA 28.32%-$1,060,050 |
| **Purpose:** | Financing of the construction of Denver Defense Shooting Range to be leased and operated by Bayport Holdings, Inc., d/b/a Denver Defense. |
| **Collateral:** | First deed of trust of all real property located: 4.494 acres on Highway 16 in Denver currently owned by Borrower. |

398. Hansen's commitment letter led DPP to expect an 85% Loan on a TPC of $3,743,000, and further to expect that the $500,000 loan 6980 would be paid off because the new loan would assume a first deed of trust.

399. Likewise, Hansen also did not have the authority to reduce the total loan under her January 28, 2014 Credit Memo because Hansen certified that this loan would pay off the Advance Draw loan and Yadkin's TCE stating on the front page of her memo, "The existing $500,000 loan will be paid out

with loan proceeds bringing exposure to $5,577,043 and once SBA pays down loan exposure will be $4,266,993."163

400. Once the SBA, Self-Help, and Yadkin removed Yadkin's 6980 Draw Bridge loan, Yadkin could have simply requested DPP pay off the $500,000 at closing.

401. However, Hansen and Yadkin knew that DPP did not have enough cash to pay this first 6980 lien off.

402. Hansen was indifferent if DPP could raise money outside of DPP's business plan for additional BC.

403. Yadkin claimed it sought and received SBA approval for 6980 to remain in first position as stated in the SBA's second Screenout response. "This will put the SBA in 3rd position but the TPL is in 1st and 2nd making it acceptable."

404. Although no one spoke to DPP if it was acceptable to them that they either have to pay $500,000 at closing or retain a 90-day revolving note for the next ten or twenty years.

405. Since Yadkin's 6980 6980 Draw Bridge permanent loan was originated after the debenture's issue, the SBA had no knowledge of how the increase in payments on Yadkin's new first lien loan negatively impacted DPP's cash flow coverage and repayment ability under Yadkin's own underwriting.

406. All the SBA acknowledged in its screenouts was that 6980 was a noncompliant interim or bridge loan.

407. Although, Yadkin could provide no SBA documentation showing the SBA accepted a 3rd lien position behind Yadkin's 6980 Advance Draw in any later compliance submission.

_____

163 Mo2224 pg.1, pg.13 ("Loan amount $3,181,550 Total Exposure $*after payoff $5,7956,543" yet SBA payoff would be $150,000 less than the credit memo specified)

408. Yadkin never discussed with DPP if it was possible for DPP to pay the SBA's objectionable original lien from McMickle, Kurey & Branch, LLP ($60,000) with DPP accounting for expenses paid to its TPC from 6980's Advance Draw cash out which were the SBA's only noncompliant portions denying 6980 as a bridge or interim financing.

409. With DPP's BC at $512,154.35 on May 27, 2104, DPP paying an additional $202,641.79 for 6980's SBA disqualified cash to Borrower and the $60,000 attorney lien would make DPP's BC $774,796.14 or 20.7% of the TPC.

410. Any BC over the promised SBA 504 15% would invalidate Yadkin's claim for qualification under the 504 program as their certification stated in Self-Help's undisclosed credit memo, Yadkin's 6980 conventional "loan requested exceeds the Lender's conventional advance rate for this type of property."[164]

411. Both Yadkin and Self-Help owed a duty to disclose to DPP that they were not paying off the 6980 first lien at Yadkin's closing of DPP's 504 loan.

412. Yadkin owed a duty to disclose to DPP that its new Range Construction Project had reduced to $486,450 from the new TPC of $3,243,000.

413. Yadkin owed a duty to disclose to DPP that although its new financing structure reduced DPP's BC, Yadkin was requiring a BC% over 20%.

Loss of Equity

414. Yadkin removing or not incorporating DPP's 6980 Draw Bridge loan into 7028 meant the loss of DPP's October 25, 2013 entrusted Range Property equity of $660,000 to Yadkin that DPP was to use as its original BC.

---

[164] Mo1173 pg.2

415. While DPP still expected to pay the value of its prior two liens of $297,726.76 to achieve the Range Property's full equity value of $660,000, Yadkin had tied this portion of Range Property's equity to 6980 and not 7028.

416. Yadkin had stripped DPP of its remaining Range Property's equity when it did not incorporate 6980 into 7028.

417. Yadkin stripping DPP of its planned equity to support 7028's BC, became a cost to DPP/Bayport cash to pay for 7028's BC and a benefit to Yadkin as additional collateral to its first 6980 lien and not to the second 7028 lien.

418. This direct cash loss to DPP/Bayport to repay its BC in cash created an increase of value conferred upon Yadkin and its 6980 false Draw Bridge loan.

419. Yadkin's increase value places DPP's APR over North Carolina maximum interest rate or APR of 16%.

420. Yadkin's and Hansen's actions and concealments of the circumstances and facts surrounding stripping DPP of its Range Property's equity from concealing and fraudulently maintaining 6980's loan priority along without crediting DPP's equity to 7028's BC were at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

Yadkin Committed to a Non-Compliant Loan

421. Instead, Watson replied to Norfolk's email on May 27, 2014 stating, "Craig and I just talked to Sandee and she said Janet/SBA has a concern on the property around $250,000.00. Government BS and Sandee said she really didn't understand the question. Sandee told the SBA/Janet that Yakon [sic] would cover that amount If it was a problem."

422. However, Self-Help had already resolved the SBA's $250,000 concern from the McMickle $250,000 deed of trust by removing Yadkin's $500k draw from October 28, 2013 that violated SOP 50.165

423. So, the $250,000 problem Hansen had was her increasing Yadkin's loan from 50% to 56.68% to further reduce the SBA's position to the 30% amount required under Brown's 504 Certification166 all to obfuscate DPP from discovering that their BC had increased.

424. On May 28, 2014 Hansen concealed the reason she 'covered' that $250,000 amount from DPP.

425. Hansen without Yadkin or SBA authorization167, issued DPP another Yadkin Commitment letter citing not the modified TPC amount from yesterday, but the original TPC of $3,743,000 and full 85% Yadkin/SBA funding of $3,181,550.168

426. Yadkin's May 28, 2014 Commitment Letter to DPP did not disclose to DPP Yadkin and Self-Help's denial of 6980's Advance Draw loan of $500,000.

427. Yadkin's May 28, 2014 Commitment Letter to DPP did not disclose to DPP that Yadkin's 50% was now $1,621,5000.

428. Yadkin's May 28, 2014 Commitment Letter to DPP did not disclose that DPP's BC was increasing to over 20%.

429. Instead, Hansen had to reduce the SBA's 35% to 28.32% representing the SBA's loan position of a net debenture $1,060,050 from its second Screenout169 not Self-Help's March 20, 2014 $936,000 debenture limitation170 making the SBA's position 28.32% on the revised TPC of $3,243,000.

---

[165] Mo19

[166] Mo1195pg.4

[167] Mo2420, "Loan documentation for change from $2,121.5M to $2,532M was not clear and did not see if approval was granted by SBA to allow increase that affects their 2nd lien position.", "Critical servicing due to unclear changes in loan amount from $2,12lM for Loan Authorization.", "SBA Authorization was not observed."

[168] Mo826

[169] Mo1244

[170] Mo1366

Case 5:24-cv-00165-KDB-DCK   Document 1   Filed 07/15/24   Page 64 of 236

430. Yadkin provided Self-Help with its revised May 28, 2014 Commitment Letter, but not one DPP member signed this commitment letter as Yadkin reused Hansen's previous five-year commitment letter's signature page to place into the new ten-year Yadkin Commitment Letter with the same date.[171]

## No Yadkin Authorization

431. While Hansen's May 28, 2014 Commitment Letter changed Yadkin's loan amount to $2,121,500.[172]

432. For DPP material loan changes on an existing Commitment Letter, Yadkin Bank required a 1) new credit memo 2) submitted to the credit committee and 3) their written approval.

433. Hansen disregarded each of these requirements.

434. The Loan Credit Committee approved none of Hansen's structure or lien position changes.[173]

435. Furthermore, Hansen did not inform Yadkin's Chief Credit Officer that DPP's loan amount had changed by $250,0000.[174]

436. There was no disclosure to anyone that Hansen reduced DPP's TPC from $3,743,000 to $3,243,000.

437. And Hansen concealed or failed to disclose to the Chief Credit Officer what changes she had yet to make for SBA compliance of its loan to 30%.

438. Hanson could not change Yadkin's 50% loan position because:

        (1) 504 Certification limited Yadkin's portion to not more than 50%;

        (2) Hansen was already aware that the SBA portion was not more than 30%;

---

[171] Mo876 pg.5 "Documents Q6 [Mo824 5-Year Yadkin Commitment Letter] and Q7 [Mo825 10-Year Yadkin Commitment Letter] contain identical signatures of multiple individuals and one or both of those documents is a mechanically produced document with no genuine original signatures supporting the document."
[172] Mo2420
[173] Mo2420, "Loan documentation for change from $2,121.SM to $2,532M was not clear and did not see if approval was granted by SBA to allow increase that affects their 2nd lien position.", "Critical servicing due to unclear changes in loan amount from $2,12lM for Loan Authorization.", "SBA Authorization was not observed."
[174] Mo2214

(3) Yadkin's underwriting did not support a portion over 50%.

439. Without Yadkin authorization, Hansen stated in Yadkin's May 28, 2014 Commitment Letter to DPP that Yadkin was assuming an additional $250,000 (from Watson's May 27, 2014 email reference) on top of its previous commitment letter's $1,875,000 totaling $2,121,500 or 56.68% of the TPC of $3,743,000.175

440. Hansen knew that both the SBA and Yadkin could not take a 56.68% loan position from all of the previous documentation of this loan.

441. Hansen would have to correct Yadkin's non-compliance from Brown's 504 CERTIFICATION later by disrupting and shorting the disbursements in this loan to DPP by $150,000.

442. Hansen's Commitment Letter to DPP after she changed the structure with Self-Help to a TPC of $3,243,000 provided no information on DPP's actual BC amount or how DPP would provide for it.176

443. On May 28, 2014, DPP had provided $512,194.35 in BC and had no disclosure that its BC or financing structure had changed so much in the last week from Self-Helps Credit memo to Yadkin's latest Commitment letter.

444. DPP only saw on Hansen's May 28, 2014 Commitment Letter that Yadkin was providing $3,181,550 at the closing table on a TPC of $3,743,000 paying off the 6980 draw loan first lien.

---

175 Mo

176 Mo 2214 - This would come in Hansen's Amendment to Loan Committee Meeting Minutes never approved. See Mo2420

66

445. Hansen's May 28, 2014 Commitment Letter should have notified DPP that Yadkin's final loan amount was to be $2,531,553.00177, not $2,681,500 from the debenture and not $3,181,550 from the commitment letter.

446. It would be apparent that Hansen's May 27, 2014 Commitment Letter and Self-Help's May 28, 2014 Debenture did not reconcile. The Commitment Letter showed a loan of $3,181,550 on its face, and the Debenture showed a loan of $2,681,550.

447. DPP did not see the Debenture before its June 13, 2014 closing to make this distinction.

448. So, Self-Help did not send the Debenture to any of the DPP members, but instead sent it to Hansen.

449. Neither Hansen nor Self-Help had any DPP or Bayport shareholders or members execute the Debenture prior to closing Yadkin's new 7028 loan.

450. On May 28, 2014, the SBA's DPP 504 Debenture cited a higher DPP BC:

4. **Borrower's Contribution** ("Borrower's Contribution"):

a. At or prior to 504 Loan Closing, Borrower must contribute $561,450.00 to the Project. This amount is 17.31% of the total project cost.

(1) Contribution may be in cash, land or other property acceptable to SBA;

(2) Contribution may come from Borrower's own resources, CDC, or another source;

(3) If any of the contribution is borrowed and secured by any of the Project Property, the resulting obligation must be expressly subordinate to the liens securing the Promissory Note ("Note") in favor of CDC and may not be repaid at a faster rate than the Note unless prior written approval is obtained from SBA. A copy of any debt instrument evidencing the obligation must be supplied to CDC at or prior to 504 Loan Closing.

451. In fact, Self-Help did not have a signed copy of the debenture until March 19th of the following year when the 504 loan actually closed.

---

[177] First Yadkin reduced the TPC and 7028 loan by $500,000 per SBA ruling that 6980 was not qualified a bridge or interim loan. Second, Yadkin would reduce 7028's loan proceeds by $150,000 during its construction disbursements, not at the closing table. This undisclosed later reduction was to conform Yadkin's ultimate loan with Self-Help's March 20, 2014 restriction that any "[a]pplication for [a Gross] debenture guaranty and sale in the total amount [was] not to exceed $936,000.00"

67

### DPP's Downpayment

452.  Hansen also did not have authorization from Yadkin to prevent DPP from making a downpayment at the closing table of $297,726.26.

453.  DPP had a downpayment requirement in Yadkin's upcoming Commercial Construction Loan Agreement as follow," Loan-in-Process Account means the account with Lender into which the balance of the Borrower's required contribution to the transaction is deposited after first being applied to the payments due at closing including, but not limited to, closing costs and down payment."

454.  If Hansen avoided a downpayment, she could continue her control over the amount of DPP's BC by adjudicating each construction expense, including the documentation Lafone had already provided earlier to manipulate how much cash DPP had to add to the TPC and subsequently increase DPP's BC.

455.  Hansen communicated with DPP that it had to provide all of its equity injection prior to achieving a Certificate of Occupancy (CO).

456.  Hansen did not mention to DPP that she planned to withhold any further funding after the CO.

457.  Hansen did not mention BC to DPP until it was time to increase DPP's BC to compensate for the Special Building 5% BC increase Yadkin concealed from DPP.

### Mandatory 6980 Loan Prior to 7028

458.  After Yadkin learned the SBA removed 6980 from DPP's TPC, Yadkin immediately required DPP to renew and pay for another instalment of 6980's 90-day revolving loan prior to closing 7028.

459.  Yadkin concealed from DPP that 6980 was not to be incorporated into 7028, so DPP still expected this incorporation, but Yadkin still demanded a renewal payment.

460.  This renewal concealed the real circumstances surrounding the surviving 6980 Draw Bridge loan, yet would still maintain Yadkin's first lien priority over 7028's Construction Project loan.

68

461. Hansen maintained that if DPP did not renew 6980 now, 7028 would not close.

462. On May 29, 2014 at 3:49 p.m., Hansen emailed Lafone, Green, Watson and Norfolk that her renewal of 6908's Advance Draw loan was overdue and she stated that," I need everyone to stop by and sign the renewal for the $500,000 that needs to be done by tomorrow.  Craig-I need to collect the interest at that time."178

463. DPP understood Yadkin would not provide its 7028 construction loan unless it paid and signed a new 90-Day 6980 Draw Bridge loan first.

464. Not DPP, Bayport or their guarantors had outside counsel or assistance to provide any insight to 6980's third renewal as a condition precedent to receiving Yadkin's 7028 loan.  As DPP/Bayport was dependent on Yadkin where Hansen gave her voluntary assumption of a duty to advise, counsel, and protect the DPP and its collateral captured in 6980, through her upcoming 7028 loan structure.

465. Hansen's actions here asserted a complete dominance over DPP/Bayport's finances and future operations by demanding 6980's renewal to maintain Yadkin's first lien position, secretly altering DPP's capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

466. Yadkin's and Hansen's actions here created a special relationship between the Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP from its wrongful assertion that 6980 qualified as a Bridge loan needed renewal for DPP to have its 7028 504 loan.

467. The next day On May 30, 2014, Hansen collected all signatures including McMahon's as a Guarantor even though he was not on the original loan on October 25, 2013.179

---

178 Mo – on comments not in Mo
179 Mo23

468. Hansen's actions and concealments of the circumstances and facts surrounding her May 30, 2014 7028 Commitment Letter were at least in a wanton disregard of good faith, DPP/Bayport's trust, and Yadkin's obligations.

### SBA Debenture Issued

469. On May 30, 2014, undisclosed to DPP, Self-Help received its Debenture authorization for the reduced TPC of $3,243,000.180  On the first page of this Debenture, the SBA specified that DPP was an (EPC) or Eligible Pass-Through Company for Bayport.181

470. Yadkin reviewed the Debenture on May 30, 2014.182

471. DPP never saw or consented to the Debenture's debt structure or to Yadkin's ever changing 7028 loan.183

472. Although, Self-Help later would claim that "the guarantors agreed to inject the amount of $561,450.00 or 17.31%."184  DPP never knew or consented to such an agreement.

473. Hansen's actions concealing necessary DPP BC material changes asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

474. Hansen's actions concealing necessary DPP BC material changes was at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

475. On May 30, 2014, DPP had paid a BC of $518,721.43.

---

[180] Mo1071
[181] Mo2335
[182] Mo2335
[183] Mo1391(No signed Deb)
[184] Mo2001

70

476. Despite all of Hansen's efforts to prevent DPP from dropping out, on May 30, 2014, she still did not have approval for the Yadkin's underlying loan for $3,743,000.

477. Hansen never received written and signed authorization from Yadkin Bank for her May 28, 2014 Commitment Letter to DPP.

478. Yet on June 9, 2014, Ed Shufford, COO of Yadkin, emailed Hansen stating, "You can proceed with closing."185

479. Hansen's actions proceeding with DPP's 504 loan without Yadkin's signed authorization was at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

Yadkin Loan Origination Charge

480. On June 11, 2014 at 4:11 P.M., Sheila Kerr of Yadkin emailed DPP's closing attorney "We are hoping to have these docs to you by late tomorrow afternoon. Just wanted to go on and give our fees to you so we could possibly get a Hud for Sandee's review tomorrow. Loan origination fee $9358 Environmental fee     $2250   (Coastal Environmental Consulting)".186

481. Kerr's $9358.00 .05% loan origination fee claimed the loan amount for Yadkin was $1,871,500 not $2,121,500 as indicated in Yadkin's May 28, 2014 Ten Year Commitment Letter to DPP.187

482. Therefore, on June 11, 2014 at 4:11 P.M., either Kerr did not know of Hansen's Yadkin's May 28, 2014 Ten Year Commitment Letter to DPP or Hansen lied in her commitment letter and she never diverted the $250,000 off of the SBA portion, making Yadkin's origination fee charged to DPP equal to a $1,871,500 50% loan.188

---

185 Mo2214
186 Mo619
187 Mo619 (Yadkin did not get an origination fee for the SBA portion)
188 Mo619

483. "On Jun 11, 2014, at 5:44 PM, Sandee Hansen wrote: The closing package was ordered earlier today after we received the title work. Mike should have the package tomorrow to close Friday. The earlier the better because I can't do disbursements until it's recorded."189

484. Hansen approved the Hud1 with the original charge for the March 27, 2014 Commitment Letter loan amount.

485. On June 12, 2014, Yadkin provided its closing documentation including another May 28, 2014 Ten Year Commitment Letter for DPP to execute as the previous one was slipsheeted with the May 28, 2014 Five Year Commitment Letter's signature page.190

486. On this May 28, 2014 Ten Year Commitment Letter it stated that the origination charges of .05% were $10,607.50 matching an origination charge on the face of the document for Yadkin's portion of $2,121,500.191

487. This charge was noted "Loan origination 9358" and changed on the Hud1 closing statement per Sheila Kerr's June 11, 2014 email.192

488. On June 12, 2014 DPP's BC was $521,143.34, which corresponded to Hansen's assertion that the." . . . majority of equity has been injected prior to closing"193.

489. Undisclosed to DPP or Elliott, on June 12, 2014, Shelia Kerr of Yadkin emailed Denise Benge of Yadkin Bank stating to her, "The loan amount has changed. It is now $2,681,500.00[.] The P/I payment amount is $17,995.00 monthly[.] Thanks"194

_____

189 Mo309
190 Mo654
191 Mo654
192 Mo654, Mo619
193 Mo2212
194 Mo2216

72

490. Hansen's October 3, 2013 6980 Credit Memo undisclosed to DPP, Hansen's 6980 loan terms were 41 [$19,798.67] monthly payments and a balloon payment. On January 31, 2014, undisclosed to DPP, Hansen's 7028 draft Credit Memo both loan payments totaled $22,107.48 monthly. Self-Help's Credit Memo estimated DPP's monthly payment at $23,150 for both loans. However, with Yadkin unable to pay off 6980, Hansen would later craft a new loan with a P&I of $6075.00[195]. This new Yadkin P & I loan's $17,995 added to the upcoming SBA P & I amount of $6,402.17[196] plus Yadkin's 6980's loan P&I of $6075.00[197] equaled a total DPP monthly payment of $30,472.17.

491. Yadkin's June 2014 conglomeration of loans was $10,673.33 more per month than Hansen indicated back in October 2013 when DPP pledged its collateral for the initial draw loan and the subsequent Range Construction Project loan on or about November 13, 2013.

492. Hansen's action exceeding Yadkin's original underwriting by knowingly increasing DPP/Bayport's repayment amount $10,673.33 more per month asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

493. Hansen's actions concealing DPP/Bayport's increased monthly payment from her altered DPP financial structure was at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

---

[195] Mo251
[196] Mo2146
[197] Mo251, Mo21

494. Finally on June 13, 2014 at the closing table, Yadkin did not provide DPP with any explanation of its multi amended loan structure.

495. Instead, Yadkin did revert its 7028 loan back to five years against SBA policy and the SBA's first Screenout above[198].

496. Yadkin further confused DPP at the closing table when it required DPP to sign another Yadkin Commitment letter with the original May 28, 2014 terms of a TPC of $3,181,550.[199]

497. Yadkin here did not provide DPP an explanation of how 6980 Advance Draw Loan figured into the debt structure reconciled with the Commitment Letter they just signed.

498. Yadkin did not explain to DPP what it meant to leave a 90-day revolving note in first lien position, the increase in bank charges, the required changes for SBA compliance, nor its effect on DPP's construction money.

499. Yadkin owed an explanation to DPP concealing the change in DPP's loan structure, term of loan, BC, and adding an additional 6980 term loan.

500. DPP trusted and relied upon Yadkin's assertions that its 6980 loan was incorporated into 7028 and not proceed with additional monthly loan fees outside of the original underwriting.

501. In fact, as DPP saw it at the closing table, Yadkin was still adhering to all of its promises by requiring execution of another May 28, 2014 Commitment Letter.

502. Further supporting that the project's 6980 Advance draw was aligned with Hansen's May 28, 2014 Commitment Letter in DPP's membership's minds was Hansen's own project cost Excel sheets

---

[198] Mo24,
[199] Mo654

74

stating that 6980's $500,000 was an advance draw on the TPC of $3,181,550, which Hansen later provided to DPP with a copy of the closing HUD statement.200

503.  Hansen dominated DPP's present and Bayport's future financing through Yadkin's Commitment Letter narrative without any explanation to DPP through her project accounting.

504.  And, only Hansen maintained authority and control over DPP's 7028 loan disbursements throughout the construction of the range constituting this accounting.

505.  Hansen's position controlling the debt structure and project payments allowed her to later refuse disbursements to further shift the SBA's portion onto DPP's BC.

506.  DPP and Bayport had no other economic option but to proceed with Hansen's closing as it would lose the Range Property, its equity and all of the cash paid in developing the property during its ongoing construction.

507.  On June 13, 2014, DPP had contributed $536,305.84 in BC.

508.  With the June 13, 2014 closing, Yadkin removed the $500,000 advanced draw and maintained a TPC of $3,243,000 to measure DPP's ongoing 17.31% BC of $561,450.201

509.  However, Hansen's AIA draw and DPP project cost accounting spreadsheet titled, "Commercial Const Line – Denver Defense – 6 – 6 – 14.xls" still showed a TPC of $3,743,000 with a first Draw that included her $500,000 6980 Advance Draw for a BC of $561,450. 202

---

[200] Mo192
[201] Mo646,1290, Mo102 pg.4
[202] Mo2242 (Draw #1 6/19/14), 2243 (Draw #2 6/20/14), Mo2244 (Draw #3 6/25/14), Mo2245 (Draw #4 6/30/14), Mo2246 (Draw #5 7/10/14), Mo2247 (Draw #6 7/17/14), Mo2248 (Draw #7 8/01/14), Mo2249 (Draw #8 8/29/14 – increased BC to $603,568), Mo2250 (Draw #9 9/09/14), Mo2251 (Draw #10 9/15/14), Mo2252 (Draw #11 9/15/14 increased BC to $606,723), Mo2253 (Draw #12&13 9/24/14), Mo2254 (Draw #13 10/07/14), Mo2254 (Draw #14 10/15/14)

510. Hasen provided Lafone a copy of Yadkin's budget her spreadsheet titled, "Commercial Const Line – Denver Defense – 6 – 6 – 14.xls" after 7028's closing with its HUD attached.

511. After Yadkin received DPP's closing documents, Hansen transmitted DPP's actual signatures from her 10 year May 28, 2014 Commitment Letter to Self-Help by both mail and email.

## Yadkin Correcting Non-Compliant Loan Documents

512. It was not until July 14, 2014, that Hansen attempted to correct its non-compliant 7028 five-year term loan documentation when Hansen requested the DPP membership to come to Yadkin Bank, not the closing attorney, for signatures correcting Yadkin's mistake.[203]

513. Unfortunately, Yadkin failed to contact Heather O'Brien and had a Yadkin employee sign her name.[204]

514. After Hansen viewed each DPP member except O'Brien execute her July 14, 2014 10-year term note for 7028, Hansen transmitted DPP's actual signatures from her 10 year note to Self-Help by both mail and email.

515. Likewise on July 30, 2014, Hansen's 6980 Advance Draw loan had another 90-day expiration and requested all but Heather O'Brien to sign a third 6980 change agreement.[205] And Yadkin used an employee to sign for Heather O'Brien without her knowledge or consent.[206]

516. Intervening Yadkin's 7028's noncompliance issues, on July 23, 2014, Hansen drafted DPP its third change in terms for her 6980 Advance Draw Loan without a new 6980 credit memo.

---

[203] Mo33
[204] Expert Affid.
[205] Mo21
[206] HoB Affid, Expert Affid.

517. This new 6980 loan was not a 90-day revolving interest loan. It was no longer a 5% interest loan with a balloon payment. "The loan term was for 10 years based on a 10-year amortization."[207] It was now at a 5.2% interest rate not a 5% as previously. Yadkin provided no information on its changes to the SBA. This information on a superior lien loan would be relevant to the SBA's computation of cash flow coverage and repayment ability.

518. Additionally, Hansen's new 6980 loan did not have Heather O'Brien's signature.[208] While this was the second Yadkin document executed without Heather O'Brien, this is the first instance of this reoccurring false signature.[209]

519. Hansen's actions creating and or using a false Heather O'Brien's signature was at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

520. Yadkin had no underwriting to support DPP's repayment of a $30,472.17 monthly loan payment for Hansen's multi loan structure of 6980 and 7028 that incorporated SBA's 5000 loan.

Hansen'$150k Freeze

521. Norfolk would forward both Canipe's AIA payment request along with DPP's own construction expenses to Hansen.

522. Hansen alone viewed each of Norfolk's submissions for construction loan disbursements.

523. Yadkin policy dictated that a loan officer could only make construction loan disbursements after AIA payment application and an independent inspection.

524. Out of nineteen 7028 Loan disbursements to DPP, Hansen only ordered four independent inspections.

---

[207] Mo
[208] Mo830pg53
[209] *See* Mo830 pg.s 48, 53, 90, 93, Mo295, Mo824, Mo825, Mo829 pg.52.

77

525. Hansen did not order an independent inspection until Draw #4, #7, #16 and #18.

526. Hansen did not order an independent inspection for Draw #19.

527. Hansen maintained her project budget records of each draw request and disbursement on a spreadsheet titled, "Commercial Const Line – Denver Defense – 6 – 6 – 14.xls".

528. On or about August 5, 2014, Hansen now sought to increase DPP's BC to 20%. This would also place Yadkin back at 50% instead of 56.68% as indicated on her May 28, 2014 Commitment Letter to DPP.

529. Therefore, Hansen had to reduce Yadkin's 7028 construction loan by $150,000, so she would have to tell DPP that she had to not disburse or freeze $200,000.[210]

530. Now she had to convince DPP that it was necessary they short their own 7028 construction budget.

531. To convince DPP to remove $150,000 from its 7028 construction loan, Hansen remembered that Bayport needed a start-up inventory loan that she promised back in October 2013. Hansen would trade $200,000 of DPP's 504 construction funds for a new Yadkin loan to Bayport for $400,000 that matched her 6980 October 3, 2013 Credit Memo. With or without Bayport's inventory loan, Hansen was going to reduce DPP's 7028 construction budget. Hansen issued a Financial Spread Request Form for Bayport's missing start-up inventory loan.[211]

532. Hansen explained to the DPP membership to get an inventory loan for Bayport, DPP had to not use $200,000 of its construction budget.

533. Hansen explained to DPP, the Bayport inventory loan would get $200,000 from freezing DPP's 504 loan and that amount would land in Bayport's loan of $200,000, making a total of $400,000.

---

[210] Mo2264 pg.9
[211] Mo2257

534.  Hansen did not explain why or how $200,000 of DPP's term construction loan money, which already had paid origination fees on, could then transfer into a one-year line of credit for the entirely different company Bayport's inventory requirements.

535.  DPP understood from Hansen that it would not get Bayport's required inventory line of credit if it did not bear the strain of a $200,000 construction budget reduction.

536.  DPP understood if Bayport did not get its inventory capital line of credit, it would not be able to sustain the pro forma's required inventory levels and therefore the required sales for repay ability under all of DPP's and Bayport's financial assumptions.

537.  DPP and Bayport felt that they had no choice but to bear the consequences of a reduced construction budget or lose the project in its entirety.

538.  At the time Yadkin believed DPP's construction was underbudget.   However, there was $1,573,111.04 still remaining in the 7028 construction project.   And DPP had $16,586.31 BC remaining.  The Actual project costs at this time was $2,152,997.65.

539.  Hansen would later email Self-Help that "#1017028 was originated for $2,681,550.00. In the fall of 2014, we froze $149,997.00 to establish a line of credit to Bayport Holdings, LLC [sic] & Denver Property Partners. We are modifying this credit facility to a loan amount of $2,531,553.00 based on SBA requirements."[212]

540.  From the information available to DPP at the time, DPP had to accept Hansen's $200,000 7028 freeze as a requirement to Yadkin's new Bayport inventory loan.

541.  DPP now believed it had $200,000 loan money less to complete its Range Project.

_____

[212] Mo2213

79

542.  During construction, Hansen falsely claimed that for Bayport to attain its required inventory loan, Hansen had to freeze $200,000 of DPP's construction loan budget. This disguised the effect of increasing DPP's BC without actually revealing anything to DPP.

543.  Not DPP, Bayport or their guarantors had outside counsel or assistance to provide any insight to Hansen's $200,000 construction budget freeze to somehow fund Bayport's inventory LOC. As DPP/Bayport was dependent on Yadkin where Hansen gave her voluntary assumption of a duty to advise, counsel, and protect the DPP and its collateral captured in 6980 as PayGo was ongoing, through her 7028 loan structure, to provide Bayport's inventory LOC.

544.  Hansen's actions here asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

545.  Hansen falsely claiming that for Bayport to attain its required inventory loan, Hansen had to freeze $200,000 of DPP's construction loan budget was at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

546.  On August 15, 2014 DPP's TPC was $2,082,993.78.

547.  On August 22, 2014, undisclosed to DPP, Hansen wrote in her credit memo and emailed it to Self-Help about DPP's 7028 Range Construction Project loan:

> We have frozen $200M of funds from the contruction loan since the project is under budget and by making this loan for $400M we are only increasing our TCE by $200M. This would give us a value of 91% LTC on the real estate alone not counting the value of the inventory this line of credit will be funding. Based on the appraised value the LTV of 88% based solely on the real estate.[213]

---

[213] Mo2264 pg9

548. On August 26, 2014, Hansen emails Watson, "I just got the spreads back today and am finishing it up. Hoping to have approval by tomorrow but I am out til Friday so can't do anything until then."[214]

549. Hansen's AIA on Draw #8 for August 29, 2014 listed the total spent on 7028 Range Construction Project was $1,156,476.[215]

550. Hansen provided Bayport's inventory loan to Yadkin's credit committee.[216]

551. Hansen did not disclose to DPP that her 8989 Yadkin Credit Memo failed approval at the Yadkin Credit Committee.

552. Hansen's actions concealing Yadkin's Credit Committee's denial of her Bayport Credit Memo was at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

553. Instead, Yadkin did not provide Bayport a loan, except through a SBA 7a express with a limit of $350,000, which was $50,000 less than Bayport needed for its proforma proscribed, credit-funded inventory amount of $400,000 to operate.[217]

554. And DPP had no notice that an SBA 7a Express $350,000 loan had no $150,000 7028 freeze requirement.

555. But Hansen was going to freeze $150,000 of 7028 construction funds regardless of Bayport's start-up inventory loan's approval.

556. At some time during the fall of 2014, just months after closing and during its disbursements, Yadkin downgraded 7028 from the 1/31/14 credit memo proposed credit rating of 4 to a 5 without any notice to DPP/Bayport.

---

[214] Mo310
[215] Mo2249
[216] Mo2264 (8/22/14)
[217] Mo199(9/4/14 app)

81

557. Yadkin's 7028 credit downgrade during construction asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

## 8289 SBA 7a Express Loan

558. It was not until September 4, 2014 that Hansen even sent Bayport an application for a SBA 7a Express loan.218

559. Before Bayport could sent the completed application back to Hansen, the SBA had already approved the loan on September 5, 2014 for $350,000 for a three-year term.219

560. This loan had a 5% floor never mentioned in any Bayport disclosures.220

561. This new Yadkin 8289 SBA 7a Express loan cost Bayport $7,250.00221 instead of Yadkin's loan costing $2,000222.

562. Hansen's new SBA 7A Express loan required no 7028-construction loan contribution.

563. And while Yadkin still secured this loan with a UCC in the inventory, "as an abundance of caution, [Yadkin placed] a 4th DOT on the gun range/shop."223

564. DPP could maintain its complete budget with this new Bayport loan in place, but Hansen never told DPP she already froze $150,000 back in the beginning of August 2014.

565. However, on September 10, 2014, Hansen emails the Bayport officers,

---

218 Mo199, Mo2425 ("A third loan [4313] was extended in February 2016 to Bayport Holdings, LLC dba Denver Defense for $350M which termed out a SBA LOC [8289]. Initial proceeds were used to fund the startup costs of Bayport Holdings.")
219 Mo1070
220 Mo2256
221 Mo2291 pg.1
222 Mo2264 pg.1
223 Mo2426 (12/12/16 - "UCC filing on all business assets, comprised mainly of guns, ammunition and related inventory. Plus as an abundance of caution, a 4th DOT on the gun range/shop.")

From: Sandra Hansen <sandee.hansen@yadkinbank.com>
To: Craig Norfolk <craig.norfolk@yahoo.com>
Sent: Wednesday, September 10, 2014 4:07 PM
Subject: Surprise.....

I have a surprise for your meeting tonight. Since I lowered the loan from $400,000 to $350,000 I lowered the frozen portion from
$200,000 to $150,000. Now don't let them talk bad about me tonight.

**Sandee Hansen**
*Market Executive*
19525 West Catawba Ave.
Cornelius, NC 28031

O: 704-768-1503
F: 704-892-3449

**YADKIN**
BANK

566. Hansen never applied for a $400,000 SBA express loan.

567. Hansen's $400,000 loan was Yadkin's 8289 loan that failed in Yadkin's Credit Committee on or
about August 26, 2014.

568. Hansen intentionally misled Bayport to expect, believe and justifiably rely upon the fact that Bayport
only had enough credit for a $350,000 loan and not a $400,000 loan instead of just telling Bayport
that an SBA 7a express loan had a $350,000 limit for a three-year term.

569. Hansen closed DPP's SBA 7a express loan to Bayport on September 12, 2014.[224]

570. Not DPP, Bayport or their guarantors had outside counsel or assistance to provide any insight to
Hansen's $150,000 construction budget freeze to somehow fund Bayport's inventory LOC. As
DPP/Bayport was dependent on Yadkin where Hansen gave her voluntary assumption of a duty to
advise, counsel, and protect the DPP and its collateral captured in 6980 as PayGo was ongoing,
through her 7028 loan structure, to provide Bayport's inventory LOC.

571. Hansen's actions falsely freezing DPP's construction budget for Bayport's inventory LOC asserted
a complete dominance over DPP/Bayport's finances and future operations by altering its capital

---

[224] Mo408

structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

572. Hansen falsely claiming that for Bayport to attain its required inventory loan, Hansen had to freeze $150,000 of DPP's construction loan budget was at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

## Adjudicated Equity

573. On September 25, 2014, Hansen took DPP's equity reconciliation it submitted in May 2014 and adjudged how much BC DPP had contributed on that date.225

574. Hansen allowed all of 6980's Advance Draw expense items as $202,641.79 in DPP equity.

575. Hansen claimed and misrepresented that DPP had a BC of $561,450 and that DPP had an "Equity Shortfall" of $50,408.52 as it only contributed $427,206.50 in DPP expenses as equity on page one.

576. Therefore, here at this time, DPP thought it would have to contribute $50,408.52 to the final project expenses to complete its BC obligation when issued a Certificate of Occupancy226.

577. Hansen did not attribute DPP's October 25, 2013 equity contribution of the Range Property equity at that time of $362,641.79 inherent to the appraised property value ($660,000) minus the two then existing liens of $297,358.21.

578. And no Hansen equity calculation included her $160,000 equity left in the property from her $500,000 6980 Advance Draw Loan deduction she would apply later in her own reconciliation of DPP's equity investment citing only $401,450.00.227

579. Hansen's 150,000 freeze reduced DPP's TPC from $3,243,000 down to $3,093,000.228

---

[225] Mo646, submitted to SBA Mo1290
[226] *See* Mo2212
[227] Mo2069 Final Use of Proceeds
[228] Mo311

580. On September 25, 2014, DPP's BC was $547,552.57 or 16.88% of Yadkin's and Self-Help's TPC of $3,243,000. Hansen freezing $150,000 of 7028's construction loan[229] immediately meant that DPP's BC of $547,552.57 was now 17.70% and over Self-Help's Debenture requirements of DPP's BC at 17.31%.[230]

581. Alternatively, Hansen's reduction of 7028's construction loan funding shifted that $150,000 freeze obligation onto DPP's BC to make for that portion of TPC.

582. Hansen did not disclose this to DPP.

583. But the SBA would disclose exactly this internally in their 327-3 action.[231]

584. Contrary to a BC increase, Hansen stated twice in writing that DPP's BC remained at $561,450.[232]

585. Therefore, Hansen's freeze only affected the TPC through a $150,000 decrease in available project funding.

586. DPP never meant to pay more out of pocket that $297,726.76.[233]

587. In fact, that day, Hansen had no authority[234] to reduce DPP's 7028 construction loan and she actually never reduced it. She just told DPP that. [235]

588. Hansen also stopped reporting DPP's construction progress at Draw #17 in October 2014.

589. In his October 21, 2014 email to the DPP membership about how much 7028 funds were left, Norfolk

"went back to Melissa and together we figured out that Sandee had not read the system right and miscalculated our remaining funds by $150,000. Melissa apologized for the error and

---

[229] Mo311
[230] Mo1071,2335
[231] Mo1305 (Decrease the SBA Interim Loan Amount by $149,997.00 to match funds disbursed by the bank. The borrowers paid more out of pocket [$561,450] so the Project costs will remain the same however the Interim loan will be reduced to $910,053.00 and the Borrower contribution will increase to $711,447.00. The SBA loan amount will decrease to $936,000.00.)
[232] *Compare* Mo646 pg.166 *with* Mo614
[233] See Mo1305
[234] Mo2213 4/14/15 (This memo to will serve as approval to modify the loan amount.)
[235] Mo1002 (ending balance 12/19/14 $2,531,553.00 paid off 5/7/15)

we agreed to reconcile other numbers that might be out of line as well due to their new accounting system."236

590. So, Hansen's $150,000 was available from 7028's construction draw until Yadkin paid the balance off237 on May 7, 2015 with its new loan dated April 21, 2015.238

591. Not DPP, Bayport or their guarantors had outside counsel or assistance to provide any insight to Hansen's adjudication of DPP's expenses as BC and equity. As DPP/Bayport was dependent on Yadkin where Hansen gave her voluntary assumption of a duty to advise, counsel, and protect the DPP and its collateral captured in 6980 and ultimately DPP's BC throughout its PayGo period.

592. Hansen's actions here asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

593. Yadkin's and Hansen's actions here created a special relationship between the Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP from its wrongful assertion that DPP owed more than its downpayment in BC.

594. Hansen's actions adjudicating DPP's expenses and commanding how much DPP had to pay over its downpayment were at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

Yadkin's Final Construction Draw

595. On November 12, 2014, Lincoln County Inspection Department issued DPP its Certificate of Occupancy (CO).239

---

236 Mo201
237 Mo1002
238 Mo34 (O'Brien forged signature) Loan#1017028-1096004212015
239 Mo805

86

596. Per Hansen's Amended 7028 Credit Committee minutes[240] proscribed that DPP's CO or Certificate of Occupancy signified DPP's project completion, regardless of whether DPP actually had completed all of the construction or not.

597. Later, on or about November 15, 2014, Norfolk applied for a DPP draw upon 7028 for $114,749.00.[241]

598. Hansen met Norfolk's request with her annotations on his Draw Request stating $"50408.72 less CK from Borrower/Equity in". Now DPP had to pay its "Equity shortfall" of $50,408.52 to complete its BC obligation.[242]

599. While a CO signifies that the construction is significantly complete for the owner to occupy, both contract and project were not yet complete. Hansen ignored this fact and proceeded with her final draw.

600. On November 18, 2014, Hansen authorized a Draw for $64,340.48. DPP had to pay exactly $50,408.52 itself for this Draw payment.

601. By Hansen's calculations, DPP had met its $561,450 BC Obligation without considering any further BC since DPP's equity submission to Hansen in May 2014. However, DPP's BC was now approximately $244,000 not including any Range Property equity.

602. Hansen calculated this was 20.21% of Yadkin's and Self-Help's TPC of $3,243,000. Using this BC% of over 20%, DPP could have sought financing elsewhere other than the SBA, who promised in Yadkin's May 28, 2014 Commitment Letter it would have only a 15% BC.

---

[240] Mo2212
[241] Mo614
[242] Mo646 pg.166

603. Hansen oversaw her DPP final BC payment of $50,408.52 leaving Yadkin only $108,234.66 instead of $258,234.66 of 7028 funds available to complete the Yadkin's altered TPC of $3,243,000.

604. Now Hansen's freeze would certainly affect the debenture's ability to pay for completing the project since Canipe had not yet issued its final AIA payment application for general construction.

605. On November 30, 2014, Bayport made two Accusport purchases for $45007.86 ref#2039 and $49774.76 ref#2051.

606. Based upon Bayport's 7329 Yadkin Checking balance, Bayport would not order the two 8289 transfers for the two inventory purchases until on or about December 17, 2014.

607. On December 1, 2014, Canipe Construction issued its last AIA invoice for $177,798.00 citing underneath a "$373,883.63 balance to finish, including retainage".243

608. However, Yadkin already determined that the project was completed when Lincoln County issued its certificate of occupancy, not when all of the construction was actually completed including any "punch-list" incomplete items.

609. Still on December 4, 2014, based on Yadkin's project determination, Self-Help issued a closing notification to Hansen and Norfolk that it will email a "pre-closing letter to you outlining items we will need to collect, in order for our Closing Team to prepare your closing package."244

610. On December 10, 2014, DPP's 8667 bank balance was $25,193.85.245

DPP's December 19, 2014 Construction Draw
611. Norfolk resigned from Denver Defense and alerted Yadkin on or about December 16, 2014.246

---

243 Mo648
244 Mo312
245 Mo2234
246 Mo203

88

612. On or about December 17, 2014, Bayport ordered one Bayport 8289 loan transfer of $45,000 for the previous Accusport purchases for $49774.76 ref#2051.

613. On December 18, 2014 at 9:25 a.m., Yadkin noted that Craig Norfolk will need to be removed as primary user." And, "Kevin Lafone will need to be the administrator".247

614. On December 19, 2014, when Hansen checked DPP's 8667 checking account to take funds for her check to Canipe's final AIA invoice and found DPP's 8667 balance only $25,193.85.248

615. Then Hansen handwrote on Canipe's last AIA application that this draw's "request is for $177,798 funded $108,238.65 all that was available 12/19/14".249

616. Hansen misrepresented to Yadkin and DPP that there was only $108,238.65 in DPP's construction account250 instead of $258,238.65, which was still available in 7028's account since there was no approval for Hansen to reduce DPP's 7028 loan.

617. Hansen's concealment of the true amount residing in 7028's remaining loan was at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

618. Without access to the full 7028 funding because of Hansen's $150,000 freeze, DPP could not pay for Canipe's last AIA invoice.

619. DPP could not pay its outstanding construction bills because Hansen stopped the last $150,000 of the loan.

---

247 Mo1065
248 Mo2234
249 Mo2231
250 Mo201 Norfolk email to DPP, "After Sandee left for the day I talked with Melissa [Ortega] who actually handles the draws. She said that their new accounting system had merged with the old and it was hard to interpret sometimes but she understood the system better than Sandee and would help me. She gave me some printouts to help calculate remaining dollars and I took them home to reconcile to DPP records. I then went back to Melissa and together we figured out that Sandee had not read the system right and miscalculated our remaining funds by $150,000."

620. With Hansen shifting the SBA's portion onto DPP's BC, Hansen had made DPP insolvent and unable to pay its bills because she froze or refused to release $150,000 of DPP's 7028-construction budget.

621. Hansen's resulting actions from freezing or refusing to release $150,000 of DPP's 7028-construction budget asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

622. Yadkin's and Hansen's resulting actions from freezing or refusing to release $150,000 of DPP's 7028-construction budget created a special relationship between Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct resulting in DPP's insolvency.

623. Hansen's resulting actions from freezing or refusing to release $150,000 of DPP's 7028-construction budget creating DPP's insolvency was at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

## Hansen's Decision

624. Without authorization or consent of DPP or Bayport, seven minutes after Yadkin Bank opened that day, at or at 9:07 A.M, Hansen diverted $50,000 from Bayport's inventory account into DPP's 8667 checking account.[251]

625. Hansen concealed the diversion from 8289 into 8667 from DPP and Bayport.

626. Neither DPP or Bayport knew or consented to Bayport funding DPP's construction with its inventory cash.

---

[251] Mo2233

Case 5:24-cv-00165-KDB-DCK   Document 1   Filed 07/15/24   Page 90 of 236

627. Therefore, Hansen's intentional diversion cost Bayport $50,000 of its proforma long term capital for inventory.

628. Hansen's actions diverting Bayport's inventory cash to DPP's construction account without notice or consent from wither DPP or Bayport asserted a complete dominance over DPP/Bayport's finances and future operations by altering its capital structure, corrupting their repay ability under their own business plan and forever altering its proforma sales plans by irrevocably draining Bayport's starting capitol inventory.

629. Yadkin's and Hansen's actions here created a special relationship between Yadkin and DPP as Yadkin the engaged in egregious or outrageous conduct toward DPP from its wrongful diverting Bayport's inventory cash to DPP's construction account without notice or consent from wither DPP or Bayport.

630. Hansen's actions diverting Bayport's inventory cash to DPP's construction account without notice or consent from DPP or Bayport were at least in a wanton disregard for DPP/Bayport's trust and Yadkin's obligations.

631. At 9:11 A.M., Hansen electronically transferred $108,238.65 from DPP's 7028 Construction account into DPP's 8667 Checking Account.[252]

632. At 9:12:17 A.M. on December 19, 2014, Hansen issued Yadkin Check Number 1200000103 to Canipe Construction and Denver Properties for $177,798.00 before Lafone or Norfolk authorize or sign Hansen's Checking Withdrawal slip.[253]

633. At 9:41 A.M. Hansen then emailed Lafone and Norfolk that

---

[252] Mo2232
[253] Mo2234

"I [Hansen] have debited the Denver construction loan for $108,238.65 and Denver Property Partners checking account for $69,559.35 to cut a check to Canipe Construction and Denver Property Partners. I will just need you [Lafone] or Craig to sign the check for Skip [Canipe]"[254] as it is a two-party certified check requiring DPP and Canipe to indorse.

634. Norfolk explained to Hansen that Canipe's certified check was in the wrong amount at $177,798.00 but did match his AIA request.

635. The actual amount was $8,231.39 less than Canipe's AIA.

636. Therefore, DPP had to deposit Hansen's certified check back into DPP's account and provide Canipe the correct amount on another handwritten check.

637. On December 19, 2014, Lafone had to go into Hansen's branch to deposit Hansen's check No. 103 to Canipe for $177,798.00 back into DPP's 8667 account to avoid a overdraft.[255]

638. Once Lafone endorsed Hansen's Cashier's check, Hansen deposited it back into DPP's 8667 account.[256]

639. Immediately after Lafone's deposit, Yadkin hit DPP's 8667 account with a $177,798.00 withdrawal.[257]

640. Then Norfolk handwrote DPP check No#1021 to Canipe Construction for $169,566.61, which Canipe cashed that day.[258]

641. All of these transactions occurred before Yadkin's 2:00 p.m. posting time deadline for December 19, 2014.

---

[254] Mo874
[255] Mo2234
[256] Mo2234
[257] Mo2234
[258] Mo226

92

642. Lafone did not have access to Yadkin's accounts with DPP or Bayport until days after the December 19, 2014 transactions that Norfolk and Hansen conducted.

643. Lafone assumed the Bayport's 8289 $50,000 transfer on December 19, 2014 to 7329 was for a payment of Accusport purchase ref#1051.

644. Bayport's December increased revenue masked the omission of this missing $50,000 transfer.

645. Finally, Hansen's $50,000 diversion from Bayport SBA 7a express loan to DPP violated Yadkin's April 2, 2014 certification to the SBA that "[t]he Borrower Contribution is cash or property that is part of the Project Property and is not derived from an SBA business loan program."259

## 7028 Termination Results

646. Yadkin considered its loan to DPP complete with DPP's use of proceeds amounting to only $2,531,553.260

647. This made DPP's BC $711,447 or 21.94% of Self-Help's TPC of $3,243,000.261  No documentation in this matter explained why DPP's BC increased an additional 7% without DPP's consent or notification.

648. Unknown to DPP, Self-Help would later account to the SBA for Yadkin's $150,000 reduction in 7028 TPC in its SBA 327-3 action to reduce its debenture value.

> "The borrowers were able to negotiate a reduction for the installation of the equipment as well as monitor expenses and came in under budget..[sic]  Also, the guarantor's equity portion actually exceeded the required amount of 15%, and the guarantors agreed to inject the amount of $561,450.00 or 17.31%."262

---

259 Mo1195
260 Mo521
261 Mo1306 "Debenture Proceeds . . . to final 28.06% of the total project cost."
262 Mo2001

649. The reduction in DPP's equipment is directly from Self-Help abandoning Yadkin's BEFCOR submission project numbers and adopting Yadkin's $3,743,000 TPC.263

650. Self-Help provided this reduction already in its May 12, 2014 submission and now is trying to attribute the reduction again as a second "reduction for the installation of the equipment" that never occurred.

651. Likewise, it is impossible that DPP had "monitor[ed] expenses and came in under budget" when on December 19, 2014 Hansen oversaw DPP's construction project going over her reduced budget and became insolvent from her $150,000 freeze of its 7028-construction funds to reduce Yadkin's loan portion from 56.6% down to 50%.

652. However, Hansen lacked the authority to freeze DPP's funds in 2014.

653. She later claimed that her approval to freeze or modify DPP's loan amount only occurred on April 14, 2015.264

654. She then claimed "This memo to will serve as approval to modify the loan amount." And in her memo, Hansen's sole reason she gave to the SBA and Yadkin was that she froze the funds under "SBA requirements that the loan amount match the actual disbursement." 265

655. Hansen did not recite that it was necessary for DPP to forego $150,000 of construction funds in exchange for a $350,000 SBA 7a Express loan to Bayport.

656. Bayport could have had another Bank provide an SBA 7a Express $350,000 loan with no impact to DPP's construction budget.

657. Hansen's freeze had no commercially reasonable purpose here.

_____

263 Mo1223
264 Mo2213
265 Mo2213

94

658.  Alternatively, if either DPP or Bayport's finances were insufficient alone and eroded each other's loans, then Yadkin should have disclosed that fact to the borrowers before lending.

659.  Instead, Yadkin intentionally lent all of the money to later place all of the loans into special assets monitoring.

660.  DPP did not have its Range Project Construction fully completed until April 2015.

661.  DPP had to raise the cash to pay for all Range Project Construction expenses until 2015 from Bayport's operating capital and initial inventory capital.

## Self-Help SBA closing

662.  On March 19, 2015, Self Help had DPP execute the May 28, 2014 504 Debenture at its official 504 loan closing with Attorney Elliott.

663.  On March 19, 2015, Bayport had been in business at least since November 2014 or at least five months.

664.  Self-Help did not have its SBA clear to close DPP's 504 loan for funding on March 19, 2015.

665.  With Yadkin's help, Self-Help did not start collecting its compliance documentation for SBA funding until after it closed DPP's 504 loan on March 19, 2015.

666.  Under SBA form LRSC 504 Closing Document Listing (12/24/14) Self-Help had to provide the SBA the following documents in this form's Closing Document List:

  1)  504 Closing Document List (form)

  2)  DPP's Authorization for Debenture Guarantee (from May 28, 2014)

  3)  504 Debenture Closing Checklist (SBA form 2286)

  4)  CDC Board Resolution (SBA form 1528)

  5)  Note (SBA form 1505)

  6)  Development Company 504 Debenture (SBA form 1504)

95

667. Only DPP's Closing date survived Self-Help's complete replacement of its 504 loan documentation.

668. On April 3, 2015, after reviewing DPP's March 19, 2015 closing documents, Self-Help knew of Yadkin's problem with Heather O'Brien's signatures containing Alice as her middle name by its 327-2 action.

669. On April 8, 2015, Self-Help knew Yadkin collected DPP's use of its equity injection as the project progressed reported in Yadkin's and loan proceeds (UOP) SBA submission requirement.

670. And Self-Help relied upon other Hansen's UOP documentation as Hansen provided none of DPP's remaining 504 funds disbursed after Draw 16 in Yadkin's UOP submission.

671. DPP used $202,273,74 of Hansen's $500,000 6980 Draw Bridge loan money for its site construction, therefore, Hansen's $500,000 6980 Draw Bridge loan money was permanently commingled in DPP's Range Construction Project and already permanently part of Yadkin's 504 loan in 2013 and Q1 of 2014.

672. Still DPP's 504 loan amount decreased when the SBA disqualified and Yadkin removed Hansen's $500,000 6980 Draw Bridge loan from DPP's TPC and the SBA's 504 loan.

673. Hansen had frozen $150,000 of DPP's Range Construction Project loan budget and Self-Help learned about Hansen's $150,000 freeze when Self-Help requested Hansen sign the SBA TPL agreement and she had listed the funds disbursed as $2,531,553 instead of $2,681,550.

674. Self-Help knew from Hansen's Paygo UOP equity injection submissions that Yadkin did not disburse the full amount of DPP's loan by approximately $149,999.01.

675. In Self-Help's April 13, 2015 327 action, it sought to decrease DPP's 504 loan amount and cited Yadkin's updated

"Reason for Change  The borrowers were able to negotiate a reduction for the installation of the equipment as well as monitor expenses and came in under budget..  Also, the

96

guarantor's equity portion actually exceeded the required amount of 15%, and the guarantors agreed to inject the amount of $561,450.00 or 17.31%."

676. Further in Self-Help's April 13, 2015 327 action, it stated DPP's TPC was $3,243,000 where the SBA back funded Yadkin the now changed amount of $1,060,050 or 32.69% and Yadkin's loan percentage was 50% or $1,621,550.

677. But Self-Help's knew from its April 13, 2015 327-action was unnecessary as Yadkin's changes to TPC, BC and the SBA% at 32.69%, already appeared in Self-Help's approved May 28, 2014 DPP 504 Debenture;

678. And Self-Help knew that in Yadkin's May 30, 2014 Commitment letter to DPP for the 504 loan that Yadkin increased its loan by $250,000 making its percentage at 56.68% while the SBA reduced to 28.32%;

679. At some point, Self-Help learned from Hansen who issued a memo stating,

"The SBA loan to Denver Property Partners, LLC #1017028 was originated for $2,681,550.00. In the fall of 2014 we froze $149,997.00 to establish a line of credit to Bayport Holdings, LLC & Denver Property Partners. We are modifying this credit facility to a loan amount of $2,531,553.00 based on SBA requirements that the loan amount match the actual disbursement. This memo to file will serve as approval to modify the loan amount."[266]

680. So on April 15, 2015 at 4:25 P.M., Self-Help amended their 327 action citing

"Reason for Change Add Bayport Holdings, Inc. as Co-Borrower/Operating Company instead of as Operating Company/Guarantor to mirror the Bank. Bayport Holdings, Inc. owns the equipment. Decrease the SBA Interim Loan Amount by $149,997.00 to match funds disbursed by the bank. The borrowers paid more out of pocket so the Project costs will remain the same however the Interim loan will be reduced to $910,053.00 and the

---

[266] Metadata scrubbed

Borrower contribution will increase to $711,447.00. The SBA loan amount will decrease to $936,000.00. . . Change amount of Borrower's contribution to $711,447.00 and change the percentage to 21.94% of the total project cost."

681. On April 21, 2015, Self-Help sent an email requiring Yadkin to do the following:

"Enclosed are 3 sets of documents:
- Copies of documents for the borrowers of the documents they didn't have to resign and changes were made to other than the signature page.
- Borrower Documents that they need to sign: Note & Resolution
- Bank Documents showing the New Loan amount that Sandee needs to sign. If you still have the originals she signed on April 6th you can just replace the front pages and send those. The Interim Lender Agreement does need a new date since it has to be no sooner than 60 days from funding.

Please have borrowers resign the Resolution and the Note and give them their copies. Please have Sandee sign the new Interim Lender Agreement and the Third Party Lender Agreement and return originals with the check for the Third Party Lender fee. We also need a copy of your Note Modification showing the new loan amount and a term at least 10 years from the funding date. We are trying to make funding on June 17, 2015."

682. However, in her July 23, 2021 affidavit, Hansen swore,

6. Regarding the statements in paragraph 18 of the Affidavit of Heather W. O'Brien, these statements involve a SBA Unconditional Guaranty. This Guaranty, along with the SBA Note, are not part of this action. Furthermore, the SBA Unconditional Guaranty and all related documents were prepared the U.S. Small Business Administration along with its counsel. Neither Affiant nor anyone at Plaintiff prepared these documents or participated in the execution these documents.

683. Hansen did not participate in the execution of the April 21, 2015 documentation because either she or another Yadkin employee took prior signature pages from DPP's prior loan documents and put or slipsheeted each into new DPP loan documents as "documents they didn't have to resign and changes were made to other than the signature page."

98

684. Hansen or another Yadkin employee transmitted these essential loan documents by email and mail to Self Help on or about April 22, 2015.

685. DPP had no notice of these changes, nor did DPP consent to such violation of their right to view, address, and execute these material changes.

686. Not one DPP or Bayport executed document from March 19, 2015 survived the closing to go into Self-Help's final August 2015 SBA funding submission.

687. Yadkin could not qualify for SBA funding of DPP's debenture until somehow, nine months after DPP's closing of the SBA 504 loan.

First long term effect from Hansen's action

688. Bayport's Inventory Revenue at proforma levels was impossible to achieve because Bayport didn't have enough inventory to sell directly from Hansen's significant shifts in Bayport's credit and cash away from inventory funding to Hansen's inflated BC.  This included:

1) Hansen's initial $400,000 inventory loan through her change to a SBA 7a Express loan net after charges only reduced to $342,750 in the face of another Yadkin loan rejection to Bayport.  This $50,000 reduction was insufficient to achieve Bayport's proforma revenue.

   $600,000 MaxInv became $542,750 MaxInv from the loan reduction and further reduced using Bayport inventory cash to cover the $50k gap making MaxInv $500,000.

2) Hansen's $50,000 diversion on December 19, 2014 from Bayport's already $50,000 deficient 8289 Bayport inventory loan to pay Canipe Construction for DPP's AIA contract left Bayport only with a $292,750 in 8289 inventory loan capital.

   $500,000 MaxInv became $492,750 MaxInv from the second loan reduction and further reduced using Bayport inventory cash to cover the second $50k gap.

3) Then afterwards, the impact of Hansen's $150,000 construction funding freeze cost DPP more of Bayport's cash allocation to complete its Range Construction Project

99

after Hasen received DPP's COO and declared the Range Construction Project complete. Typically, where a Borrower had sufficient equity in the project, a bank would extend further credit to complete the construction project, but not Yadkin. Hansen's $150,000 construction funding freeze cost Bayport at least another $198,794.80 of its inventory cash to compete the Range Construction Project and left Bayport with only with $1,205.20 in cash allocated for its $200,000 cash financed inventory. Bayport had now used all of its inventory cash on additional BC and inventory loan reductions to its MaxInv.

$492,750 MaxInv became $293,955.20 MaxInv, from the final construction budget costs further reduced Bayport inventory cash to zero to cover the $198,794.80 gap.

4) After the effects Hansen's $150,000 construction funding freeze took on Bayport's inventory cash, Bayport no longer had cash to pay pro forma startup expenses.

5) Using Bayport's revenue for Bayport's initial inventory level financing caused Bayport's cash shortages, which it had to the use Bayport's 8289 inventory loan for cash operating expenses of approximately $55,000 further reducing MaxInv down to $238,955.20.

| | Bayport Cash | Bayport Credit | Max Inventory Capital |
|---|---|---|---|
| Original Proforma | $200,000 | $400,000 | $600,000 |
| $400K -> $350K | $200,000 | $342,750 | $542,750 |
| Hansen 12/19/14 $50K Redirect | $200,000 | $292,750 | $492,750 |
| $198,794.80 Construction expenses for $150K freeze | $1,205.20 | $292,750 | $293,955.20 |
| $55,000 Bayport Expenses after loss of startup cash | $1,205.20 | $237,750 | $238,955.20 |

689. So, Bayport had to take an outside Yadkin short term inventory credit option repaid through Bayport revenue to Acusport (an inventory vendor) to bridge the $340K it lost to Yadkin.

690. Bayport had to pay Acusport's term payments back from revenue, not capital, creating month-by-month deterioration of MaxInv through Yadkin's inventory undercapitalization effects.

100

691. Each Bayport month saw its revenue paying off Acusport's bill and not replenishing its sold MaxInv inventory.

692. Further this revenue diversion to Acusport damaged Bayport's cash flow intended for overhead and expansion of inventory or retiring MaxInv credit inventory by converting it to cash financed inventory within Bayport's proforma.

693. By April 2015, DPP's Actual TPC was $3,264,912.52 (without the land already owned) plus $660,000K (Range Property Value) plus overages of $83,362,50 = TPC of $3,826,362.52.

694. DPP's original 15% BC of its Commitment Letter defined TPC of $3,743,000 was $561,450.

695. In addition, there was an overage on TPC of $83,362,50.

696. Once DPP had paid off its $297,726.26 downpayment under Hansen's adjudication, DPP's Range Property's equity at 15% of TPC would have covered $644,812.50 with $15,187.50 remaining.

697. So, even after DPP's overages in TPC, DPP had enough Range Property equity to maintain its 15% position.

698. This meant that Yadkin should have increased its loan to DPP by $83,362,50 to pay for the TPC construction overage.

699. Instead, Hansen declared the Range Construction Project complete too early at the CO, so DPP bore an out-of-pocket expense of a BC of $561,450 and the overage of $83,362,50 or $644,812.50.

700. Yadkin did not increase its loan to meet its 85% obligation either for the original TPC of $3,743,000 or the actual TPC of $3,826,362.52.

701. Yadkin's concealed its final 504 numbers from DPP.

702. Undisclosed to DPP, Yadkin and Self-Help arrived at a total final BC of $711,553.

703. As early as March 18, 2014, Yadkin and Self-Help derived DPP's undisclosed BC of 21.94%. from an undisclosed project cost of $3,243,000.

101

704. Self-help derived its $3,243,000 TPC from refusing to include Yadkin's $500,000 advance in the Range Construction Project because Hansen's Draw Bridge didn't qualify as a bridge loan under SBA SOP 50 10. This was the SBA's final TPC without DPP's advance draw.

705. DPP's $711,469 BC minus $660,000 Range Property equity left DPP to pay an additional $51,469 over its downpayment of $297,726.26 from Yadkin's concealed BC shift.

706. Out of pocket cash would be $297,726.26 plus $51,469 plus DPP's TPC overage $83,353.53 = $432,548.79.

707. DPP's $432,548.79 out of pocket cash was necessary to complete construction in addition to Yadkin's construction loan.

708. DPP used $134,822.53 in Bayport's cash that had otherwise been reserved for inventory,

709. Alternatively to avoid DPP's increase cash requirement, (1) Yadkin's Third-Party Loan could have increased to cover the overage, and used DPP's residual equity to secure an increase, or (2)Yadkin could have taken DPP's downpayment at the very first closing to preserve the entire Range Property equity and avoiding both complex loan structures and increased fees and costs.

Second long term effect from Hansen's action

710. Hansen's failure to achieve compliance with her loans forced late or false compliance, which included loan servicing changes that were never underwritten or approved and could not possibly allow Bayport to achieve Yadkin's or Self-Help's underwritten debt service coverage requirements.

711. Months after DPP closed its TPL loan with Yadkin that rejected Hansen's advance draw, Hansen's advance draw loan became $6075 per month instead of her promised $3,299.78 per month under Yadkin's single construction loan outlined in her May 28, 2014 commitment letter.

712. This additional $2,775.22 per month in debt service negatively affected DPP's Debt Service Coverage Ratio ("DSCR"), but Yadkin never modified the DSCR it required of DPP, even after Self-Help's loan structure change made Yadkin's DSCR impossible.

713. The SBA charged DPP $29,950 in loan originating and closing costs outside of the TPC that became increase TPC debt outside of DPP's proforma and original Yadkin loan request and subsequent May 30, 2014 commitment letter.

714. And instead of Yadkin's original conventional loan which carried no extra monthly fees, the SBA loan fees (SBA $731.25+CSA $78+CDC $487.50) were $1296.75 per month further negatively affecting Bayport's following 34 months of operation.

715. Yadkin's fee-intensive loans cost Bayport an additional $44,089.050 in loan servicing over 34 months, reducing Bayport's revenue earmarked for inventory replenishment. (Mo1471)

716. Bayport's inventory loan had interest-only payments of $1,667 per month.

717. Bayport only had approximately $260,000 of inventory held in this long-term financing instrument.

718. The rest was for Hansen's $50,000 diversion to DPP's construction costs and $55,000 for Bayport operating expenses that originally was spent to make up for Hansen's BC shifts.

719. After only one year, Hansen required Bayport to "term out" its three-year 7(a) Express loan to a Yadkin conventional loan at almost four times the monthly payment ($6,615.88 per months v. $1,667 per month).

720. This again devastated Bayport's inventory be taking away its LOC and ability to protect its cash flow.

721. But worse, Bayport's inventory loan became Yadkin loan #4313 costing Bayport now $6,615.88 per month, or $4,949,21 more per month over what Yadkin's own underwriting had approved for DPP's three construction loans.

103

722. Bayport's total per month debt servicing increased by $9,021.18 per month because of Hansen's concealments and breach of fiduciary duties.

723. No Yadkin underwriting anticipated this increase in debt service, and this amount was outside of the original underwriting's DSCR requirements, DPP's construction financing budget, and Bayport's proforma revenues that were intended to pay back these loans.

724. Because of Hansen's concealed actions Bayport could not maintain its inventory level of $600k without its original $200K cash and $400k inventory loan money attributed to Hansen's additional $51,469 BC spent in DPP construction, $50k shorted on 7a express loan choice and $50,000 DPP construction cost diversion on December 19, 2014.

725. This made Bayport's inventory levels $237,750 of a term loan and $1,205.20 cash or $238,955.20.

726. Yadkin's drastic decrease in inventory and capital finance structure cut Bayport revenues in half further depleting its on hand inventory and credit with vendors.

727. Only Yadkin benefitted from Hansen's concealed actions with $9,021.18 in additional loan fees and interest per month.

728. Bayport could not recovery from Yadkin's resulting undercapitalization and cash stripping of Bayport's revenue for DPP's BC.

## PART ONE CLAIMS

## ONE: Breach of a Duty to Negotiate in Good Faith

### (6980 draw bridge loan)

729. This claim incorporates all allegations within this complaint as if each were realleged below.

104

730. Yadkin's 6980 Draw Bridge Loan based DPP's acceptance of Yadkin's implied agreement within its Draw Bridge Loan to continue negotiating in an attempt to finalize the terms of an unapproved 7028 DPP Construction loan agreement available to close in two weeks.

731. Yadkin provided at least two other "lesser" loans to DPP that could not operate a valid construction loan financing or operating inventory LOC violating its Good Faith Requirement.

732. Yadkin did not have honesty in belief or purpose when it knew its 6980 Draw Bridge Loan did not qualify as either a draw or a bridge loan under SBA SOP.

733. The SBA knew the Draw Bridge 6980 $500,000 loan was a cash out refi and not eligible for any SBA financing as a bridge loan or a first draw.

734. Yadkin knew and concealed from DPP these facts as Yadkin's sole purpose offering 6980 was to prevent DPP and its collateral from going to another bank for its construction loan.

735. It was not until after SBA deemed it not part of the project, Yadkin required DPP to renew the drawbridge loan, concealing that material fact.

736. Yadkin's actual purpose was to require DPP to renew 6980 as a condition precedent to attaining Yadkin's 7028 504 construction loan.

737. Yadkin also stated that the reason for the SBA loan in the SBA Credit Memo that "the loan requested exceeds the lender's conventional advance rate for this type of property."

738. Yadkin's Draw Bridge 6980 loan commitment from Yadkin was not made in good faith as the "big loan" or 7028 loan initially promised could not have been made by Yadkin alone and SBA was not involved in October 2013.

739. Yadkin was not faithful to its good faith duty or obligation with any of its actions.

740. Yadkin failed to observe any of a N.C. State Bank's reasonable commercial standards of fair dealing through concealing material facts and terms from DPP/Bayport such as ,

105

1) DPP 80/20 construction loan conventionally unavailable to DPP as Yadkin Credit Committee denied each attempt;

2) 6980 Draw Bridge loan not SBA SOP compliant;

3) DPP's Range was an SBA special Use building required an additional 5% downpayment, so Yadkin's loan could not be an 85% loan;

4) 85/15 loan was not Yadkin complaint either;

5) Yadkin required DPP cash for additional BC after closing to change 7028 into a 80/20 loan;

6) Yadkin required renewal of 6980 to get 7028 504;

7) Bayport's 8289 $400,000 loan application denied;

8) Bayport's SBA 7a express term was 3 years not a one year renewable note;

9) Hansen's claim that she had to freeze $150,000 of DPP's 7028 construction budget, not Yadkin approved nor necessary to extend Bayport a $350,000 SBA 7a express LOC.

10) Hansen diverting $50k of 8289 loan money for insolvent DPP's December 19, 2014 construction bill.

741. Hansen's credit decisions and concealments to DPP/Bayport were not reasonable or sound banking practices under any Yadkin policy, FDIC or OCC guidance or ethical standards.

742. Hansen and Yadkin had an intent to defraud or to seek unconscionable advantage where:

11) Yadkin had to maintain first lien position

12) SBA did not approve this priority structure

13) Yadkin could only provide an 80/20 loan

14) Gained SBA reimbursement through fraudulent documentation

15) Yadkin's October 2013 discussions of DPP's conventional loan with DPP did not anticipate an SBA loan, so Yadkin dealt in bad faith.

743. As a result of Yadkin's breach of the duty to negotiate in good faith:

1) Bayport could not maintain its inventory level from Yadkin's changes to BC and reduction in Bayport's 8289 Inventory loan;

2) Yadkin's drastic decrease in inventory and capital finance structure cut Bayport revenues in half further depleting it's on hand inventory and credit with vendors;

106

3) Only Yadkin benefitted from Hansen's concealed actions with $9,021.18 in additional loan fees and interest per month;

4) Bayport could not recovery from Yadkin's resulting undercapitalization and cash stripping of Bayport's revenue for DPP's BC and eventually led to Yadkin unfairly foreclosing DPP's Range.

744. Both Yadkin and the SBA claim DPP was a pass-through company where Bayport would represent both entities' responsibility for repayment of all loans.

745. Both DPP and Bayport's damages were proximately caused by Yadkin and Hansen's actions enumerated above.

746. Without Yadkin and Hansen's actions, Bayport's Denver Defense Range would still be operating under Bayport today and not under PSA Denver LLC.

747. DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

748. As a result of Yadkin delaying its 7028 funding to DPP/Bayport, Bayport had a loss in excess of $1,007,492.29.

749. Bayport and DPP had a combined cash loss in excess of $198,193.34 for Yadkin's concealed extra contractual BC.

750. As a result of Yadkin's effect on Bayport's inventory levels, Bayport had a loss of cash flow in excess

751. As a result of Yadkin's effect on Bayport's 8289 and DPP's 6980 loan increases, both incurred an additional $6,046.85 for the remaining 27 months of Bayport's operation or $163,265.04.

752. Bayport suffered a loss of capital inventory resulting in consequential damages of Bayport lost sales in excess of $3,735,769.84 per year based upon 2016 sales using Bayport's pro forma MaxInv amounts. For six years of sales revenue lost amounts to $22,414,619.04 in Bayport damages.

# **TWO: Breach of Contract**

(6980 & 7028)

753. This claim incorporates all allegations within this complaint as if each were realleged below.

754. Yadkin sold its 6980 Draw Bridge Loan to DPP's with an implied agreement within its Draw Bridge Loan provide a 7028 DPP Construction loan agreement available to close in two weeks:

   1) An unambiguous offer of a $500,000 Draw or Bridge loan and the rest in two weeks;
   2) Unambiguous acceptance by DPP's advancing collateral dollar for dollar on a draw, not a property acquisition;
   3) Unambiguous acceptance of a 2-week consolidation of construction funding, otherwise DPP now paying interest on equity it already owned;
   4) Mutual intent to be bound, DPP closed and Yadkin made many attempts to provide the promised construction loan,
   5) DPP's consideration paid in the form of $500,000 of Range Property collateral equity.

755. DPP assented to this agreement and closed the contract on October, 25, 2013 with renewal agreements in January, April and July 2014.

756. Yadkin concealed the material fact that its 6980 Draw Bridge Loan did not qualify as either a draw or a bridge loan under SBA SOP.

757. Yadkin knew and concealed from DPP these facts as Yadkin's sole purpose offering 6980 was to prevent DPP and its collateral from going to another bank for its construction loan.

758. It was not until after SBA deemed it not part of the project, Yadkin required DPP to renew the drawbridge loan, concealing that material fact.

759. Yadkin's actual purpose was to require DPP to renew 6980 as a condition precedent to attaining Yadkin's 7028 504 construction loan.

760. Yadkin also stated that the reason for the SBA loan in the SBA Credit Memo that 7028 "the loan requested exceeds the lender's conventional advance rate for this type of property."

761. Further Yadkin commitments were its numerous commitment letters and the SBA's 504 Debenture.

762. In its Commitment Letters, Yadkin concealed the following material facts about any future 7028 construction loan

1) It would list the land as an acquisition;

2) A Yadkin DPP 80/20 construction loan conventionally unavailable to DPP as Yadkin Credit Committee denied each attempt;

3) 6980 Draw Bridge loan not SBA SOP compliant and therefore not commingled with 7028 causing extra fees and expenses;

4) DPP's Range was an SBA special Use building required an additional 5% downpayment, so Yadkin's loan could not be an 85% loan;

5) A DPP 85/15 loan was not Yadkin complaint either;

6) Yadkin required DPP cash for additional BC after closing to change 7028 into a 80/20 loan;

7) Yadkin required renewal of 6980 to get 7028 504;

8) Yadkin would short its 7028 construction budget causing DPP to be insolvent owing its primary contractor cash outside of its original TPC budget it gave to Yadkin.

763. Yadkin's credit decisions and concealments to DPP/Bayport were not reasonable or sound banking practices under any Yadkin policy, FDIC or OCC guidance or ethical standards led to the following breaches of contract:

1) Yadkin willfully ignored critical loan analysis where no one had analyzed Bayport's working capital position in any Yadkin Credit Memo. Not only was there a lack of long term capital (i.e. for inventory), but there was a lack of short term working capital to finance Bayport's start-up operations, both required under Bayport's business plan.

2) Yadkin backdated documents, reused signatures on different documents or forged signatures necessary for loan documentation and amendments.

3) Yadkin backdated documents for necessary loan documentation and amendments.

109

4) Concealed drawbridge loan not SBA compliant and failed to incorporate

5) Concealed Yadkin providing only an 80/20 loan at higher rates than Yadkin's conventional loans.

6) Yadkin increased DPP's BC without notice

7) 6980 capture of BC equity

8) 7028 not requiring downpayment to conceal actual upcoming BC

9) Paygo tracing of valid BC excluding interim interest and other expenses

10) 7028 Draw tracking stopped at Draw 15-16

11) Yadkin concealed failed conv. 400k required inv. Bayport loan LOC and actual replaced it with an SBA 7a express LOC's 36 month term, but providing only one year before stopping Bayport's inventory with a term loan

12) Yadkin freezing 150K 7028 construction loan funds for Bayport's inventory LOC

13) Yadkin claiming CO terminated 7028 loan funds even though construction was not complete, nor was its funding

14) Yadkin's freeze of 7028 for 8289 after DPP met its BC made DPP insolvent and unable to pay for construction expenses under Yadkin's budget and loan parameters

15) Yadkin diverting 50k from Bayport's LOC to fund DPP's insolvent construction amount without notice to DPP, Bayport or the SBA

16) Yadkin's concealed charges to DPP's BC caused Bayport's loss of its inventory capital:

17) Reduced LOC from 400k to 350k

18) Yadkin diversion of 50k to DPP as enhanced BC outside of Commitment Letters

19) DPP forced to use Bayport cash to satisfy PayGo.

20) Yadkin diverting Bayport's inventory planned capital to DPP's BC caused increased costs to DPP's construction project budget from the fragmented financial structure's many interest payments and fees resulting in DPP's decreased TPC of 3.743k to return to DPP's original TOC of 3.943k.

21) Yadkin reimbursed with SBA funds unfairly.

764. As a result of Yadkin's breach of 6980's and 7028's contract:

1) Bayport could not maintain its inventory level from Yadkin's changes to BC and reduction in Bayport's 8289 Inventory loan;

110

2) Yadkin's drastic decrease in inventory and capital finance structure cut Bayport revenues in half further depleting it's on hand inventory and credit with vendors;

3) Only Yadkin benefitted from Hansen's concealed actions with $9,021.18 in additional loan fees and interest per month;

4) Bayport could not recovery from Yadkin's resulting undercapitalization and cash stripping of Bayport's revenue for DPP's BC and eventually led to Yadkin unfairly foreclosing DPP's Range.

765. Both Yadkin and the SBA claim DPP was a pass-through company where Bayport would represent both entities' responsibility for repayment of all loans.

766. Both DPP and Bayport's contract damages were caused by Yadkin and Hansen's actions:

1) 6980 cost more in fees to maintain than the promised whole construction loan;

2) cost more undisclosed BC to DPP but not SBA;

3) Increased BC drained Bayport available inventory cash;

4) reduction of 8289 50k diversion reduced Bayport's available inventory credit.

767. Without Yadkin and Hansen's actions, Bayport's Denver Defense Range would still be operating under Bayport today and not under PSA Denver LLC.

768. DPP Bayport also endured the following aggravating circumstances:

1) Yadkin's May 28, 2014 of Commitment Letter led to Paygo (150k) and further concealed material terms changes that diverted Bayport inventory cash to DPP BC;

2) Hansen's $50,000 Bayport inventory diversion for DPP BC;

3) All Yadkin inventory diversions, increased costs and expenses directly led to decimated Bayport inventory levels and sales;

4) Yadkin knew 6980's Draw Bridge loan was not an SBA compliant bridge loan or property acquisition, but upon discovery by SBA, Yadkin had to conceal the change from DPP to force it to renew 6980's 90-day renewable to term loan as a condition precedent to attaining 7028 just so Yadkin could maintain 6980's first priority lien position;

5) 6980 lower int rate at 5% bait and switch for 7028's 5.2%;

111

6) 6980 as a standalone term loan cost DPP over $202,000 in Range Property Equity that led to a direct benefit to Yadkin and is attributable to 6980's APR as a cost to DPP;

7) SBA compliance fraud including false sigs and three closings slipsheeted.

769. DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

770. As a result of Yadkin delaying its 7028 funding to DPP/Bayport, Bayport had a loss in excess of $1,007,492.29.

771. Bayport and DPP had a combined cash loss in excess of $198,193.34 for Yadkin's concealed extra contractual BC.

772. As a result of Yadkin's effect on Bayport's inventory levels, Bayport had a loss of cash flow in excess

773. As a result of Yadkin's effect on Bayport's 8289 and DPP's 6980 loan increases, both incurred an additional $6,046.85 for the remaining 27 months of Bayport's operation or $163,265.04.

774. Bayport suffered a loss of capital inventory resulting in consequential damages of Bayport lost sales in excess of $3,735,769.84 per year based upon 2016 sales using Bayport's pro forma MaxInv amounts. For six years of sales revenue lost amounts to $22,414,619.04 in Bayport damages.

## THREE:  Unjust Enrichment

775. This claim incorporates all allegations within this complaint as if each were realleged below.

776. Through all actions in this complaint, Yadkin was wrongfully enriched by foreclosing upon DPP for its Range Property Collateral in excess of $4,110,000 when Yadkin itself was responsible for the devastating loss of Bayport's inventory and startup capital that was the primary repayment method of all of Yadkin's loans to DPP/Bayport.

777.  DPP Bayport also lost cash from Yadkin/FNB increased loan fees enriching Yadkin/FNB from its needless complex financing structure in excess of $163,265.04.

112

778. Yadkin/FNB also benefitted though DPP's whole portfolio increasing the banks respective value.

779. Without Yadkin foreclosing upon DPP's Range Property collateral, Yadkin would not have been unjustly enriched.

780. Yadkin knowingly and intentionally sought to "get these people out of my bank" and accelerate other portfolio loans to pressure DPP to provide payment before exiting FNB.

781. FNB had no right under Yadkin's prior performance placing DPP/Bayport in a nonpayment situation through wanton and intentional lack of sound banking actions.

# FOUR:  Creation and Breach of Fiduciary Duty

### 6980 COLLATERAL EXCHANGE

782. This claim incorporates all allegations within this complaint as if each were realleged below.

783. Yadkin created a fiduciary relationship with DPP/Bayport's Draw-Bridge Loan consisting of when:

1) DPP/Bayport placed a special trust in Yadkin outside of the typical lender borrower relationship and outside of Yadkin policy when it first accepted Yadkin's 6980 draw bridge loan anticipating a full construction loan in two weeks and placing dollar for dollar collateral value for Yadkin's first draw on its unapproved construction loan for DPP;

2) DPP/Bayport relied upon Yadkin to exercise its discretion and expertise after the 6980 draw bridge loan to provide a SBA 504 loan for DPP's construction and Bayport's inventory loans

3) After Yadkin's 6980's draw-bridge loan took its collateral, DPP/Bayport had no choice but to rely upon Yadkin to provide its SBA 504 loan

4) Yadkin knowingly accepted DPP/Bayport's trust and confidence first seeking 504 loans with BEFCOR, Farm Bureau and Self Help (Reg Z)

5) And Yadkin acted on DPP/Bayport's behalf providing its financial information to Self Help and exercising Yadkin's discretion and expertise (pg.342)

6) Yadkin acting in a fiduciary relationship over DPP/Bayport failed to make truthful and complete required disclosures to DPP/Bayport

113

7) With DPP's collateral tied completely to its 6980 draw-bridge loan, Yadkin undertook to act for DPP/Bayport in seeking its SBA 504 construction and inventory loans while preventing DPP from seeking alternative financing from another bank.

8) DPP pledged its collateral on the two-week upcoming SBA loan

9) Yadkin promised DPP that its construction loan would be forthcoming if DPP took Yadkin's $500k bridge loan

10) Yadkin created a Special Relationship with DPP Bayport through its draw bridge loan and maintaining DPP/Bayport's financials available for other banks

11) 6980 bridge loan not a product within Yadkin or SBA policy

12) 6980 was a draw on a later unapproved larger construction loan

13) Yadkin altered DPP's property status to an acquisition outside of policy

14) When one party is guided by the judgment or advice of the other party or is justified in believing that the other party will act in his interest;

15) When one party has acquired influence over the other and has abused that influence;

16) When the parties have worked together toward a mutual goal for a long period of time;

17) When the lender knows or has reason to know that the customer is placing his or her trust and confidence in the lender and is relying on the lender to counsel and inform;

18) When both parties understand that a special trust or confidence has been reposed;

19) When there is an allegation of dependency by one party and a voluntary assumption of a duty by the other party to advise, counsel, and protect the weaker party. and

20) When the lender excessively controls or dominates the borrower, or gains substantial control over the business affairs of the borrower.

784. Yadkin's fiduciary relationship with DPP under its 6980 and other loan promises was not created unilaterally. After DPP accepted 6980, it willingly provided its collateral believing it would merge with the Range Construction loan in two weeks.

785. Over the next six months, since DPP did not have $500,000 cash to pay off Yadkin's 6980 Draw Bridge loan, DPP believed that it could not go anywhere else to complete its project or it would face the loss of all the whole investment.

114

786. Yadkin violated each fiduciary obligation by:

787. Yadkin acted adversely or contrary to DPP/Bayport's interests detailed in its business plans and pro formas:

    1) Yakin's actions above were not Yadkin's best efforts on DPP/BAyport's behalf to exercise its skill, care and diligence in providing a 7028 construction loan to incorporate the draw bridge loan's collateral.

    2) Through Yadkin's drawbridge loan's transfer of collateral that prevented DPP/Bayport from going to another lender for its construction loan, Yadkin obtained an unreasonable advantage and benefit at DPP/Bayport's expense.

    3) Yadkin/FNB breached its fiduciary duty by stripping inventory cash during DPP's BC phase.

788. Both DPP and Bayport's damages were proximately caused by Yadkin and Hansen's actions enumerated above.

789. DPP/Bayport suffered the following damages as a proximate result of Yadkin's violation of its fiduciary obligation

790. Without Yadkin and Hansen's actions, Bayport's Denver Defense Rang would still be operating under Bayport today and not under PSA Denver LLC.

791. DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

792. As a result of Yadkin delaying its 7028 funding to DPP/Bayport, Bayport had a loss in excess of $1,007,492.29.

793. Bayport and DPP had a combined cash loss in excess of $198,193.34 for Yadkin's concealed extra contractual BC.

794. As a result of Yadkin's effect on Bayport's inventory levels, Bayport had a loss of cash flow in excess

795. As a result of Yadkin's effect on Bayport's 8289 and DPP's 6980 loan increases, both incurred an additional $6,046.85 for the remaining 27 months of Bayport's operation or $163,265.04.

115

796. Bayport suffered a loss of capital inventory resulting in consequential damages of Bayport lost sales in excess of $3,735,769.84 per year based upon 2016 sales using Bayport's pro forma MaxInv amounts. For six years of sales revenue lost amounts to $22,414,619.04 in Bayport damages.

# EIGHT: Breach of Covenant of Good Faith and Fair Dealing
### 6980-7028

797. This claim incorporates all allegations within this complaint as if each were realleged below.

798. DPP/ Bayport had a mandatory right to the benefit of Yadkin's 6980 agreement as Yadkin sold its 6980 Draw Bridge Loan to DPP's with an implied agreement within its Draw Bridge Loan provide a 7028 DPP Construction loan agreement available to close in two weeks:

1) An unambiguous offer of a $500,000 Draw or Bridge loan and the rest in two weeks;
2) Unambiguous acceptance by DPP's advancing collateral dollar for dollar on a draw, not a property acquisition;
3) Unambiguous acceptance of a 2-week consolidation of construction funding, otherwise DPP now paying interest on equity it already owned;
4) Mutual intent to be bound, DPP closed and Yadkin made many attempts to provide the promised construction loan,
5) DPP's consideration paid in the form of $500,000 of Range Property collateral equity.

799. DPP assented to this agreement and closed the contract on October, 25, 2013 with renewal agreements in January, April and July 2014.

800. DPP/Bayport justifiable relied upon each Yadkin assertion and promise in pledging its collateral under Yadkin's 6980 Draw Bridge Loan

801. DPP/Bayport believed and justifiably relied upon Yadkin's promises of a DPP construction loan in two weeks as Yadkin previously provided a 80% loan for the same guarantors for CPP.

802. Yadkin breached its good faith immediately by closing 6980 as a Draw or Bridge loan when it knew it was not SBA SOP 50 10 compliant.

116

803. DPP/Bayport incorporates Special Circumstances detailed under its Breach of Fiduciary Duty Claim.

804. DPP/Bayport suffered the following damages as a proximate result of Yadkin's violation of its fiduciary obligation

805. Without Yadkin and Hansen's actions, Bayport's Denver Defense Rang would still be operating under Bayport today and not under PSA Denver LLC.

806. DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

807. As a result of Yadkin delaying its 7028 funding to DPP/Bayport, Bayport had a loss in excess of $1,007,492.29.

808. Bayport and DPP had a combined cash loss in excess of $198,193.34 for Yadkin's concealed extra contractual BC.

809. As a result of Yadkin's effect on Bayport's inventory levels, Bayport had a loss of cash flow in excess

810. As a result of Yadkin's effect on Bayport's 8289 and DPP's 6980 loan increases, both incurred an additional $6,046.85 for the remaining 27 months of Bayport's operation or $163,265.04.

811. Bayport suffered a loss of capital inventory resulting in consequential damages of Bayport lost sales in excess of $3,735,769.84 per year based upon 2016 sales using Bayport's pro forma MaxInv amounts. For six years of sales revenue lost amounts to $22,414,619.04 in Bayport damages.

# NINE: NC UDTPA

(6980)

812. This claim incorporates all allegations within this complaint as if each were realleged below.

813. Yadkin acted unfairly both as a fiduciary and as a bank when:

   1) 6980 cost more in fees to maintain than the promised whole construction loan;

117

2) 7028 cost more undisclosed BC to DPP but not SBA;

3) Yadkin Increased BC drained Bayport available inventory cash;

4) Hansen's $50,000 diversion reduced Bayport's available inventory credit.

5) Without Yadkin and Hansen's actions, Bayport's Denver Defense Range would still be operating under Bayport today and not under PSA Denver LLC.

814.  All of these actions were in or affecting commerce both in North Carolina and the United States.

815.  Yadkin's unfair loans and subsequent actions proximately caused actual injury to DPP/Bayport.

816.  Yadkin promoted these following aggravating circumstances:

1) Yadkin's May 28, 2014 of Commitment Letter led to Paygo (150k) and further concealed material terms changes that diverted Bayport inventory cash to DPP BC;

2) Hansen's $50,000 Bayport inventory diversion for DPP BC;

3) All Yadkin inventory diversions, increased costs and expenses directly led to decimated Bayport inventory levels and sales;

4) Yadkin knew 6980's Draw Bridge loan was not an SBA compliant bridge loan or property acquisition, but upon discovery by SBA, Yadkin had to conceal the change from DPP to force it to renew 6980's 90-day renewable to term loan as a condition precedent to attaining 7028 just so Yadkin could maintain 6980's first priority lien position;

5)  6980 lower int rate at 5% bait and switch for 7028's 5.2%;

6) 6980 as a standalone term loan cost DPP over $202,000 in Range Property Equity that led to a direct benefit to Yadkin and is attributable to 6980's APR as a cost to DPP;

7) SBA compliance fraud including false sigs and three closings slipsheeted.

817.  DPP/Bayport suffered the following damages as a proximate result of Yadkin's violation of its fiduciary obligation

818.  Without Yadkin and Hansen's actions, Bayport's Denver Defense Rang would still be operating under Bayport today and not under PSA Denver LLC.

819.  DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

118

820. As a result of Yadkin delaying its 7028 funding to DPP/Bayport, Bayport had a loss in excess of $1,007,492.29.

821. Bayport and DPP had a combined cash loss in excess of $198,193.34 for Yadkin's concealed extra contractual BC.

822. As a result of Yadkin's effect on Bayport's inventory levels, Bayport had a loss of cash flow in excess

823. As a result of Yadkin's effect on Bayport's 8289 and DPP's 6980 loan increases, both incurred an additional $6,046.85 for the remaining 27 months of Bayport's operation or $163,265.04.

824. Bayport suffered a loss of capital inventory resulting in consequential damages of Bayport lost sales in excess of $3,735,769.84 per year based upon 2016 sales using Bayport's pro forma MaxInv amounts. For six years of sales revenue lost amounts to $22,414,619.04 in Bayport damages.

825. DPP/Bayport requests treble damages and its attorney's fees under this statute.

## TEN:  Clayton Act (sec.4) tye-in

826. This claim incorporates all allegations within this complaint as if each were realleged below.

827. DPP/Bayport had no knowledge of this claim until November of 2022 where Self-Help's subpoena response identified the concealment of 6980's status to DPP prior to DPP executing Yadkin's May 28, 2014 Commitment Letter for 7028. Other discoveries ensued such as enumerated above: Land acquisition concealment, 250k fraud for special use, Paygo, BC fraud in SBA docs, 50k inv reduction, 3year 7a express term concealed, and Bayport's LOC to term loan.

828. In Yadkin/FNB's geographic area surrounding DPP's Range, Yadkin/FNB controlled over 10% of all SBA loans from 2011-2019.

829. Yadkin created its 6980 as a tie-in loan required before DPP could attain its full construction loan.

119

830. Yadkin's 6980 loan locked in and provided the majority of DPP's Range Property collateral supporting future 7028 to prevent competition that required commercially reasonable underwriting that Yadkin ignored.

831. On the eve of attaining DPP's 7028 construction loan, Yadkin on May 30, 2014 required DPP's renewal of 6980 to get 7028's 504 construction loan.

832. DPP received no benefit and actually was penalized as Yadkin's requirement was solely to conceal 6980's non incorporation into 7028 and to maintain Yadkin's first lien position.

833. Likewise, Yadkin's 6980 tye-in loan was a bait and switch loan that previously locked in DPP to future Yadkin loan overcharges.

834. Yadkin forcing DPP to pay for 6980 when Yadkin knew it would not be incorporated into 7028 and therefore an independent loan is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful".

835. Inventory cash diversion damages discovered through drawbridge loan incorporation fraud

836. DPP/Bayport respectfully requests that it recover treble damages for injuries it has suffered at Yadkin's violations of this statute.

# TWELVE:  Fraud in the Inducement

837. This claim incorporates all allegations within this complaint as if each were realleged below.

838. In October 2013, Yadkin offered DPP its 6980 Draw Bridge loan as a draw or Bridge loan to a future SBA qualified bridge loan in two weeks.

839. Yadkin knew 6980 was not SBA SOP 50 10 qualified as either a Draw on a later construction loan or a bridge fianicning for a later 504 loan.

840. Each of these facts Yadkin falsely represented or concealed from DPP.

120

841. Yadkin's false representation or concealment for DPP to pledge its Range Property Collateral under 6980 was reasonably calculated to deceive.

842. Yadkin's false representation was made or the concealment was done with the intent to deceive DPP and with the intent that DPP acted upon the offer and transfer its collateral under Yadkin's control.

843. DPP was, in fact, deceived by Yadkin's false representation or concealment and acted upon it.

844. DPP was irreparably damaged to its collateral, Bayport's business and other collateral losses.

845. DPP reasonably have relied on Yadkin's false representations which cause damages to DPP/Bayport.

846. Every Damage stemming from this transaction was proximately caused by Yadkin's fraudulent actions.

847. Without Yadkin and Hansen's actions, Bayport's Denver Defense Rang would still be operating under Bayport today and not under PSA Denver LLC.

848. DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

849. As a result of Yadkin delaying its 7028 funding to DPP/Bayport, Bayport had a loss in excess of $1,007,492.29.

850. Bayport and DPP had a combined cash loss in excess of $198,193.34 for Yadkin's concealed extra contractual BC.

851. As a result of Yadkin's effect on Bayport's inventory levels, Bayport had a loss of cash flow in excess

852. As a result of Yadkin's effect on Bayport's 8289 and DPP's 6980 loan increases, both incurred an additional $6,046.85 for the remaining 27 months of Bayport's operation or $163,265.04.

853. Bayport suffered a loss of capital inventory resulting in consequential damages of Bayport lost sales in excess of $3,735,769.84 per year based upon 2016 sales using Bayport's pro forma MaxInv amounts. For six years of sales revenue lost amounts to $22,414,619.04 in Bayport damages.

121

# **FOURTEEN:  Actual Fraud (Concealment)**

854.  This claim incorporates all allegations within this complaint as if each were realleged below.

855.  Yadkin concealed or suppressed a material fact to DPP that:

   1)  6980 was not a SBA SOP qualified bridge loan;
   2)  6980 would not be paid off through 7028;
   3)  7028 would not fund as in its May 28, 2014 Commitment Letter;
   4)  7028's loan amount was to be reduced to create an 80/20 loan.

856.  Yadkin knew each fact was material to DPP.

857.  DPP/Bayport justifiably relied upon Yadkin's loan assertions and subsequent behavior.

858.  Yadkin's omitted facts were unknown and inaccessible to DPP and Bayport.

859.  Moreover, DPP and Bayport were unaware of the fact and would not have acted as DPP/Bayport did if DPP/Bayport had known of Yadkin's concealed or suppressed facts.

860.  Yadkin intentionally concealed or suppressed these facts with the intent to defraud DPP and Bayport.

861.  As a result of the concealment or suppression of the fact, DPP/Bayport sustained damages.

862.  Without Yadkin and Hansen's actions, Bayport's Denver Defense Rang would still be operating under Bayport today and not under PSA Denver LLC.

863.  DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

864.  As a result of Yadkin delaying its 7028 funding to DPP/Bayport, Bayport had a loss in excess of $1,007,492.29.

865.  Bayport and DPP had a combined cash loss in excess of $198,193.34 for Yadkin's concealed extra contractual BC.

866.  As a result of Yadkin's effect on Bayport's inventory levels, Bayport had a loss of cash flow in excess

867. As a result of Yadkin's effect on Bayport's 8289 and DPP's 6980 loan increases, both incurred an additional $6,046.85 for the remaining 27 months of Bayport's operation or $163,265.04.

868. Bayport suffered a loss of capital inventory resulting in consequential damages of Bayport lost sales in excess of $3,735,769.84 per year based upon 2016 sales using Bayport's pro forma MaxInv amounts. For six years of sales revenue lost amounts to $22,414,619.04 in Bayport damages.

# FIFTEEN: Constructive Fraud

869. This claim incorporates all allegations within this complaint as if each were realleged below.

870. Yadkin had an existing relationship with the members of DPP/Bayport.

871. Once DPP had executed 6980 under Yadkin's promises, DPP had extended its collateral entrusting Yadkin to perform its future loan promise in two weeks.

872. Yadkin further made additional acts outside of banking policy or loans o other clients.

873. Yadkin took a role as fiduciary as described in DPP's claim for Breach of Fiduciary Duty above establishing that Yadkin held a relationship of trust and confidence existed between DPP/Bayport and Yadkin.

874. Yadkin used its position of trust and confidence to bring about:

1) 6980 was not a SBA SOP qualified bridge loan;
2) 6980 would not be paid off through 7028;
3) 7028 would not fund as in its May 28, 2014 Commitment Letter;
4) 7028's loan amount was to be reduced to create an 80/20 loan.

to the detriment of DPP/Bayport and solely for the benefit of Yadkin/FNB.

875. DPP/Bayport never obtained or acted on independent advice of another.

876. Yadkin as fiduciary did not provide periodic reporting, fairly negotiated transactions, and gained personal advantage from the transactions.

877. Yadkin actions were not open, fair or honest fiduciary behavior.

878. DPP/Bayport suffered the following damages as a proximate result of Yadkin's violation of its fiduciary obligation

879. Without Yadkin and Hansen's actions, Bayport's Denver Defense Rang would still be operating under Bayport today and not under PSA Denver LLC.

880. DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

881. As a result of Yadkin delaying its 7028 funding to DPP/Bayport, Bayport had a loss in excess of $1,007,492.29.

882. Bayport and DPP had a combined cash loss in excess of $198,193.34 for Yadkin's concealed extra contractual BC.

883. As a result of Yadkin's effect on Bayport's inventory levels, Bayport had a loss of cash flow in excess

884. As a result of Yadkin's effect on Bayport's 8289 and DPP's 6980 loan increases, both incurred an additional $6,046.85 for the remaining 27 months of Bayport's operation or $163,265.04.

885. Bayport suffered a loss of capital inventory resulting in consequential damages of Bayport lost sales in excess of $3,735,769.84 per year based upon 2016 sales using Bayport's pro forma MaxInv amounts. For six years of sales revenue lost amounts to $22,414,619.04 in Bayport damages.

## SIXTEEN:  Punitive Damages

886. This claim incorporates all allegations within this complaint as if each were realleged below.

887. Yadkin's actions enumerated above as wanton were all in reckless or callous disregard of, indifference to the rights of one or more persons including DPP/Bayport

124

888. Further Yadkin's wanton actions enumerated above were aggravating factors and oppressively done in a way or manner which injuries or damages or otherwise violated the rights Bayport/DPP and its Guarantors (i.e. Reg Z) with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of DPP's trust in providing its collateral under 6980.

889. Yadkin's wanton actions proximately caused actual or compensatory damages as enumerated above.

890. Yadkin's Act, or omission proximately caused actual injury as enumerated above.

891. Yadkin's injuries to DPP/Bayport were unfair and unjust as enumerated above.

892. Yadkin displayed a lack of calm discretion and sound reason where:

1) Yadkin withheld material facts and
2) loan documents were continually non-compliant to Yadkin or other policy or regulation

893. DPP seeks punitive damages in the amount of four times its damages awarded at trial or $118,170,957.61.

## SEVENTEEN:  RICO 1962(c)

894. This claim incorporates all allegations within this complaint as if each were realleged below.

895. DPP/Bayport had no knowledge of this claim until November of 2022 where Self-Help's subpoena response identified the concealment of 6980's status to DPP prior to DPP executing Yadkin's May 28, 2014 Commitment Letter for 7028. Other discoveries ensued such as enumerated above: Land acquisition concealment, 250k fraud for special use, Paygo, BC fraud in SBA docs, 50k inv reduction, 3year 7a express term concealed, and Bayport's LOC to term loan.

896. Yadkin's conduct in the creation and servicing of DPP/Bayport's loan enumerated above violated this statute.

897. Yadkin/FNB is a banking enterprise affecting the lives of thousands of U.S. citizens every day.

898. Yadkin, through a pattern of concealing underwriting validity of proper and sound loans, would offer and close small loans that would in some fashion, lock or prevent the borrower from paying off Yadkin's loan and taking its business to another bank.

899. Yadkin's creation of a drawbridge loan prior to other loan improperly funded and noncompliant documentation concealing loan structure and BC fraud.

900. Yadkin's use of wire and mail supporting its fraudulent concealment and activities of both 1) creation-maintenance of noncompliant loans AND 2) its foreclosure activities.

901. Yadkin's use of its own attorney to act as the alter ego of its corporate trustee STS, to alter the FCL sale to increase Guarantor deficiency of the illegal loan through special appraisals, delaying or canceling sales where bidders attended, false facts on filings created and served by Hutchens.

902. Yadkin ignored sound lending practices in achieving these loans solely to increase its value to a future merger increasing the bank and its employee's compensation.

903. Yadkin/FNB directly operated, participated, and controlled the racketeering activity

1) fraud in the sale of securities (6980 pool loan) Yadkin sale to FNB
2) 18 U.S.C. § 1343 (wire fraud)
3) 18 U.S.C. § 1344 (bank fraud)
4) 18 U.S.C. § 1341 (mail fraud)
5) 18 U.S.C. §§ 891-894 (loansharking) 6980's collateral captured $202,000 of DPP's equity on Yadkin's 90-day note created a N.C. APR over 16%.
6) N.C Gen. Stat. §75-1 (antitrust felony)

904. Yadkin's activities and concealments enumerated above caused DPP/Bayport to be undercapitalized at Yadkin's hand and subsequently foreclosed upon losing all investment, land and property value and further creating a monetary deficiency to all of its Guarantors all directly due to Yadkin's violations.

126

905. Yadkin's activities continue through FNB as a regular way of conducting the Yadkin/FNB's ongoing legitimate business.

906. Moreover, Yadkin's activities are a regular way of conducting or participating in FNB's ongoing and legitimate Banking enterprise.

907. Yadkin/FNB's racketeering activity was a proximate cause of DPP/Bayport's harm where Yadkin's DPP BC diversion and inventory cash looting concealed Yadkin's direct harm from this RICO violation to DPP and Bayport under Yadkin's special and fiduciary relationship with DPP/Bayport.

908. DPP/Bayport requests treble damages and its attorney's fees under this statute.


# PART TWO

## Summary

909. Yadkin Valley Bank and FNB have a history of employing Hutchens Law Firm for its collections and collateral foreclosures in North Carolina.

910. Hutchens solicits delinquent loan opportunities from noteholders.[267]

911. If successfully hired, Hutchens would have complete control over the Borrower's collections including foreclosure of any collateral.

912. This includes Hutchens substituting the noteholder's original neutral trustee for Hutchens alter ego, Substitute Trustee Services, Inc. (STS).

913. Hutchens is a debt collector.[268]

THIS IS A COMMUNICATION FROM A DEBT COLLECTOR. THE PURPOSE OF THIS COMMUNICATION IS TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE, except as stated below in the instance of bankruptcy protection.

---

[267] Website
[268] Buncombe 18 SP 520 pg. 8.

127

914. STS Inc. is also debt collector as indicated by its own debt collection language.[269][270]

915. Hutchens has a foreclosure department that STS claims it provides the manpower to complete all trustee-required tasks under N.C. Gen. Stat. § 45.[271]

> Since the inception of this proceeding, Hutchens Law Firm has assumed responsibility for the prosecution of this proceeding. Attorneys employed or retained by Hutchens Law Firm have been responsible for the preparation, review, supervision and/or execution of various documents, as well as, the provision of other legal services necessary to complete this foreclosure proceeding. At a minimum this includes the following:

916. The noteholder signs a contract with Hutchens for collections.

917. Next Hutchens sends the Borrower a statutory demand letter[272] notifying the Borrower must pay Hutchens' attorney's fees relating to the Borrower's note without specifying the fees' purpose.[273]

> Note Holder also provides this notice, pursuant to N.C. Gen. Stat. § 6-21.2, that you have five (5) days from the mailing of this notice to pay the entire outstanding indebtedness due pursuant to the Note without attorneys' fees. If you pay the entire indebtedness due pursuant to the Note within five days, then your obligations thereunder to pay Note Holder's attorneys' fees shall be void. If Note Holder does not receive full payment within five (5) days, then Note Holder will be entitled to enforce the provisions of the Note requiring you to pay Note Holder's attorneys' fees, and you will be liable for those attorneys' fees.

918. Here, Hutchens represents the noteholder on or before drafting and sending Hutchens' demand letter usually with its debt collection language to the delinquent Borrower.

919. Hutchens provides this demand letter under N.C. Gen. Stat. §6.21.2 to ensure it will be able to collect its 15% attorney's fees on a subsequent deficiency action before a trustee even files for foreclosure.

920. And only after Hutchens sends a deficiency demand letter on behalf of its noteholder client, would Hutchens record its appointment of Substitute Trustee to STS in the county's register of deeds for the upcoming foreclosure action.

---

[269] Buncombe 18 SP 360 Withdrawal Notice and Certification
[270] Davidson 17 SP 470 Motion to Set Aside
[271] Buncombe 18 SP 520 pg. 31.
[272] *See* N.C. Gen. Stat. `45
[273] Buncombe 18 SP 520 pg. 7.

128

921. Only recording the appointment officially starts (STS') the trustee's job of neutrally performing the foreclosure sale tasks.

922. So, the noteholder hires Hutchens for the deficiency even before the foreclosure process has begun.

923. If Hutchens' retainer agreement with the noteholder is contingent on the amount of deficiency recovered or "outstanding balance", Hutchens has a financial motive to maximize the deficiency.

924. And Hutchens picks itself as STS to be the neutral in the foreclosure.

925. In turn, STS picks Hutchens to be its corporate representative providing Hutchens' legal services to complete the foreclosure proceeding.

926. STS requires an attorney to represent it in court under N.C. Gen. Stat § 84-4.

927. But Hutchens has already started the foreclosure process with the statutory demand letter before STS is registered as a trustee for the Borrower's delinquent note.

928. Undenounced to the Borrower, Hutchens further entices a noteholder to award its delinquent loan business to Hutchens by bartering away STS's trustee's foreclosure sale commission as contingent.

929. If Hutchens does not realize a surplus from its foreclosure sale, then STS foregoes its 5% commission from a trustee's foreclosure sale as allowed under N.C. Gen. Stat. §45-21.15.

930. Hutchens foregoing STS' 5% is the cost of doing business to achieve a higher 15% return on the "outstanding balance" or deficiency.

931. If STS appears at all in a special proceeding, it uses only Hutchens' original or recycled filings for its trustee documentation submissions to the court.

932. STS using only Hutchens' original or recycled filings is true even where another attorney is claimed to represent STS.[274]

---

[274] Buncombe 18 SP 360 Military Affidavit, Withdrawal Notice and Certification,

129

933. However, no STS officer is an attorney capable of representing STS as a corporation under N.C. Gen. Stat § 84-4 unless they using a recycled Hutchens' foreclosure form.[275]

934. Without Hutchens, STS provides no trustee services.

935. STS is an alter ego of Hutchens

936. When Hutchens serves collection letters on behalf of the noteholder prior to STS' appointment is representing the noteholder. Here, Hutchens shall not initiate a foreclosure serving as a trustee under N.C. Gen Stat. § 45-10(a).[276]

937. Hutchens drafted documents for both a deficiency suit and the foreclosure petition simultaneously prior to appointing STS is representing the noteholder. Here, Hutchens shall not initiate a foreclosure serving as a trustee under N.C. Gen Stat. § 45-10(a).

938. Hutchens drafting the substitution of trustee instrument prior to appointing STS is representing the noteholder. Here, Hutchens shall not initiate a foreclosure serving as a trustee under N.C. Gen Stat. § 45-10(a).

939. Where Hutchens withdraws from a foreclosure proceeding, Hutchens still drafting documents for the new attorney representing STS is still representing STS while representing the noteholder. Here, Hutchens shall not maintain a foreclosure serving as a trustee under N.C. Gen Stat. § 45-10(a).

940. Where Hutchens withdraws from a foreclosure proceeding, Hutchens still serving documents on the court and the parties for the new attorney representing STS is still representing STS while representing the noteholder. Here, Hutchens shall not maintain a foreclosure serving as a trustee under N.C. Gen Stat. § 45-10(a).

---

[275] *Compare* Buncombe 18 SP 360 Military Affidavit
[276] "An attorney who serves as the trustee or substitute trustee shall not represent either the noteholders or the interests of the borrower ***while initiating a foreclosure proceeding***."(Emphasis added).

941. Where Hutchens withdraws from a foreclosure proceeding, Hutchens still drafting documents for STS is still representing STS while representing the noteholder. Here, Hutchens shall not maintain a foreclosure serving as a trustee under N.C. Gen Stat. § 45-10(a).

942. Where Hutchens withdraws from a foreclosure proceeding, Hutchens still filing or certifying service on documents for STS is still representing STS while representing the noteholder. Here, Hutchens shall not maintain a foreclosure serving as a trustee under N.C. Gen Stat. § 45-10(a).

## FNB Servicing

943. First National Bank of Pennsylvania ("FNB") merged with Yadkin Bank on March 11, 2017.

944. However, in October of 2016, during a premerger due diligence period or for some other reason, FNB worked with Joe Oots of Yadkin to identify credit issues with DPP.

945. In October of 2016, FNB had full access and had full knowledge to all of DPP's and Hansen's files on its loans from Yadkin.

946. In October of 2016, FNB had full access and adjudged DPP's and Bayport's loans as a lower credit rating than Yadkin previously had.

947. So, on October 31, 2016, First National Bank of Pennsylvania's ("FNB") Special Asset Committee (SACC) met and determined that DPP and Bayport had a "Delinquent History".[277]

948. FNB's SACC continues to state that "The Borrowers have not demonstrated an ability to service the debt since inception in 2014. 2015 was the first full year of operations and guarantor support was required. The Borrower was not in compliance with 2015 DSC requirement of 1.25x. However, the DCS requirements were altered and waived for 2014-15."[278]

---

[277] Mo2425
[278] Mo2425

949. FNB's SACC stated that "Global analysis [ordered] at the end of 2016 to assess additional deterioration."[279]

950. On December 12, 2016, FNB's SACC met again on DPP and all of its relationships under the portfolio name Denver Property Partners.[280]

## FNB's Collection Against DPP

951. On February 22, 2017, FNB found Bayport's management "Adequate", with a "Steady" credit status of a Rating of 6 since October 2016.[281]

| Background of Problem: Be Specific – Provide a brief history of the relationship & explain the problem/reason account is a SACC credit |
|---|
| The subject loan was book as a start-up indoor shooting range in Denver, NC. It is guaranteed by a group of gun enthusiasts, several of whom have substantial net worth and liquidity to support the debt. An original guarantor, Craig Norfolk, had disagreements with the other parties and decided to sever ties to the facility. Denver Defense has been operating since the fall of 2015 and is building up a customer base. |
| Current Strategy: Event Specific (Not Date Specific) – Overall strategy of where this credit is headed |
| PM plans to review the full year financial information for 2016 to determine if the facility is generating enough revenue to support its operations without the cash injections of guarantors. Once sufficient cash flow is realized, this loan will be a candidate for upgrade. |

---

[279] Mo2425
[280] Mo2426
[281] Mo2221 16_SAC

132

Does the Borrower have positive cash flow (DSC >1.0x)? (Acceptable answers are Yes/No/Unable to Determine) yes
Are all loans current? (Acceptable answers are Yes/No) Yes - (payments made before end of grace period.)
Has there been a history of delinquency? (Acceptable answers are Yes/No) Yes
Have there been six months of contractual payments without assessed late charges? (Acceptable answers are Yes/No) Yes
Based on "as-is" values, does the net realizable value of the collateral cover the loan balance (LTV < 100%) across all loans? (Acceptable answers are Yes/No)
One or more notes identified as TDR? (Acceptable answers are Yes/No) No
Is there guarantor support? (Acceptable answers are Yes/No/Unable to Determine) Yes
Is there any other evidence of financial distress? (Acceptable answers are Yes/No) No

Accrual Justification: Briefly explain if the relationship/loan(s) should be on accrual status (FNB expects to collect all principal and interest on the obligation) or non-accrual status (FNB does NOT expect to collect all principal and interest on the obligation) based on the answers to the above.

Despite some challenges in the early months of operation, the Denver Defense Shooting Range appears to have a regular customer base and attracts new customers due to its status as the largest indoor shooting range in North Carolina. The guarantors have enough financial strength and liquidity to inject working capital if the facility experiences a downturn in revenue.

Loan Risk Rating Justification: Brief explanation of why the relationship was assigned the current LRR.

The loan was originally downgraded due to the changes in ownership and management and the status as a start-up business. However, the financial strength of the guarantors justifies keeping the risk grade a 6 at this time.

Borrower Current Financial Situation: include date of evaluation; In a short concise manner, detail the current financial situation of borrower. Focus on cash flow of the borrower and their ability to service their debt. Absent recent financial statements, analyze borrower's recent payment patterns and payment of taxes. etc. to develop your conclusion of the borrower's cash flow.

12/31/2016; Income is derived from multiple sources including member and range fees, instruction, and the sale of firearms and accessories. No financial statements or business tax returns have been received the cover the first full year of operations. Market Executive Sandee Hansen is meeting with the owners on 2/23/17 to discuss 2016 operating performance and strategic plan for the company. An internal review completed by Terri Fogel calculated a DSC of .39x using 2015 financial information.

000111

Guarantor Current Financial Situation: include date of evaluation; In a short concise manner, detail the current financial situation of guarantor(s). Focus on cash flow of the guarantor(s) and their ability to service their debt. Absent recent financial statements, analyze guarantor(s) recent payment patterns and payment of taxes, etc. to develop your conclusion of the guarantor(s) cash flow.

12/31/2016; 02/23/17 -Sandee Hansen is meeting with the principals next week to collect updated personal financial statements and tax returns. Based on prior reviews guarantor McMahon provides the most financial support to the credit, with substantial liquidity and net worth.

952. On February 22, 2017, FNB reported[282]

MUST COMPLETE A COLLATERAL WORKSHEET FOR EACH RELATED LOAN
INCLUDING LOANS OF GUARANTOR(S) AND SIGNER(S)

| CUSTOMER NAME: | Denver Property Partners | | | | |
| --- | --- | --- | --- | --- | --- |
| ACCT # / SORT CODE: | 1017028 | | | | |
| RESP CODE/ACCT OFFICER: | Williams | | | | |
| Collateral Information: | | | | | |
| Collateral Type/ Standard Realization Factor | Lien | Source | Valuation Date | Amount | Realization Factor |
| Accounts Receivable / 60-80% | | | | | |
| Inventory / 50-80% | | | | | |
| FF&E / 50% | 1 | Equipment | 5/1/2015 | $677,753.00 | |
| | | | | | |
| | | | | | |
| | | | | | |
| Residential RE / 90% | | | | | |
| Commercial RE / 87.5% | 1 | Commercial Appraisal | 6/1/2014 | $3,490,000.00 | 85% |
| Suretyship / Co-Borrower | | | | | |

[282] Mo2221 erer

953.    On May 22, 2017, FNB's Dale Mauch from Hermitage Pennsylvania ordered an appraisal for DPP's Range Property Collateral.

954.    On June 6, 2017, Effird Appraisals provided FNB an updated DPP Range appraisal of $4,110,000.00. [283]

955.    FNB's Effird appraisal corresponds with DPP's original project value plus initial inventory of $4,158,000.[284]

956.    This new Effird Appraisal included the permanently attached range equipment as part of the real estate value.[285]

957.    Even in FNB's own checklist documentation[286] it states,

> Furniture, Fixtures and Equipment (FF&E) was not included in the value estimates contained in this report. The subject property is used as a retail store for fire arms and as a firing range. There are 12 pistol lanes and 6 rifle lanes. The firing lanes each have specialized firing range equipment including computerized targeting equipment that is state of the art and was specifically manufactured to fit the subject's firing range. Additional firing range equipment includes a rubber berm trap, and overhead baffles. The equipment is physically attached to the building and due to the specific design to fit the subject's firing range, it would not be economically feasible to remove the targeting equipment for use at another location. Therefore, considering the custom design of the equipment and that the equipment is physically attached to the building, it is considered to be real property."

## DPP Delinquency

958.    On or about September 2017, DPP became delinquent one month on its FNB loans.

959.    From its FNB Special Assets Meeting notes: "[a]ccording to the original underwriting, none of the owners have previous experience in this industry. It also appears that one of the guarantors Norfolk was released as a guarantor and he was reportedly handling the day-to-day administrative duties. With the exception of William McMahon, the remaining 5 individual guarantors add little support to warrant an upgrade."[287]

---

[283] Mo207
[284] *See* Exhibit ,Mo716.
[285] Mo207
[286] FNB Comprehensive Review Checklist, pg. 2, M0 985
[287] M0 1035 (pg. 2502)

134

960. On September 22, 2017, FNB's Danny Hunter emails Joe Oots about DPP's late status on its loan and states to Oots, "You probably need to be on the call. This is the shooting range I mentioned to you. It is probably headed our way. I will send you some info on it Monday. Loans are 30+ days past due. One loan is an SBA 504, and it sounds like they have asked the SBA for a deferral and looking for a longer amortization from us."[288]

961. Familiar with all details of every DPP member's finances, on September 25, 2017, Jeffrey Cramer emails George Searle about DPP's late payment and a necessary meeting stating, "I Talked to Danny [Hunter]. He suggested Joe needs to be there. Regardless we can't carry this for quarter end. *One guarantor has $2mm is cash*. They need to understand we need payment."[289]

962. On October 12, 2017, Joe Oots ("Oots") of FNB emailed Danny Hunter of FNB,

> Hi Danny,
>
> We need to talk about the SACC for Denver Defense . I was looking at it and see where there is another 7 rated credit in the relationship that Sandra is trying to keep.... Bob's Car Wash. I really think the entire relationship should come over..... even the pass rated credits and we should consider downgrading them to 6's at least until we have a solution. Its one thing if it is just a seven and or improving and performing but this is a default. I'm not optimistic about an easy resolution and feel like most likely we are going to war. We won't be able to preserve it. Also I don't think we need to be sending the borrower two different messages. If we are going to sue them we are going after everything. If they are truly of good character they will submit. If they don't then that shows their character and we should act accordingly on the entire relationship.
>
> Give me a call this afternoon as we need to have our ducks in a row before it goes to SACC or we are going to get blasted.

963. On October 12, 2017, Oots intended to pressure the portfolio, but had to make sure there was united rhetoric before approaching a committee for approval to proceed against DPP. Oots stated to Hunter, "We

---

[288] September 22, 2017 3:17 PM Hunter to Oots email, Mo 932.
[289] September 25, 2017 8:10 AM Cramer to Searle email, Mo50 (Emphasis added).

135

need to talk about the SACC for Denver Defense . I was looking at it and see where there is another 7

rated credit in the relationship that Sandra is trying to keep .... Bob's Car Wash. I really think the entire

relationship should come over ..... even the pass rated credits and we should consider downgrading them

to 6's at least until we have a solution. It's one thing if it is just a seven and or improving and performing

but this is a default. I'm not optimistic about an easy resolution and feel like most likely we are going to

war. We won't be able to preserve it. Also, I don't think we need to be sending the borrower two different

messages. <u>If we are going to sue them we are going after everything.</u> *If they are truly of good character*

*they will submit.* If they don't then that shows their character and we should act accordingly on the <u>entire</u>

<u>relationship</u>. *Give me a call this afternoon as we need to have our ducks in a row before it goes to SACC*

*or we are going to get **blasted***."[290]

964.    Hours later on October 12, 2017 Jeffrey Smith FNB Portfolio Manager emails Cramer his evaluation of

the entire portfolio status outside of DPP for devaluation.  He states, "The purpose of this request is to

extend the LRR for one year for Carolina Eyecare OD PA , Catawba Property Partners LLC. and Recovery

Resolutions Specialists . We have complete a full annual review of this request with the previous

modification request that was submitted. However, it was determined that Bob's Car Wash of Kannapolis

LLC, Bayport Holdings Inc, and Denver Property Partners LLC should be handled by special assets.

Lake Norman Health and Wellness PA was already reviewed previously. . . *However, loan has been paid*

*AA despite cash flow issue*."[291]

965.    Later on October 12, 2017, after Smith's email to Cramer, Oots responds to Hunter stating about the

portfolio, "I think there is a lot of potential loss in this relationship. The line of credit to Recovery

Resolution Specialists is pretty much unsecured and it doesn't make much money. That guy Watson owns

it as well as the car wash he is having to feed. He's got a lot of debt and I bet the liquidity he lists isn't

[290] October 12, 2017 12:24:00 -0400, Oots to Hunter email, Mo 899 (Emphasis added).
[291]  October 12, 2017 2:52 PM Smith to Cramer email, Mo935 (Emphasis added).

real. Looks like he's living off debt to me. His personal ODA wih [sic] us has $212 in it and Bob's car wash only has $119. Recovery Resolution has $3,700 and his line of credit is almost maxed out. He's in worse shape than jhe [sic] is letting on and we are[.]"[292]

966.  So on October 23, 2017 FNB puts DPP's loans in "Non-Accrual" status.[293]

967.  As a result of the alleged defaults, on October 23, 2017, Chief Credit Officer of Special Lending John Stolar ("Stolar") authorized FNB to demand payment on DPP's Loans including #4313, #6980 and #7028.[294]  And Stolar authorized FNB to engage Counsel to collect on these loans.

### AUTHORIZATION TO DEMAND PAYMENT/ENGAGE COUNSEL

**ACCOUNT NAME:** Bayport Holdings / Denver Property Partners

**CURRENT A/O:** Danny Hunter /Steve Ray (SBA)

| ACCOUNT NUMBER | LOAN BALANCE | PAYMENT DUE DATE | COLLATERAL |
|---|---|---|---|
| 2095704313 | $254,483.00 | 09/03/17 | Inventory, 4th D/T |
| 1016980 | $ 458,500.00 | 09/12/17 | 1st D/T commercial real estate |
| 1017028 | $ 1,557,110.00 | 08/12/17 | 2nd D/T commercial real estate |
| | | | |
| | | | |
| | | | |
| | $ 2,270,093.00 | | |

968.  On October 23, 2017, Oots reported that (Special Attention Credit Committee)

"SACC placed the Denver Property and Bayport Holdings loans on non-accrual. [However] All other [Portfolio] loans remain on accrual status with payments as agreed and adequate collateral coverage." [295]

969.  On October 26, 2017, Corporate Counsel Donna Donaher ("Donaher") for FNB sent a demand for payment to DPP, Bayport Holdings, and all guarantors of DPP's loans.[296]

---

[292] October 12, 2017 15:44:54 -0400 Oots to Hunter email, Mo 935.
[293] Exhibit Mo927.
[294] Mo2196
[295] Mo1035, pgs. 1-2 (pgs. 2501-2)
[296] Lincoln 18 SP 135 pgs.154-158

970. Donaher concluded her Demand Letter stating that FNB would enforce G.S. § 6-21.2, which would entitle FNB to demand and enforce DPP to pay attorney's fees if the balance was not paid within five business days.[297]

971. On or about October 26, 2017, FNB authorized outside counsel for collecting on DPP's collateral and any resulting deficiency.[298]

## Hiring Hutchens

972. Some North Carolina Law Firms, like Hutchens Law Firm, compete for noteholder collections business.

973. A law firm that reduced costs to noteholders in foreclosure and deficiency collection actions meant more noteholders' business and a larger share of the collections market.

974. And one way to reduce foreclosure costs was for a noteholder not to pay a trustee's commission.

975. A part of Hutchens' marketing to noteholders was that its trustee STS, would only take a commission if there was a surplus.[299]

976. This reduced the noteholder's costs, because now even the foreclosure was on contingency.

977. Except now, the foreclosure trustee had no financial incentive to remain neutral since the only way STS would be paid would be through Hutchens deficiency collection action at 15% commission.

---

[297] Lincoln 18 SP 135 pg.158

[298] Mo2434, Mo2196

[299] *Compare commissions paid in Hutchens'* Cabarrus 17 SP 120, Guilford 17 SP 1421 *to no commissions paid in* Guilford 17 SP 144, Guilford 18 SP 26, Guilford 19 SP 1590, Guilford 19 SP 2071, Guilford 20 SP 211, Guilford 20 SP 912, Davidson 17 SP 054, Mecklenburg 18 SP  200, Buncombe 18 SP 360, Cabarrus 18 SP 715, Lincoln 18 SP 086, Lincoln 18 SP 196, 18 SP 207

978. Later on, October 26, following Stolar's Authorization, Harry Ray ("Ray") of FNB's SBA Section emailed Danny Hunter ("Hunter") of FNB's Special Assets Department stating, "In light of the cost, I assume you will use Walt [Pettit]"[300]

> In light of the cost, I assume you will use Walt. Have him demand the SBA as well. I'll send him a package for our loan.

## Devaluing DPP

979. Immediately after Oots email to Hunter on November 27, 2017, Harry Ray of FNB emails David Beck at Radius Bank in High Point North Carolina, "I have a R/E SBA Loan called Denver Defense located in Denver, NC. If memory serves me correctly, *the property appraised for $4.9MM* and Robert Watson the owner is trying to sell it for around $4MM. It's a shooting range that sells guns and ammo. Carol and I got our CCL there and I go once in a while. It is a newer building.   I can't finance our SBA with a new SBA Loan. I didn't know if you might be interested in looking into it?  Danny Hunter has 2 commercial loans and there is a 504 piece also."[301] (Emphasis added)

980. On November 29, 2017, Oots emails Hunter about evaluating DPP's inventory and states, "George Searle made an appeal that we meet with Denver Defense again. Danny and I don't think that they have anything new to add to the discussion that will change our action. Nevertheless, as an acomodation [sic] to George we decided it was a good tack to agree to the meeting. Danny wants an opportunity to look at the inventory and it will give us the opportunity to drive home our strategy again. I don't think their plan to find a buyer is realistic. The assets are not worth what they think they are. Anyway, if you could joins us for the meeting that would be great but if you want to pass that is OK too. Its completely up to you."[302]

---

[300] Mo2434, *see also* Mo2196
[301] Exhibit November 27, 2017 2:32 PM Ray to Beck email, Mo 946.
[302] Exhibit November 29, 2017 9:22 AM Oots to Hunter, Mo 951.

981.    Immediately after Oots email to Hunter on November 27, 2017, Harry Ray of FNB emails David Beck at Radius Bank in High Point North Carolina, "I have a R/E SBA Loan called Denver Defense located in Denver, NC. If memory serves me correctly, *the property appraised for $4.9MM* and Robert Watson the owner is trying to sell it for around $4MM. It's a shooting range that sells guns and ammo. Carol and I got our CCL there and I go once in a while. It is a newer building.   I can't finance our SBA with a new SBA Loan. I didn't know if you might be interested in looking into it?  Danny Hunter has 2 commercial loans and there is a 504 piece also."[303] (Emphasis added)

982.    Oots believed that DPP's Range Property was not worth the appraised value because the loans were non-accrual.

983.    On November 27, 2017, Special Assets Officer Joe Oots emailed Hunter stating, "I don't think the collateral isn't[sic] worth $4MM and the business doesn't cash flow enough to provide any return to an investor as a going concern. **It's a special use building** that would require a lot of Modification to be repurposed. They will file BK so we might as well push the accelerator."[304]

From: Oots, Joseph
Sent: Monday, November 27, 2017 2:00 PM
To: Hunter, Danny <HunterD@fnb-corp.com>; Ray, Harry <RayH@fnb-corp.com>
Subject: RE: Denver Defense projection next 3 months.

Danny,

I think you should go ahead and send a Demand Letter. I was looking at the Line of credit and the avg. YTD balance is $211M and the current balance is $253M.  That tells me that they advanced money on the line when they should have been retiring it.  When we met with them I told them they should be taking every dollar from sales and paying down the line. They aren't doing that.  The guarantors should be reaching into their pockets to keep it operating but instead they are using our collateral.  They are asking us to lose money while they try to get out whole in a deal that will never close.  Even if they get it under contract any due diligence by a competent prospect is going to make the deal fall through.  I don't think the collateral isn't worth $4MM and the business doesn't cash flow enough to provide any return to an investor as a going concern.  It's a special use building that would require a lot of modification to be repurposed. They will file BK so we might as well push the accelerator.

---

[303] Exhibit November 27, 2017 2:32 PM Ray to Beck email, Mo 946.
[304] Mo950 (emphasis added)

984. On November 29, 2017, Oots emails Hunter about evaluating DPP's inventory and states, "George Searle made an appeal that we meet with Denver Defense again. Danny and I don't think that they have anything new to add to the discussion that will change our action. Nevertheless, as an acomodation [sic] to George we decided it was a good tack to agree to the meeting. Danny wants an opportunity to look at the inventory and it will give us the opportunity to drive home our strategy again. I don't think their plan to find a buyer is realistic. The assets are not worth what they think they are. Anyway, if you could joins us for the meeting that would be great but if you want to pass that is OK too. Its completely up to you."[305]

985. On February 7, 2018, Oots contacted Donaher to explain that while Hunter was still listed as the responsible officer, Oots himself was handling DPP's credits (loans) with FNB.

## FNB Employing Hutchens Law Firm as Trustee's Attorney

986. A North Carolina trustee under a power of sale has the following statutory responsibilities defined in Chapter 45 of the N.C.G.S.

987. A neutral trustee prevents asymmetric information favoring the noteholder.

988. An attorney trustee cannot be neutral when he or she has a both must be impartial under the fiduciary duty to both noteholder and borrower simultaneously with a duty to zealously represent the noteholder.

989. An example of asymmetric information is a neutral not exposing an illegal bid strategy of the noteholder's opening bid.

990. N.C. Gen. Stat § 45-21.36  allows for an obligor to raise as a valid defense or offset that the property sold through foreclosure was fairly worth the amount of the debt secured by it at the time and place of sale, or that the amount bid was substantially less than it's true value.

---

[305] Exhibit November 29, 2017 9:22 AM Oots to Hunter, Mo 951.

Case 5:24-cv-00165-KDB-DCK   Document 1   Filed 07/15/24   Page 141 of 236

991. A true neutral party Trustee would necessarily refrain from discussing and enacting an illegal bid strategy on behalf of the noteholder, because such could not comply with N.C.G.S § 45-21.36 and would face open scrutiny if revealed to the obligor.

992. There can be no forfeit of claim or ratification possible under a trustee's broken fiduciary duty from creating a sale based upon asymmetric information.

993. No one has oversight over a trustee during the sale process.

994. Under N.C.G.S. § 45-21.31(a1) the Clerk has no oversight of claimed attorney's fees where the attorney is not formally designated as the trustee.

995. H. Terry Hutchins filed for creation of Substitute Trustee Services, Inc. (STS) on December 18, 2001

996. STS has provided trustee services in all 100 North Carolina Counties.

997. LC Miller was Vice President at all times relevant to this action.

998. Since 2017, Substitute Trustee Services, Inc. uses no other law firm than Hutchens Law Firm (Hutchens).

999. Hutchens offers its Banking and Lending Industry clients one-stop shopping when they are seeking foreclosure and collections services.

1000. No Special Proceeding documentation **ever** flows from the court or any adverse party to STS Inc. Rather, it is only addressed to Hutchens.

1001. Hutchens Foreclosure department handles the full responsibility of STS Inc.'s duties as trustee since STS is a corporation and may not represent itself.

1002. STS uses Hutchens exclusively because it completely provides all services from the inception of the proceeding.[306]

1003. Hutchens completes all of the Trustee's tasks from the inception of the debt notice and special proceeding filing.

---

[306] Attorney's Fees Affidavit of Costs - Davidson County 17 SP 470, 17 SP 498

142

1004. An example form filing Hutchens used in many North Carolina foreclosure cases from Davidson County Special Proceedings Case No. 17 SP 470 document dated January 22, 2018 in Hutchens Affidavit Of: Posting Of Notice Of Foreclosure Sale, Of Expenses and Disbursements, And Of Attorney Fees states in section C cited what tasks "[a]t a minimum" Hutchens provided STS Inc.:

**C. ATTORNEY'S FEES**

Since the inception of this proceeding, Hutchens Law Firm has assumed responsibility for the prosecution of this proceeding. Attorneys employed or retained by Hutchens Law Firm have been responsible for the preparation, review, supervision and/or execution of various documents, as well as, the provision of other legal services necessary to complete this foreclosure proceeding. At a minimum this includes the following:

- Review of the title search of the subject property;
- Review of debt figures for the N.C. Gen. Stat. § 45-21.16(c)(5a) notice;
- Review of the statutory pre-foreclosure notice and corresponding NCHFA SHFPP certificate, if applicable;
- Review of Note and Deed of Trust;
- Review of PACER searches for each party to the foreclosure proceeding;
- Review of Department of Defense Manpower database searches for each party to the foreclosure proceeding;
- Review and execution of Notice of Foreclosure Hearing on Deed of Trust;
- Review and execution of Military Affidavit;
- Review and execution of Affidavit of Service;
- Review of Order Allowing Foreclosure Sale;
- Review and execution of Notice of Foreclosure Sale;
- Review of the Trustee's Deed;
- Review and execution of the Final Report and Accounting and corresponding affidavits; and
- Review and execution of Notice of Foreclosure;
- Confirm the death of Larry McCraw;
- Confirm the correct parties entitled to notice of the foreclosure proceeding due to the death of Larry McCraw;
- To determine the heirs of Larry McCraw and the proper parties to provide notice of the foreclosure action to as no Estate proceeding was opened for Larry McCraw; and
- Prepare and file a Motion to Appoint a Guardian ad Litem for the unknown heirs of Larry McCraw.

This is a proceeding to foreclose a Deed of Trust secured by real property located in the county listed in the caption above. The subject Deed of Trust specifically provides that the Beneficiary is entitled to recover attorneys' fees and costs associated with the collection of sums due under the Promissory Note. Attorneys' fees in the sum of $2,175.00 have been incurred in this proceeding.

As Hutchens Law Firm is not serving as the Substitute Trustee in this proceeding, no approval of attorneys' fees by the clerk is required by N.C.G.S. § 45-21.31.

This _22_ day of _Jan_, 2018.

By: _Shiann R. Schmidt_

Attorney at Law
Hutchens Law Firm          Shiann R. Schmidt
Attorneys for Substitute Trustee Services, Inc.
Substitute Trustee
P.O. Box 1028, Fayetteville, NC 28302
Firm Case No: 1215475 (FC.FAY)

Sworn to and subscribed before me [307]

1005.   Nowhere in any STS Special Proceeding filing has STS, on its own as a corporate fiduciary, provided the total compliment of these enumerated services without Hutchens.

---

[307] Davidson County 17 SP 470 Hutchens' CaseNo. 1215475 (FC.FAY), 17 SP 498 Hutchens' CaseNo. 1222010 (FC.FAY), 17 SP 367 Hutchens' CaseNo. 118762 (CFC.FAY), 17 SP 073 Hutchens' CaseNo. 1203216 (FC.FAY), 21 SP 069 Hutchens' CaseNo.3963-13757

1006. Hutchens offers a contingency package to its Banking and Lending Industry clients where it will provide foreclosure services through its alter ego STS for free if a deficiency is expected to exist after STS's foreclosure sale.

1007. Because if there remains a deficiency, Hutchens then would stand to collect 15% of the amount of the noteholder's deficiency from the borrower, above and beyond the amount owed to the noteholder.

1008. This creates a zero cost to lender collateral enforcement contract with Hutchens and its alter ego STS.

1009. Where there is a deficiency on any STS foreclosure, it does not charge a commission.

1010. An STS commission accrues only where the noteholder receives the note's value plus a surplus through the foreclosure sale.

1011. Due to the very low frequency of surplus foreclosure sales, for STS to operate as a stand-alone foreclosure trustee, it would have to have income from other sources than from turning away foreclosure sale commissions.

1012. Therefore, Hutchens has the entire trustee operations under its law firm and not under STS based upon analyzing the corporate revenue.

1013. Or Hutchens is sharing its 15% deficiency and foreclosure fees/expenses illegally with STS.

1014. But Hutchens still receives its expenses on each foreclosure with a deficiency.

**1015. Under Hutchens deal with a noteholder, Hutchens is the Trustee and represents the lender, offering a maximum return to the lender who pays nothing. But the Borrower pays everything. (emphasis added)**

1016. In order to maximize the noteholder's return on the collateral and maintain Hutchens 15% collection on the deficiency, Hutchens would offer to drive down the appraisal value under its proprietary bid strategy.

1017. And to avoid defenses raised by the obligor under N.C.G.S § 45-21.36, and since the debt due is transparent, the only way for Hutchens's bid strategy to work is for Hutchens to order appraisals that devalue the property being sold in foreclosure.

145

1018. As Trustee and representing the noteholder, Hutchens can avoid statutory scrutiny attributed to the role of the Trustee.

1019. The Clerk of Court is granted no authority to pierce a corporate trustee represented by a law firm to verify there is no conflict of interest.

1020. No assistant clerk can refuse a corporate filing at the special proceedings intake desk.

1021. Each clerk must rely upon the filing requirements and make no independent assessment on the veracity of the filing.

1022. Likewise, the clerk has no investigatory responsibility or authority under the statute.

1023. An exception to this is that an attorney must represent a corporation in any matter, including special proceedings, under N.C.G.S 84-4.[308]

1024. Notwithstanding N.C.G.S 45-21.36, a noteholder may make an initial bid at a foreclosure sale that is less than either the debt owed, the fair worth of the property, or both and the clerk has no statutory authority to question the bid.

1025. But such a bid could rightfully be questioned by a neutral Trustee under N.C.G.S 45-21.36 when placed by the Noteholder.

1026. A neutral Trustee would be expected as a fiduciary to question any bid that does not conform with any section or subsection of Chapter 45 of the N.C.G.S.

1027. Hutchens has claimed in open court that STS was a non-profit company as the reason it did not take commissions for its trustee services.

---

[308] Lexis-Nexis, Division of Reed Elsevier, Inc. v. Travishan Corp., 155 N.C. App. 205, 573 S.E.2d 547 (2002) quoting N.C.G.S § 84-4 "*it shall be unlawful for any person or association of persons, except active members of the Bar of the State of North Carolina admitted and licensed to practice as attorneys-at-law, to appear as attorney or counselor at law in any action or proceeding before any judicial body except in his own behalf as a party thereto.*"

146

## DPP's Buyer

1028. On January 3, 2018, after DPP located a buyer for its business, Oots emailed Searle and stated, " . . . Danny indicated that it was a non-binding LOI with no hard money down? I don't really believe anyone is going to pay any amount close to the loan amount for this business. The LOI is most likely done with good intentions but I believe once they investigate the value further they will walk away or adjust the price significantly downward. I believe Danny was clear that it had to be a purchase contract with a close closing date. As an operating entity it is worth close to zero. *From a collateral standpoint; I'm guessing but its worth about $2.5MM .... maybe . . .* "[309]

1029. The next day on January 9, 2018, Oots emails Hansen about the sales agreement to purchase the range and states, " . . . This seems to be another stall? If the business is worth $3MM+ how did they come up with an operating agreement for $15M /month? It tells me the business is only worth $1.5MM to $2MM. The narrative on this never seems to match the numbers which is why I don't think this is a viable deal."[310]

1030. Once DPP's purchaser started making payments on DPP's outstanding loans on February 21, 2018, Hansen emailed Oots, "The buyer dropped off a check for $10,882 yesterday. How would you like me to process it?"[311]

1031. On February 21, 2018, Oots unilaterally took control over DPP's lease proceeds and directed <mark>Hansen</mark> to pay only the fourth [inventory] loan stating, "Our Line of credit has the most exposure. Can you apply all of the check to its principal? Will that effect the SBA Guarantee at all? lf not put it all on the Bayport Holdings Line of credit Principal."[312]

1032. However, FNB had already applied the DPP lease proceeds to FNB's second position loan.

---

[309] Exhibit January 03, 2018 1:33 PM Oots to Searle email, Mo 964.
[310] Exhibit January 9, 2018 22:25:00 -0400 Oots to Hansen Email, Mo 965.
[311] February 21, 2018 10:36 AM Hansen to Oots email, Mo 962.
[312] February 22, 2018 11:40 AM Oots to Hansen email, Mo 962.

1033. So, Harry Ray emailed Oots back about his decision to skip over the first three DPP loans for payment stating, "Joe, I'll have Sabrena reverse the payment off the SBA Loan and apply to [the fourth position loan] LOC. Sabrena, can you handle this for Joe? Thank you."[313]

## Hutchens' DPP Forbearance Agreements

1034. As early as February 7, 2018, Oots had been working to craft Forbearance Agreements with Hutchens where Oots reported to Shearer "The forbearance will require confessions of judgment, etc. They won't sign but at least we can say we offered before we sue."[314]

> The forbearance will require confessions of judgment, etc. They won't sign but at least we can say we offered before we sue.
>
> Joe Oots

1035. Oots contacted Donaher on February 7, 2018 and reported that he intended to proceed to sue DPP and its guarantors unless they agreed to his Forbearance Agreement: "Bruce authorized me to offer a forbearance but I doubt very seriously they will accept it. I would like to have lawsuits prepared and serve them next week after I pitch the proposal. I don't want it to grow any Moss."[315]

1036. In Donaher's response to Oots, on February 7, 2018 she replied, "I would rather see if they agree to the Forbearance Agreement as such an agreement can be documented internally versus incurring the cost of outside counsel."[316]

---

[313] February 22, 2018 1:17 PM Ray to Oots email, Mo 962.
[314] Mo955
[315] Mo957
[316] Mo957

1037. Between March 1, 2018 and June 26, 2018, Pettit shared at minimum thirty-two privileged emails with FNB.[317]

1038. But Oots did not draft nor present the Forbearance Agreement to DPP before engaging Pettit and Hutchens Law Firm as Counsel as Donaher had instructed him to do. Oots instead communicated with Pettit on March 1, 2018 in a privileged email regarding the term sheets of the Forbearance Agreement.[318]

| First National Bank Discovery Privilege Log | | | | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 14 | 3/1/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Joseph Ooots and Walt Pettit | Email regarding term sheets and attachments |

1039. Pettit added to Oots' Term Sheets and Forbearance Agreements[319], his demand default letter on Hutchens Law Firm letterhead stating that, "**We [Hutchens] have been retained to represent the interests of First National Bank of Pennsylvania** which is the successor by merger to Yadkin Bank (FNB). FNB is the owner and holder of each obligation referenced above."[320]

1040. Pettit's letter concluded with,

"[p]ursuant to N.C.G.S. § 6-21.2, you have five (5) days from the date of this letter/notice to provide the documentation requested, or the satisfy each of the loans, in order to avoid assessment of reasonable attorneys' fees up to 15% as provided in the Loan Documents and pursuant to the aforementioned statute."[321]

---

[317] Mo2437 (Pettit Priv. Log)
[318] Lincoln 18 SP 135, pg. 163, 25, Mo2391, Mo2399, Mo2437
[319] Lincoln 18 SP 135 pgs.166-171, Mo992 (6980 Term/Forb), Mo997 (7028 Term/Forb), Mo998 (4313 Term/Forb)
[320] Lincoln 18 SP 135 pgs. 25-27, 163-165 (emphasis added)
[321] Mo779

149

1041. Pettit deviated from the firm's other cases' normal inclusion of Hutchens' debt collection language

in its commercial or residential demand letters as seem below. [322]

THIS IS A COMMUNICATION FROM A DEBT COLLECTOR. THE PURPOSE OF THIS COMMUNICATION IS TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE, except as stated below in the instance of bankruptcy protection.

IF YOU ARE UNDER THE PROTECTION OF THE BANKRUPTCY COURT OR HAVE BEEN DISCHARGED AS A RESULT OF A BANKRUPTCY PROCEEDING, THIS NOTICE IS GIVEN TO YOU PURSUANT TO STATUTORY REQUIREMENT AND FOR INFORMATIONAL PURPOSES AND IS NOT INTENDED AS AN ATTEMPT TO COLLECT A DEBT OR AS AN ACT TO COLLECT, ASSESS, OR RECOVER ALL OR ANY PORTION OF THE DEBT FROM YOU PERSONALLY.

1042. On March 5, 2018, FNB discusses a deferment of maturity in DPP's loans and how it would affect

Watson's towing loan.[323]

| From: | Shearer, Bruce |
| Sent: | Mon, 5 Mar 2018 17:21:00 +0000 |
| To: | Cramer, Jeffrey |
| Cc: | Hansen-Lock, Sandee;Oots, Joseph |
| Subject: | RE: Recovery Resolutions Specialist, LLC |

Morning, Jeff,

We're having a hard time believing the gun range sale is going to happen. If it doesn't happen, we're going to be looking for the guarantors to step up, which includes Mr. Watson. We have $2MM of non-accrual loans with the last payment received 12/11/17. Instead of renewing/modifying to a demand LOC, I would suggest we do a short-term extension of the 3/2/18 maturity date to see what happens with the Denver Defense sale. A positive resolution of that deal will support a longer term renewal of Mr. Watson's towing loan.

*Bruce G. Shearer*
Senior Vice President
Director of Special Assets

_____

[322] *Compare* Buncombe 18 SP 520 Hutchens Case No. 1236913 (CFC.CH), Guilford 19 SP 1590 Hutchens Case No. 1284337 (FC.FAY),
[323] March 5, 2018 17:21 PM Shearer to Cramer email, Mo 949.

1043. Then, on March 8, 2018, Pettit served DPP his Term Sheets and Forbearance Agreement by postal service.

1044. Pettit drafted this document indicated from his document footer showing:

U:\ WWP Files\First National Bank\Bayport Holdings\ Term Sheet ltr.docx
*however*, prior to printing it, Pettit emailed pages two and three with MS Outlook. Then he printed them from a different computer that showed a revised footer stating:[324]

1045. Hutchens anticipated that it would make 15% on DPP's deficiency amount in DPP's collection

D:\Users\walt.pettit\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\WVJZSD9Q\Term Sheet ltr.docx

action (18 CVS 720), but also knew that Hutchens would not file for a STS commission if there was no surplus at DPP's foreclosure sale as was Hutchens' practice in all of its other foreclosures.[325]

1046. So, when Pettit attached his term sheets for his upcoming 18 CVS 720 collection action, he would also use them as evidence in his foreclosure proceeding of notice under N.C. Gen. Stat. §6-21.2.

1047. Through STS, Hutchens intended to control both DPP's Deed of Trust collection action in 18 CVS 720 and 18 SP 135's collateral foreclosure of DPP's Range Property.[326]

1048. On March 28, 2018, after DPP's counsel responded to Hutchens' demand, Pettit acknowledged a dispute over the collection and foreclosure and Pettit emailed DPP's lead counsel Michael Elliott ("Elliott") stating, "I have had a chance to review various documents and talk with the special assets officer involved. For the reasons stated below, **First National Bank (FNB) disagrees with virtually each factual statement in your email**."[327]

---

[324] Lincoln 18 SP 135 pgs. 25, 163

[325] Lincoln 18 SP 135 pg. 1, *see also* Buncombe 18 SP 520, Cabarrus 17 SP 161, 18 SP 715, Davidson 17 SP 73, 17, SP 367, 17 SP 470, 17 SP 498, 21 SP 69 (removed commission from form), Guilford 18 SP 262, 19 SP 1590, 19 SP 2071 (removed commission from form), Lincoln 17 SP 175, 18 SP 86, 18 SP 207

[326] Lincoln 18 SP 135, pgs. 25-33, 163-172

[327] Mo904 (emphasis added)

151

1049. On March 23, 2018, Oots and Pettit discussed by email, under FNB's attorney-client privilege, DPP's attempt to reinstate its FNB's loans.[328]

| First National Bank Discovery Privilege Log | | | | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 18 | 3/23/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Email regarding loan account and borrowers attempts to reinstate |
| 7 | 3/23/2018 | Email | Attorney Client Privilege | Confidential communications between Counsel for FNB and FNB employees made for the purpose of seeking legal advice on behalf of FNB. | Joseph Ooots, Charles Snipes and Walt Pettit | Email regarding loan account |
| 8 | 3/23/2018 | Email | Attorney Client Privilege | Confidential communications between Counsel for FNB and FNB employees made for the purpose of seeking legal advice on behalf of FNB | Joseph Oots, Walt Pettit, Sabrina Hughes, Harry Ray, Sandee Hansen-Lock, Peter Rizzo | Email regarding communications with borrowers/guarantors and loan account statements |

1050. Later on March 23, 2018, FNB's Joe Oots sent an email to Sandee Hansen and Sabrena Hughes, both of FNB, acknowledging that Pettit had issued a demand upon DPP stating, "I'm sorry but we made Demand. They cannot be brought current. We need a full pay-off. We are done. The time to cure is long passed [sic]. I intend to start a law suit on all the guarantors the first working day in April. **Please do not report any information to this customer without coming to me**."[329]

1051. On March 23, 2018, in Buncombe County, Pettit's paralegal, Darlene R. Snee, filed and signed Pettit's foreclosure proceeding against the Rands in Hutchens Case No. 1125308 (CFC.CH), Buncombe County Special Proceeding 18 SP 201.

| Case No:<br>1125308 (CFC.CH) | Signature Of Attorney/Party/Substitute Trustee<br>*William Kit Pettit by DRS*<br>Attorney at Law |
|---|---|

---

[328] Mo2437
[329] Mo904 (Emphasis added)

152

## FNB Freezes DPP Portfolio

1052. On March 28, 2018, Pettit and Oots, under FNB's attorney-client privilege, discussed Oots restraining any FNB communication and all of its loan accounts with DPP.

1053. As a direct result, two days later on March 30, 2018, FNB unilaterally and without notice "Froze" access to the entire DPP portfolio's checking and savings accounts.

1054. Both Watson locally and Lafone were travelling in St. Antonio, Texas were affected when FNB froze their personal and business accounts not affiliated with DPP.

1055. In response, on the same day March 30, 2018, Oots and Pettit had an email discussion and conference call under FNB's attorney-client privilege. [330]

| # | Date | Category | Privilege Category | Justification | Between | Description |
|---|------|----------|--------------------|---------------|---------|-------------|
| | | | First National Bank Discovery Privilege Log | | | |
| 13 | 4/2/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Joseph Ooots and Walt Pettit | Email regarding Account histories and attachments |

1056. Later on March 30, 2018, Oots emailed Shearer, [331]

> The freezing of Robert Watson's DDA accounts was an error by Sandee. I spoke with Searle and he is taking care of it.
>
> Joe Oots
> Special Assets Manager

1057. Finally on March 30, 2018, Oots and Pettit discussed by email under FNB's attorney-client privilege DPP's request for the March 5, 2018 loan deferment on FNB's loans that affected Watson.[332]

---

[330] Mo2437

[331] Mo902 (March 30, 2018, 11:29 Email from Oots to Shearer)

[332] Mo2437

153

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9 | 3/30/2018 | Email | Attorney Client Privilege | Confidential communications between Counsel for FNB and FNB employees made for the purpose of seeking legal advice on behalf of FNB | Joseph Ooots and Walt Pettit | Email regarding payment deferrment | |

| First National Bank Discovery Privilege Log | | | | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |

1058. On April 2, 2018, Bruce Shearer of FNB emailed Pettit,

"Walt, I have cc'd Brian Mancos on this response to bring him into the loop on Mr. Watson's email [on the freeze]. Brian is one of our in-house attorney's and handles any litigation against the Bank. Based upon the email below, I thought it was appropriate to include him. Brian, **Walt Pettit is our outside counsel, if you haven't worked with him before. Feel free to give me a call if you have any questions**." [333]

1059. On April 3, 2018, Oots emails Mancos and Pettit,

"Walt Petit is drafting law suits against all of the guarantors. The next step will be to initiate foreclosure. I'm hoping that the suit against the guarantors will lead to a solution and we can avoid the foreclosure."[334]

1060. In response to Shearer's "freeze" email, Mancos emailed Oots on April 3, 2018,

"Joe - Send the [Watson] email to Complaint Escalation (complaintescalationcustomerfeedback@fnb-corp.com ) but let them know that **I do not think a response is necessary as we have outside counsel [Pettit] handling the matter.** I do not need to be involved any further unless they file a counterclaim against FNB. Let me know if that happens."[335]

1061. On April 3, 2018, in response to the email above, Mancos, Oots and Pettit have another email discussion under FNB's attorney-client privilege on the portfolio's account statements.[336]

---

[333] Mo901 (emphasis added)

[334] Mo977 April 3, 2018 9:06 AM Oots to Mancos and Pettit email

[335] Mo 901 (April 3, 2018, 13:24 Mancos to Oots) (emphasis added)

[336] Mo2437

154

| First National Bank Discovery Privilege Log | | | | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 12 | 4/3/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees, In-house counsel and counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Brian Mancos, Bruce Shearer, Joseph Oots, Walt Pettit | Email regarding communications with borrowers/guarantors and loan account statements |

## Pettit Drafts Collections Complaint and Foreclosure Simultaneously

1062. On April 3, 2018, Pettit drafted FNB's (18 CVS 720) Complaint against DPP ***contemporaneously***

with Substitute Trustee Services, Inc.'s ("STS") Petition for Foreclosure (18 SP 135) and FNB's

| | | | | | | |
|---|---|---|---|---|---|---|
| 32 | 4/3/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Copy of Complaint, Affidavit and Petition and email chain |

Debt Affidavit (18 SP 135) before STS was even nominated as trustee.[337]

| First National Bank Discovery Privilege Log | | | | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |

1063. On April 5, 2018, Pettit again drafted FNB's collection documents for DPP's adversary

proceeding contemporaneously with STS' neutral trustee documentation prior to the Trustee's

nomination.[338]

| First National Bank Discovery Privilege Log | | | | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 33 | 4/5/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Final draft of affidavit and exhibits attached and discussion of followup meeting. |

---

[337] Mo2437

[338] Mo2437

155

1064. Hutchens' own foreclosure fee affidavits filed during the same time period in other foreclosures stated about foreclosure legal services:[339]

> **C. ATTORNEY'S FEES**
>
> Since the inception of this proceeding, Hutchens Law Firm has assumed responsibility for the prosecution of this proceeding. Attorneys employed or retained by Hutchens Law Firm have been responsible for the preparation, review, supervision and/or execution of various documents, as well as, the provision of other legal services necessary to complete this foreclosure proceeding. At a minimum this includes the following:

1065. On April 10, 2018 Oots noted in his SACC meeting that:[340]

> 4/10/2019     Joe Oots
>
> The Bank continues to pursue its rights and remedies under the loan documents on all of the commercial credits in the relationship.

1066. On April 13, 2018, Tracy Ward of Self-Help, the CDC for the SBA 504 loan controlling this transaction emailed Oots and Pettit,

"I wanted to confirm because it is unusual for SBA to be in 3rd lien position on the project property. I've looked back at the origination file, and that structure was approved in this case. Borrower's $500,000.00 note for the land purchase was not part of the 504 project, but was approved to remain in 1st lien position. You are correct that FNB is in 1st and 2nd lien position, with SBA in 3rd lien position, on the project property." [341]

---

[339] Mecklenburg 18 SP 200, Davidson 17 SP 367, 17 SP 470, 17 SP 498, Buncombe 18 SP 520, Cabarrus 18 SP 715, Guilford 17 SP 1421, 18 SP 262, 19 SP 2071, 20 SP 912, Lincoln 18 SP 207, *compare* Lincoln 18 SP 135, pgs. 2-3
[340] Mo1033 pg. 14
[341] Mo978

156

1067. April 24, 2018, Oots emailed Shearer that he will have Walt Pettit craft an amended/ restated DPP note.[342]

> Bruce/ Chuck,
>
> There are still some loose ends with this credit..... I don't have the information regarding the new proposed guarantor / ownership structure etc. The borrowers are waiting on a green light from us to do the details. I'm going to have Walt Petit craft an amended / restated note that has most of the elements of a forbearance agreement but avoids the stronger language as the borrowers do not want to alarm the new guarantor. I will gather financial data from them and of course resolve the ownership / guarantor issues as we go forward.

1068. On April 25, 2018, FNB valued DPP's Range Property and Building collateral at $4,110,000. [343]

**Collateral Description / Comments:**
1st DOT (FNB has the 2nd DOT, Loan #1017028) on 1387 North Highway 16 in Denver, North Carolina. Subject property is 4.94 acres used as a gun and ammunition store and shooting range. Appraisal dated 5/22/17 states a market value of $4,110,000.

1069. On May 14, 2018, Pettit negotiated the foreclosure with opposing counsel prior to filing STS' appointment.[344]

| | | | First National Bank Discovery Privilege Log | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 25 | 5/14/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Email regarding foreclosure action, and forwarded communication with counsel for borrowers/guarantors |

1070. On May 18, 2018, Oots and Pettit have an email discussion under FNB's attorney-client privilege on FNB's complaint's contents and its verification. [345]

| | | | First National Bank Discovery Privilege Log | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |

---

[342] Mo2210

[343] Mo1030

[344] Mo2437

[345] Mo2437

157

| 27 | 5/18/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Email regarding contents of complaint to be filed, with attached complaint and verification |
| --- | --- | --- | --- | --- | --- | --- |

1071. And on May 18, 2018, Oots and Pettit had an email discussion under FNB's attorney-client

privilege on FNB proceeding with Pettit's foreclosure and what information is needed to proceed.
346

| First National Bank Discovery Privilege Log | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 26 | 5/18/2018 | Emai | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Email chain regarding account payoff statements, FNB's request to proceed with foreclosure and information needed to proceed |

1072. On May 20, 2018 back in DPP's case in Lincoln County, Oots and Pettit had an email discussion

under FNB's attorney-client privilege on FNB's complaint's verification.[347]

| First National Bank Discovery Privilege Log | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 28 | 5/21/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Email regarding verification from FNB |

---

346 Mo2437
347 Mo2437

158

1073. On May 24, 2018 in Lincoln County, Oots and Pettit have two email discussions under FNB's attorney-client privilege on FNB's complaint against DPP.

| | | | First National Bank Discovery Privilege Log | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 29 | 5/24/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Email regarding Complaint and claims included |
| 31 | 5/24/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Copy of Complaint |

1074. The next day on May 25, 2018 in Lincoln County, Oots and Pettit have another email discussion under FNB's attorney-client privilege on FNB's complaint, verification and summons against DPP.[348]

| | | | First National Bank Discovery Privilege Log | | | |
|---|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 30 | 5/25/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Email regarding verification of complaint and filing of summons |

1075. On June 4, 2018, Pettit filed his FNB civil summons against the Denver Defense Borrowers and Guarantors in Lincoln County Case No. 18 CV 720 as Hutchens Law Firm, LLP, 6230 Fairview Road, Suite 315, Charlotte, NC 28210, Attorneys for the Plaintiff By William Walt Pettit.

1076. Also on June 4, 2018, Pettit drafted and filed FNB's complaint against the Denver Defense Borrowers and Guarantors in Lincoln County Case No. 18 CV 720 as Hutchens Law Firm, LLP, 6230 Fairview Road, Suite 315, Charlotte, NC 28210, Attorneys for the Plaintiff By William Walt Pettit and his document footer showing:

U:\WWP Files\First National Bank\Bayport Holdings\Complaint.docx

---

[348] Mo2437

159

1077. Pettit's file structure shows that the deficiency or guarantors' collection lawsuit 18 CVS 720 is held directly under "\Bayport Holdings\" while this foreclosure matter 18 SP 135 is subordinate and held under "\Bayport Holdings\FCL\" as follows:

Lincoln 18 CVS 720 –
U:\WWP Files\First National Bank\Bayport Holdings\Complaint.docx
Lincoln 18 SP 135 –
U:\WWP Files\First National Bank\Bayport Holdings\FCL\1387 N HWY 16\30 Day Notice.docx.

1078. Finally, on June 4, 2018 Pettit drafted and filed FNB's complaint verification signed by Oots against Denver Defense Guarantors in Lincoln County Case No. 18 CVS 720 with his document footer showing:

U:\WWP Files\First National Bank\Bayport Holdings\Complaint Verification.docx

1079. However, FNB provided an illegible and altered Lincoln County 18 CVS 720's complaint's exhibit #12 of the loan superseding Yadkin's first position 6980 loan for loan 1016980-1096003072016 by covering the actual loan number compared to the original below.



1080. Further on June 4, 2018, FNB did not include the disbursement page 4 that paid off Yadkin's original 10/25/13 loan as shown below.

*0000000001016980-1034503072016*

# DISBURSEMENT REQUEST AND AUTHORIZATION

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $490,720.36 | 03-07-2016 | 06-12-2024 | 1016980-1 | 01A2 | | 4194 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** DENVER PROPERTY PARTNERS, LLC
19607 W Catawba Ave., Suite 104
Cornelius, NC 28031

**Lender:** Yadkin Bank
101 W. Main St
Elkin, NC 28621

**LOAN TYPE.** This is a Fixed Rate (5.000%) Nondisclosable Loan to a Limited Liability Company for $490,720.36 due on June 12, 2024. This is a secured renewal loan.

**PRIMARY PURPOSE OF LOAN.** The primary purpose of this loan is for:

☐ Personal, Family, or Household Purposes or Personal Investment.

☒ Business (Including Real Estate Investment).

**SPECIFIC PURPOSE.** The specific purpose of this loan is: to modify amortization and monthly payment.

**DISBURSEMENT INSTRUCTIONS.** Borrower understands that no loan proceeds will be disbursed until all of Lender's conditions for making the loan have been satisfied. Please disburse the loan proceeds of $490,720.36 as follows:

| | |
|---|---|
| **Other Disbursements:** | |
| $490,720.36 Current Principal Balance | $490,720.36 |
| **Note Principal:** | $490,720.36 |

1081. June 6, 2018, Oots emails Sandee Hansen ("Hansen"),[349]

> Sandee,
>
> We are suing all of the guarantors on Denver Defense et al (filed 5/25 or 5/26). We should not extend this credit and should send a Demand letter. At the last renewal, Bruce approved this pending a satisfactory outcome of Denver Defense that did not occur. Please send a transfer form to transfer all of Robert Watson's commercial credits and the related guarantors' commercial loans to Special Assets. I have attached a SACC Collateral sheet for your reference. I'm not sure of the strategy we will take with all of these but we intend to apply pressure until cash is flowing to us. We are charging-off the Bayport Holdings credit this month. Our attorney is out of the office this week so I haven't been able to speak with him about the borrower's response to our suit yet.
>
> I know this is very disappointing to you and will impact you in the local market but we have to look out for the stockholders of FNB. The guarantors need to step up collectively to the Bank with $.
>
> Thank you
>
> Joe

1082. On June 8, 2018, Oots and Pettit had another email discussion under FNB's attorney-client privilege on Pettit's foreclosure requiring now a substitution of trustee with his drafted attachments.[350]

| First National Bank Discovery Privilege Log | | | | | |
|---|---|---|---|---|---|
| # | Date | Category | Privilege Category | Justification | Between | Description |
| 22 | 6/8/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Email regarding subustitution of trustee and attachments |

1083. On June 18, 2018, Oots emailed Tracy Ward of Self-Help CDC for the SBA,

"Hi Tracy, The individual that entered an operating agreement for the gun range left in the night with all of the inventory. The borrowers filed a law suit against him and his companies. We have filed a law suit against the borrower and guarantors. They seem to think they have a buyer for the building but I don't think they do. We are commencing foreclosure. I don't know the formal process other than sending you a notice of foreclosure? If there is a specific document you need can you please inform me? Until

---

[349] Mo1967
[350] Mo2437, pg.4

I see hard money we are going to go after them. **Walt Pettit is our attorney**. See his contact information below."[351]

1084. On June 18, 2018, Ward emailed Pettit about the foreclosure timing with the SBA,

"SBA requires at least 60 days' notice prior to legal proceedings or liquidation/foreclosure. That gives SBA time to take care of the process we need to go through with them and to decide whether to bid at foreclosure. **Will you send me copies of the demands and legal notices you've sent the borrowers/guarantors?** . . . The 60-day clock will start once we receive the notices, but if we are able to move more quickly with SBA I will update you so we can try to avoid any unnecessary delays."[352]

1085. June 20, 2018, Self-Help noted in its liquidation plan that,

"Borrower is continuing to operate while trying to find a new buyer, & is suing buyer who backed out. At least two guarantors have obtained their own legal counsel, and they are collectively working to delay and ultimately avoid foreclosure to allow time to find a buyer and sell the property."[353]

1086. On June 26, 2018, Pettit wrote Ward of Self-Help a Third Party Lender ("TPL") collection letter stating that prior to foreclosure,

"Please note that we [Hutchens Law Firm] have been retained to represent the interests of First National Bank of Pennsylvania. . . The special proceeding to foreclose will be filed after the date of this letter and a sale has been tentatively scheduled for August 30, 2018 which is More than sixty days from the date of this letter."[354]

## Hutchens' Second Collection Letter

1087. On June 26, 2018, Pettit drafted and filed FNB's second collection letter for filing in 18 SP 135 as Exhibit 1 to the notice of hearing and with his document footer showing:

---

[351] Mo1897 (emphasis added)
[352] Mo1899 (emphasis added)
[353] Mo1492, Mo1919 liquidation plan exhibit pg.2 (emphasis added)
[354] Mo1475 (footer) (emphasis added)

163

U:\WWP Files\First National Bank\Bayport Holdings\FCL\1387 N HWY 16\30 Day Notice.docx

1088. "On June 26, 2018, Walt Pettit as the noteholder's attorney, issued his 30-day notice / demand letter to DPP for FNB. [355]

1089. Its first sentence stated, "This firm [Hutchens] represents First National Bank of Pennsylvania successor by merger with Yadkin Bank (the "noteholder"), the holder of the above-referenced mortgage loan (the "Note")."[356]

1090. Further, "[p]lease contact Hutchens Law Firm at (704) 362-9255 [Pettit's phone number] if you have any questions concerning the amounts which the noteholder [FNB] contends are due under the Note."[357]

1091. At the end of the day on June 26, 2018, Oots and Pettit have had another email discussion under FNB's attorney-client privilege on meeting with counsel for borrowers and other

> By: William Walt Pettit, Attorney
> 6230 Fairview Road, Suite 315
> Charlotte, NC 28210
> Telephone: (704) 362-9255

| # | Date | Category | Privilege Category | Justification | Between | Description |
|---|------|----------|--------------------|---------------|---------|-------------|
| | | | | **First National Bank Discovery Privilege Log** | | |
| 23 | 6/26/2018 | Email | Attorney Client Privilege | Confidential Communications between FNB employees and Counsel for FNB for the purpose of seeking legal advice on behalf of FNB | Walt Pettit and Joseph Oots | Email regarding communications with borrowers/guarantors counsel and follow by Mr. Oots on the meeting with counsel for borrowers |

communication.[358]

---

[355] Lincoln 18 SP 135 pg.195
[356] Lincoln 18 SP 135 pg.195
[357] Lincoln 18 SP 135 pg.196
[358] Mo2437

## Hutchens' Foreclosure (Lincoln 18 SP 135)

1092. On June 27, 2018, on behalf of FNB Hutchens Law Firm drafted and filed in Lincoln County Register of Deeds Hutchens' Substitution of Trustee document naming Substitute Trustee Services ("STS") as Trustee for DPP's Commercial Construction Deed of Trust on the Range Property securing FNB's loan 7028.[359]  And at the bottom right, Hutchens case No. "1237056"

1093. Hutchens already had determined its case number as it published "1237056" in Hutchens' Substitution of Trustee Register of Deeds filing on June 27, 2018 prior to filing STS' Special Proceeding in Lincoln 18 SP 135 executed on July 6, 2018 and filed on July 12, 2018.

1094. On July 12, 2018 Hutchens filed its foreclosure action (18 SP 135) against DPP under FNB's 7028 deed of trust that Hutchens was already litigating in 18 CVS 720.[360]

1095. Hutchens advanced the filing fees in this special proceeding.[361]

1096. Overall, Hutchens had 10 references in 18 SP 135 that Hutchens' sought from DPP 15% of the outstanding debt as Hutchens Attorney's Fees in 18 CVS 720.[362]

1097. Hutchens did not mention in any 18 SP 135 documentation that STS would forego its 5% foreclosure sales commission.[363]

1098. At no point could STS draft, file or represent itself before the clerk of court under N.C. Gen. Stat. § 84-5.

1099. N.C. Gen Stat 45-10(a) contains no enumerated waiver of neutrality in a foreclosure.

---

[359] Mo152

[360] Lincoln 18 SP 135, pg. 190, Mo782

[361] Mo2440 ($300 filing fee paid by Hutchens on 7/12/18 13:18:56) see also Guilford 18 SP 262, 20 SP 211

[362] Lincoln 18 SP 135, pgs. 196, 164, 160, 158, 156, 119, 95, 93, 55, 26

[363] See N.C. Gen. Stat. § 45-21.15

165

1100. On or about July 6, 2018, Pettit drafted and executed his customized Special Proceedings Cover Sheet, as indicated from his document footer showing: Case No. "1237056".[364]

1101. On or about July 6, 2018, Pettit drafted and executed his Hutchens Notice of Foreclosure Hearing, as indicated from his document footer showing:

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice ofHearing.docx
and at the top, Hutchens case No. "1237056". [365]

1102. On or about July 6, 2018, Pettit drafted and executed his Hutchens' Notice of Substitute Trustee's Foreclosure Sale of Real Property, as indicated from his document footer showing:

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice ofHearing.docx
and at the top, Hutchens case No. "1237056". [366]

1103. Pettit further affirmed he, not Hutchens Law Firm, was acting as a principal of STS authorized to bind STS in the same Notice Of Hearing On Foreclosure Of Deed Of Trust and Notice of Substitute Trustee's Foreclosure Sale of Real Property.[367]

1104. STS filed no other Notice of Substitute Trustee's Foreclosure Sale of Real Property in this Special Proceeding.

of any postponement of such sale or Notice of Resale. The name and address of the Substitute Trustee are listed below.

This the 6 day of July, 2018.

Substitute Trustee Services, Inc.
Substitute Trustee
By: William Walt Pettit, Attorney
6230 Fairview Road, Suite 315
Charlotte, NC 28210
Telephone: (704) 362-9255

---

[364] Lincoln 18 SP 135, pg. 190
[365] Lincoln 18 SP 135, pgs. 191-194
[366] Lincoln 18 SP 135, pgs. 197-199
[367] Lincoln 18 SP 135, pgs. 194, 199

166

1105.  In Pettit's Notice of Foreclosure Hearing, he included the provision stating,[368]

> 10.    The Substitute Trustee is a neutral party and, while holding that position in the foreclosure proceeding, may not advocate for the Holder or for you in the foreclosure proceeding.

1106.  However, compared to other Hutchens foreclosures filed around that time, Pettit did not include Hutchens' more comprehensive Foreclosure Hearing Language on neutrality from its other foreclosure cases:[369]

> 3.    The substitute trustee, is a neutral party and may not advocate for the note holder or for the debtor in the foreclosure proceeding.

> 7.    The substitute trustee is Substitute Trustee Services, Inc. and is represented in this proceeding by Hutchens Law Firm. You may contact them at 4317 Ramsey Street, Fayetteville, North Carolina 28311, telephone number (910) 864-3068.

> 10.    You should keep attorneys for the substitute trustee, Hutchens Law Firm, 4317 Ramsey Street, Fayetteville, North Carolina 28311, notified in writing of your address or of any change in your address so that you can be mailed copies of the notice of foreclosure setting forth the terms under which the sale will be held, and notice of any postponements or resales.  The hearing may be held on a date later than stated in this notice and you will be notified of any change in the hearing date.

1107.  So even if N.C. Gen. Stat. § 45-10(a) had allowed it, DPP still had no requisite understanding of Hutchens' dual representation as both neutral party trustee and noteholder's attorney held simultaneously, that all other North Carolina home owners and business owners had with Hutchens Law Firm.

---

[368] Lincoln 18 SP 135, pg.193

[369] *Compare Hutchens' Notice of Hearing Prior to Foreclosure of Deed of Trust in* Guilford 17 SP 144 7/3/17 Hutchens Case No. 1216482 (FC.FAY), Guilford 18 SP 26 1/11/18 Hutchens Case No. 1112205 (FC.FAY), Guilford 19 SP 1421, 7/3/17 Hutchens Case No. 1216482 (FC.FAY), Guilford 19 SP 1590, 9/17/19 Hutchens Case No: 1284337 (FC.FAY), Guilford 19 SP 2071, 12/20/19 Hutchens Case No 1459- 2541, Guilford 20 SP 211, 1/3/20 Hutchens Case No: 1054 – 1609, Guilford 20 SP 912, 7/20/20 Hutchens Case No: 3487 – 9087Davidson 17 SP 054,  1/19/17 Hutchens Case No. 1203250 (FC.FAY), Mecklenburg 18 SP 200, 1/20/18 Hutchens Case No. 1252258 (FC.FAY), Buncombe 18 SP 360, 5/23/18 Hutchens Case No: 1242247 (FC.FAY), Cabarrus 18 SP 715, 9/17/19 Hutchens Case No: 1256542 (FC.FAY), Lincoln 18 SP 086, 4/16/18 Hutchens Case No: 1237221 (FC.FAY), Lincoln 18 SP 196, 9/27/19 Hutchens Case No: 1248763 (FC.FAY) 18 SP 207, 10/18/18 Hutchens Case No: 1257282 (FC.FAY)

1108. On July 12, 2018, Hutchens, as trustee's attorney, filed his special proceeding 18 SP 135 including the above Notice Of Hearing On Foreclosure Of Deed Of Trust against DPP with Hutchens case No. "1237056" at the bottom.[370]

1109. Even after Pettit had issued the March 18, 2018 and June 26, 2018 demand letters above on behalf of FNB, and even though Petit had initiated the civil complaint against the borrowers and guarantors in 18 CVS 720, in his April 3, 2018 Petition here, Pettit stated as Trustee in paragraph number 10[371] that STS is a neutral party on June 27, 2018:

> 10. The Substitute Trustee is a neutral party and, while holding that position in the foreclosure proceeding, may not advocate for the Holder or for you in the foreclosure proceeding.

1110. However, Pettit changed standard provisions in the notice and omitted a number of provisions that had been included in other notices from Pettit and Hutchens Law firm in other foreclosure cases, as can be seen in:

> 3. The substitute trustee, is a neutral party and may not advocate for the note holder or for the debtor in the foreclosure proceeding.
>
> 7. The substitute trustee is Substitute Trustee Services, Inc. and is represented in this proceeding by Hutchens Law Firm. You may contact them at 4317 Ramsey Street, Fayetteville, North Carolina 28311, telephone number (910) 864-3068.
>
> 10. You should keep attorneys for the substitute trustee, Hutchens Law Firm, 4317 Ramsey Street, Fayetteville, North Carolina 28311, notified in writing of your address or of any change in your address so that you can be mailed copies of the notice of foreclosure setting forth the terms under which the sale will be held, and notice of any postponements or resales. The hearing may be held on a date later than stated in this notice and you will be notified of any change in the hearing date.

---

[370] Lincoln 18 SP 135, pg. 190-199 *see* N.C. Gen. Stat. § 45-10(a). ("An attorney who serves as the trustee or substitute trustee shall not represent either the noteholders or the interests of the borrower while initiating a foreclosure proceeding.")

[371] Lincoln 18 SP 135 pg.193.

168

## Hutchens' First Delay

1111. On July 19, 2018, and again on July 27, 2018, and yet again on August 7, 2018 Ward from Self-Help attempted to contact Oots requesting information on FNB's senior loan payoff. Because Oots was not answering, Ward also copied Pettit on the emails because Pettit still represented FNB while also serving as STS's counsel.[373]

1112. On August 2, 2018, Shirley Clemmons, Foreclosure Processor of the Hutchens Law Firm, 4317 Ramsey Street, Fayetteville, NC 28311 issued an email to Jennifer Baucom, Assistant Lincoln County Clerk, at 9:22 a.m. cancelling that day's hearing and requests continuance to 9/6/18 with no notice to the Defendants and referencing that "[d]oesn't have enough time to serve".[374]

1113. On August 14, 2018, Oots placed the following in his SACC notes about the foreclosure and lawsuit,[375]

| 8/14/2018 | Joe Oots |
| --- | --- |

A foreclosure hearing is set for 9/6/18 and assuming the hearing is successful a sale will be scheduled within 45 days. Law suits have been filed against all of the guarantors. Their answers are due by August 23, 2018. Upon receipt the bank can file a motion for summary judgment. It is anticipated that the guarantors will fight the summary judgment but as of this date they have not shown their strategy. Defaulting related loans to the guarantors has been contemplated but not yet prosecuted.

1114. However, on August 29, 2018, contrary to Oots' most recent 8/2/18 Beck appraisal devaluing the Range Property to $2,780,000.00[376], FNB still valued DPP's Range Property and Building collateral at $4,110,000 on its books[377].

**Collateral Description / Comments:**

1st DOT (FNB has the 2nd DOT, Loan #1017028) on 1387 North Highway 16 in Denver, North Carolina. Subject property is 4.94 acres used as a gun and ammunition store and shooting range. Appraisal dated 5/22/17 states a market value of $4,110,000.

---

[373] Mo1057
[374] Lincoln 18 SP 135, pg. 189
[375] Mo1033 pg.14
[376] Mo 990
[377] ExhibitMo 1034

## Hutchens Continuance

1115. On August 13, 2018, Oots emailed Ward of Self-Help stating, "[a]pparently the hearing was postponed because we lacked service to two of the parties. **Our attorney [Pettit] is getting service and will reschedule a hearing ASAP.** I will forward a date when I receive it."[378]

1116. On August 17, 2018, as Substitute Trustee Services, Inc., Substitute Trustee By: William Walt Pettit, Attorney, Pettit notified DPP and Bayport of his intention to continue the foreclosure hearing by serving his Notice and Order with his Certificate of Service.[379]

1117. Pettit executed his September 6, 2018 Notice of Continued Hearing on August 14, 2018.[380]

1118. Pettit's document source footer cited that his September 6, 2018 Notice of Continued Hearing file storage location was

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 9-6-2018.docx
and at the top, Hutchens case No. "1237056".

1119. Pettit further affirmed he, not Hutchens Law Firm, was acting as a principal of STS authorized to bind STS in the September 6, 2018 Notice Of Continued Hearing On Foreclosure Of Deed Of Trust as Substitute Trustee Services, Inc., Substitute Trustee By: William Walt Pettit, Attorney, 6230 Fairview Road, Suite 315, Charlotte, NC 28210.



Huntersville, NC 28078

Substitute Trustee Services, Inc.
Substitute Trustee
By: William Walt Pettit, Attorney
N.C. Bar No.: 9407
6230 Fairview Road, Suite 315
Charlotte, N.C. 28210

---

[378] Mo1057 (emphasis added)
[379] Lincoln 18 SP 135, pgs. 185-188
[380] Lincoln 18 SP 135, pg. 185

1120. With Pettit's Notice, he also provided an order for the Clerk of Court to execute with Pettit's document source footer for his September 6, 2018 Notice Of Continued Hearing On Foreclosure Of Deed Of Trust Order citing his file storage location as

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 9-6-2018.docx
and at the top, Hutchens case No. "1237056".

1121. Finally, Pettit also provided his September 6, 2018 Certificate of Service that stated he served the parties on August 14, 2018, three days before the Clerk executed the order.

1122. Pettit's document source footer cited his Certificate of Service showing his file storage location as

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 9-6-2018.docx
and at the top, Hutchens case No. "1237056".

1123. Pettit further affirmed he, not Hutchens Law Firm, was acting as a principal of STS authorized to bind STS in his September 6, 2018 Certificate of Service for the Notice Of Continued Hearing On Foreclosure Of Deed Of Trust as Substitute Trustee Services, Inc., Substitute Trustee By: William Walt Pettit, Attorney, 6230 Fairview Road, Suite 315, Charlotte, NC 28210.

## Hutchens' Second Delay

1124. On September 6, 2018, Pettit explained the necessary hearing delays to Oots and Ward by emailing them, "As you will recall, any person obligated on a note or guaranty is released unless the party is timely served with a Notice of Hearing and have notice of the hearing before the Clerk. Since this is critical to obtaining a judgement [in 18 CVS 720] against all obligors and guarantors, we wanted to obtain personal service on each party."[381]

---

[381] Mo1057 (emphasis added)

1125. Also on September 6, 2018, Pettit responded to Ward's request to include her on all filings and notices going forward by saying, "Tracy – Thanks for the email and I will copy you on all pleadings/notices going forward."[382]

1126. On September 6, 2018, Shirley Clemmons, Foreclosure Processor of the Hutchens Law Firm, 4317 Ramsey Street, Fayetteville, NC 28311 issued an email to Jennifer Baucom and Hanna Cordell, Lincoln County Assistant Clerks, at 8:03 a.m. canceling that day's hearing and requested continuance to 9/627/18 with no notice to the Defendants" nor issuing a cause or reason for the continuance.[383]

1127. Thereafter, Assistant Lincoln County Clerk Jennifer Baucom drafted, dated and signed Hutchens' Motion and Order for Continuance until September 27, 2018 at 11:00 a.m. citing "The Substitute Trustee [Pettit] needs additional time to acquire documents from the note holder". [384]

1128. Finally, Pettit also provided Certificate of Service that stated he served the parties on September 13, 2018, four days before the Clerk executed the order.

1129. Since the Lincoln County Clerk of Court did not send her order back to Hutchens on September 6, 2018, Pettit had to send the Clerk a late notice, order, and certificate of service on September 17, 2018.[385]

1130. On September 17, 2018, Pettit filed his second Notice of Continued Hearing to again notify DPP and Bayport of his intention to postpone the foreclosure hearing until September 27, 2018 and serving his Notice and Order with his Certificate of Service.

---

[382] Mo1057
[383] Lincoln 18 SP 135, pg.184
[384] Lincoln 18 SP 135, pg.183
[385] Lincoln 18 SP 135, pgs.179-182

172

1131. Pettit's document source footer for his September 27, 2018 Notice of Continued Hearing cited his file storage location as

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 9-27-2018.docx
and at the top, Hutchens case No. "1237056".

1132. Pettit further affirmed he, not Hutchens Law Firm, was acting as a principal of STS authorized to bind STS in the same Notice Of Continued Hearing On Foreclosure Of Deed Of Trust as Substitute Trustee Services, Inc., Substitute Trustee By: William Walt Pettit, Attorney, 6230 Fairview Road, Suite 315, Charlotte, NC 28210.

1133. With Pettit's Notice, he also provided an order for the Clerk of Court to execute with Pettit's document source footer for his September 27, 2018 foreclosure hearing order cited his file storage location as

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 9-27-2018.docx
and at the top, Hutchens case No. "1237056".

1134. Pettit's Certificate of Service source footer for his September 27, 2018 foreclosure hearing order also cited his file storage location as

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 9-27-2018.docx
and at the top, Hutchens case No. "1237056".

1135. Pettit further affirmed he, not Hutchens Law Firm, was acting as a principal of STS authorized to bind STS in the same Certificate of Service for the Notice Of Continued Hearing On Foreclosure Of Deed Of Trust as Substitute Trustee Services, Inc., Substitute Trustee By: William Walt Pettit, Attorney, 6230 Fairview Road, Suite 315, Charlotte, NC 28210.

## Hutchens' Third Delay

1136. On September 26, 2018, Pettit as Trustee attests that he as "an attorney duly licensed to practice and practicing law in the State of North Carolina. To the best of the undersigned's knowledge, neither Akiba J. Green, Kevin W. Lafone, Craig P. Norfolk, Heather W. O'Brien, Robert E. Watson nor William J.

173

McMahon are active service members of the United States Armed Forces or reserve members called to active military service and have not been in active military service within 1 (one) year preceding the attached search or are deceased."[386]   Pettit drafted and filed the Trustee's Affidavit of Non-Military Status for filing in 18 SP 135 as indicated from his document footer showing:

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Affidavit of Non-Military Service.docx and at the top, Hutchens case No. "1237056".

1137.   On September 27, 2018, Shirley Clemmons, Foreclosure Processor of the Hutchens Law Firm, 4317 Ramsey Street, Fayetteville, NC 28311 sent an email to Sheila Getties, Jennifer Baucom and Hannah Cordell, Lincoln County Clerks, at 8:09 a.m. requesting cancellation of that day's Hearing On Foreclosure Of Deed Of Trust for 18 SP 135 and requested a continuance to October 18, 2018 with no notice to the Defendants nor issuing a cause or reason for the continuance. [387]

1138.   Later on September 27, 2018, as Substitute Trustee Services, Inc., Substitute Trustee By: William Walt Pettit, Attorney, Pettit again notified DPP and Bayport of his intention to continue the foreclosure hearing a third time.[388]

1139.   Pettit's document source footer for his October 18, 2018 third Notice of Continued Hearing cited his file storage location as

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 10-  -2018.docx
and at the top, Hutchens case No. "1237056".[389]

1140.   Because Pettit's Motion left the date blank, Pettit did not know what the Clerk would assign as the Hearing's date as indicated in his source footer for the motion and certificate of service.

---

[386] 18 SP 135 pg.39.
[387] Lincoln 18 SP 135, pg.174-177
[388] Lincoln 18 SP 135, pg.161
[389] Lincoln 18 SP 135, pg. 175

174

1141. Pettit further affirmed he, not Hutchens Law Firm, was acting as a principal of STS authorized to bind STS in the same Notice Of Continued Hearing On Foreclosure Of Deed Of Trust as Substitute Trustee Services, Inc., Substitute Trustee By: William Walt Pettit, Attorney, 6230 Fairview Road, Suite 315, Charlotte, NC 28210.

1142. With Pettit's Notice, he also provided an order for the Clerk of Court to execute with Pettit's document source footer for his October 18, 2018 foreclosure hearing order cited his file storage location as

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 10-18-2018.docx
and at the top, Hutchens case No. "1237056".

1143. Finally, Pettit also provided Certificate of Service for his October 18, 2018 foreclosure hearing that stated he served the parties on September 26, 2018, one day before the Clerk executed the order.

1144. Pettit's Certificate of Service source footer for his October 18, 2018 foreclosure hearing order also cited his file storage location as

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 10- -2018.docx
but the order had
U:\ WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Continued Hearing 10-18-2018.docx
demonstrating that Pettit's September 26, 2018 Certificate of Service did not include the new executed order.  And still at the top of every page is Hutchens case No. "1237056".

1145. Pettit further affirmed he, not Hutchens Law Firm, was acting as a principal of STS authorized to bind STS in the same Certificate of Service for the Notice Of Continued Hearing On Foreclosure Of Deed Of Trust as Substitute Trustee Services, Inc., Substitute Trustee By: William Walt Pettit, Attorney, 6230 Fairview Road, Suite 315, Charlotte, NC 28210.

## FNB's Portfolio Pressure

1146.   On October 18, 2018, Pettit emails Oots and Ward stating,

175

" Joe – As an update, we appeared at the hearing before the Clerk today at 11 am. As anticipated, counsel for the borrowers and guarantors along with Robert Watson also appeared and requested a continuance. In support of the request, counsel stated that Denver Property Partners was trying to finalize a contract to sell the property and was also looking at reinstating the obligations by curing all defaults under the various Notes which are secured by the property. Over our objection, the Clerk continued the hearing to December 6, 2018 at 11 am.

I do not read much into this decision but have a couple of thoughts. First, the Clerk noted that there will not be any other continuances. Second, Clerks routinely grant a sixty day continuance to a borrower as a matter of right today. By continuing the matter to December 6, 2018, the continuances would total around 60 days. We noted that it was routine to grant continuances for residential properties but not commercial foreclosures. Notwithstanding, the Clerk granted the request. Third, we took two Orders to the hearing today. One Order allowed the Trustee to proceed with noticing and selling the property. The other Order, a copy of which is attached, granted the continuance. The Order notes that counsel for the borrowers and guarantors appeared and requested a continuance. Not that we believe that there are any issues regarding service of the Notice of Hearing, etc., NC case law clearly provides that an appearance at the hearing waives any defense for insufficiency of service raised by a borrower or guarantor. As the Order provides, counsel appeared for each borrower and guarantor. Finally, please forward the amounts necessary to reinstate each obligation. I would like to avoid another request to continue by opposing counsel simply because we failed to let forward the reinstatement amounts. Thanks."[390]

1147. Throughout DPP's foreclosure in Lincoln 18 SP 135, Hutchens attacked FNB's Denver Property Partners Portfolio through demands and lawsuits.

1148. On October 29, 2018, true to Oots word he was "putting pressure"[391] on the portfolio, Pettit sent a demand letter from FNB, now on Catawba Property Partners, citing its default as follows:

---

[390] Mo1810
[391] June 6, 2018 14:46 Oots to Shearer email, Exhibit Mo970, December 13, 2018 8:24 AM Oots to Ward and Pettit email, Mo 832, January 4, 2019 10:16 AM Oots to Ward and Pettit email, Mo 833.

> The Promissory Note, Deed of Trust and Commercial Guarantys are currently in default for a number of reasons including but not limited to the following:
>
> (a) That Akiba J. Green and Robert E. Watson have defaulted on separate obligations in favor of the Bank;
> (b) That the Bank, in good faith, deems itself insecure; and
> (c) That there has been a material adverse change in the financial condition of Akiba J. Green and Robert E. Watson.

And Pettit still using his FNB document footer showing:
U:\WWP Files\First National Bank\Catawba Property Partners\xx2585\Demand ltr.docx.

1149. At Oots request on November 29, 2018, and while serving as counsel for STS, Pettit demanded the loans of Catawba Property Partners, LLC, a commercial real estate company owned by guarantors of DPP[392] and part of FNB's Denver Property Partners portfolio[393].

> The Promissory Note, Deed of Trust and Commercial Guarantys are currently in default for a number of reasons including but not limited to the following:
>
> (a) That Akiba J. Green and Robert E. Watson have defaulted on separate obligations in favor of the Bank;
> (b) That the Bank, in good faith, deems itself insecure; and
> (c) That there has been a material adverse change in the financial condition of Akiba J. Green and Robert E. Watson.

1150. Catawba Property Partners had not missed a FNB payment in five years and FNB had CPP listed as "accrual".[394]

1151. On November 28, 2018, Pettit emails Ward in Lincoln County Case No. 18 SP 135 the following:[395]

> Tracy – Please note that the hearing on the foreclosure of the Bank's Deed of Trust is scheduled for Thursday, December 6, 2018 at 11 am in Lincolnton, NC. Late last Wednesday, I received the attached Offer from Stacy Cordes. The Offer provides that the buyer is willing to pay the sum of $2M to purchase the Bank 's and SBA" obligation. The Offer also provides that from this sum, the Bank would be paid the sum of $1.5M and the SBA would receive the sum of $500K. The Bank has received other offers to purchase its obligations but has declined to do so for a number of reasons. Please let me know your thoughts on the offer. Thanks.

---

[392] Mo125

[393] Mo2426, Mo2208 (4/25/18 SACC on YK0241 Denver Property portfolio relationship)

[394] Mo125

[395] November 28, 2018 3:56 PM Email from Pettit to Ward, Mo

177

1152. In Pettit's November 29, 2018 demand on Catawba Property Partners ("CPP"), Pettit stated that to cure the default, Catawba Property Partners must pay the debt of DPP in full within five days even though Catawba Property Partners had not guaranteed DPP's loans.[396]

1153. Pettit drafted his CPP Demand Letter as indicated from his document footer showing:[397]

U:\WWP Files\First National Bank\Catawba Property Partners\xx2585\Demand ltr.docx

1154. On November 30, 2018, Oots notes at his SACC meeting that:[398]

11/30/2018    Joe Oots
Foreclosure is underway on the Denver Property Partners notes and the borrowers were able to gain a foreclosure hearing postponement in October 2018 and new foreclosure hearing is scheduled for December 6, 2018. A foreclosure is anticipated in January 2019. The bank is also pursuing judgments against the guarantors and they should be litigated in January or February of 2019. The Guarantors thus far have been successful in delaying and stalling. The Bank has now made Demand on other related debt to the Guarantors including Lake Norman Health, Catawba Properties and Bob's Car Wash. Recovery resolution Specialists was not demanded as the borrower has indicated that he is seeking other financing. There is no updated financial information from the borrowers. They are represented by different attorneys and one has indicated that Denver Property Partners will file Chapter 11. That will not stop efforts to seek and enforce judgments on the guarantors.

1155. On December 7, 2018, CPP had Attorney Elliott send Pettit a letter to cure the FNB's DPP default on CPP by adding additional Guarantors to replace Watson and Green.[399]

1156. On December 13, 2018, Oots emailed Ward and Pettit regarding the foreclosure hearing that had been continued. In his email, Oots stated,

"As a side note we have other loans to some of the guarantors. I have demanded all but one of them. The one I didn't demand matures 1/1/19. I will not extend the maturity. I think I will ask Walt to file judgement complaints on the guarantors for those related loans in January as opposed to foreclosing for now/ This just adds additional pressure for them to bring us a reasonable solution. Besides I want all of these folks out of our bank." Oots

---

[396] Mo125
[397] Mo125
[398] Mo1033 pg. 14
[399] Mo870

finished by saying, "**Please keep this email subject to attorney client privilege as I wouldn't want to have to testify about it down the road**."[400]

1157. On January 4, 2019, Oots emailed Ward of Self-Help and stated, "So you know we have filed actions against all of their guarantors after cross defaulting their other business loans with us. **We are exerting as much pressure as possible**. **Walt is preparing to depose everyone**."[401]

1158. On January 6, 2019, Lafone emailed Ward stating, "I understand you are planning to attend the foreclosure hearing this week? While you are there, **we need for you and Walt Pettit to sign off on an insurance check** that will be used to repair the roof."[402]

1159. On January 7, 2019, Pettit emailed Ward stating,

"Tracy - The foreclosure hearing on the real property owned by Denver Property Partners is scheduled for tomorrow at 10 am in Lincolnton, NC. Please let me know if you are still able to appear. **I would like to get you to testify that the SBA loan is in default and that the SBA has not modified the Note or extended the time to pay the same**."[403]

1160. On February 3, 2019, Pettit filed 19 CVS 2002, a lawsuit in Mecklenburg County against DPP's Guarantor Watson for Recovery Resolution Specialists, Inc., which was part of FNB's Denver Property Partners portfolio.[404]

1161. Pettit drafted this document for filing in 19 CVS 3002 as indicated from his document footer showing:

U:\ WWP Files\First National Bank\Recovery Resolution Specialists\Complaint.docx

1162. On March 26, 2019, Pettit emailed Ward and stated,

--------------------------------

[400] Mo1057 (emphasis added)
[401] Mo1799 (emphasis added)
[402] Mo1539 (emphasis added)
[403] Mo1806 (emphasis added)
[404] Mo1048

179

"**I talked with Mike Elliott a short while ago on a number of matters. This included the Denver Property/Bayport Holdings matter**. Evidently, the members of Denver Property have employed a new commercial real estate agent to sell the property. Mike is going to check with the agent and let me know if there are any new developments. I will let you know more as soon as I get an update from him."[405]

1163. On April 4, 2019, Oots cites at his SACC meeting that:[406]

> 4/10/2019    Joe Oots
> The Bank continues to pursue its rights and remedies under the loan documents on all of the commercial credits in the relationship.

1164. On April 4, 2019, Pettit sent Elliott a CPP payoff letter citing:[407]

> As you are aware, we have been retained to represent the interests of First National Bank of Pennsylvania (First National Bank). First National Bank acquired all the equity interests of Yadkin Bank and it is the current owner and holder of Note and related loan documents.

1165. Pettit drafted this document for Catawba Property Partners loan payoff statement as indicated from his document footer showing:

U:\ WWP Files\First National Bank\Catawba Property Partners\Elliott ltr - payoff.docx

1166. On April 10, 2019 Oots placed in a SACC meeting notes,

> 4/10/2019    Joe Oots
> The Bank continues to pursue its rights and remedies under the loan documents on all of the commercial credits in the relationship.

> Lake Norman Health continues to pay but is not communicating with the Bank. continuing legal pressure should motivate the borrowers to refinance the exposure

1167. On July 8, 2019, Pettit filed 19 CVS 2319, a lawsuit in Cabarrus County against DPP's Guarantor Watson and his wife Lois Watson for Bob's Car Wash of Kannapolis, LLC, which was part of FNB's Denver Property Partners portfolio.

---

[405] Mo1994 (emphasis added)
[406] Mo1033 pg. 14
[407] Mo871 (emphasis added)

180

1168. Pettit drafted this document for filing in 19 CVS 2319 as indicated from his document footer showing:

U:\ WWP Files\First National Bank\Bob's Car Wash\Complaint.docx

1169. On July 8, 2019, Pettit filed a Notice of Lis Pendens for 19 CVS 2319.

1170. Pettit drafted this Lis Pendens for filing in 19 CVS 2319 as indicated from his document footer showing:

U:\ WWP Files\First National Bank\Bob's Car Wash\Notice of Lis Pendens.docx

## Hutchens' and Pettit's Withdrawal

1171. STS' conflict with DPP arose from sharing the Noteholder's attorney.

1172. STS should have withdrawn to resolve the appearance and actual conflict with the Borrower, not STS' attorney.

1173. On December 6, 2018, Pettit and Hutchens Law Firm filed a "Motion to Withdraw as Counsel for Substitute Trustee" in 18-SP 135.[408]

1174. Pettit drafted this document and filed it in 18 SP 135 as indicated from his document footer showing:

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Motion to Withdraw as Counsel.docx
and with Hutchens case No. "1237056" on the first page.[409]

---

[408] Lincoln 18 SP 135 pg. 96, Mo785, *compare* Cabarrus 18 SP 715 (Bunda withdrawal, Hutchens filing Final Report)
[409] Lincoln 18 SP 135, pgs. 96

1175. In his filing, Pettit claimed that **"This proceeding is now contested"** but did not identify what

factors had changed that now made the proceeding contested since his last representation.[410]

1176. Claiming a matter is contested does not define where a conflict existed or originated.

1177. On December 6, 2018, Pettit and Hutchens Law Firm filed a proposed "Order to Withdraw as

Counsel for Substitute Trustee" in 18-SP 135.[411]

1178. Pettit drafted this document and filed it in 18 SP 135 as indicated from his document footer

showing:

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Motion to Withdraw as Counsel.docx
and with Hutchens case No. "1237056" on the first page.[412]

1179. Pettit further affirmed he, not Hutchens Law Firm, was acting as a principal of STS authorized to

bind STS in the same Motion to Withdraw as Substitute Trustee Services, Inc., Substitute Trustee

By: William Walt Pettit, Attorney, 6230 Fairview Road, Suite 315, Charlotte, NC 28210.



1180. And on December 5, 2018, Pettit executed and filed a "Certificate of Service" in 18-SP 135.[413]

---

[410] Lincoln 18 SP 135 pg. 96, *see* Mo904 (March 23, 1018, "I [Pettit] have had a chance to review various documents and talk with the special assets officer [Oots] involved. For the reasons stated below, First National Bank (FNB) disagrees with virtually each factual statement in your [Mike Elliott counsel for DPP/Bayport] email."), Mo1919 (August 13, 2018, Liquidation Plan email's exhibit pg.2 "At least two guarantors have obtained their own legal counsel, and they are collectively working to delay and ultimately avoid foreclosure to allow time to find a buyer and sell the property.")

[411] Lincoln 18 SP 135 pg. 161, Mo785

[412] Lincoln 18 SP 135 pg. 161, Mo785

[413] Lincoln 18 SP 135 pg. 162

Case 5:24-cv-00165-KDB-DCK   Document 1   Filed 07/15/24   Page 182 of 236

1181. Pettit drafted this document and filed it in 18 SP 135 as indicated from his document footer

showing:

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Motion to Withdraw as Counsel.docx
and with Hutchens case No. "1237056" on the first page.[414]

1182. Pettit affirmed here he, not Hutchens Law Firm, was acting as a principal of STS authorized to

bind STS in the same Motion to Withdraw as Substitute Trustee Services, Inc., Substitute Trustee

By: William Walt Pettit, Attorney, 6230 Fairview Road, Suite 315, Charlotte, NC 28210. [415]



Substitute Trustee Services, Inc.
Substitute Trustee
By: William Walt Pettit, Attorney
N.C. Bar No.: 9407
6230 Fairview Road, Suite 315
Charlotte, N.C. 28210
Telephone: (704) 362-9255
Telecopier: (704) 362-9268

1183. Pettit also provided his Certificate of Service that stated he served the parties on December 5,

2018, one day before the Clerk executed the order.[416]

1184. Knowing he was withdrawing, Pettit still filed contemporaneously with his motion to withdraw

critical foreclosure documentation necessary for the Clerk to rule upon at the Foreclosure

Hearing.[417]

---

[414] Lincoln 18 SP 135 pg. 162
[415] Lincoln 18 SP 135 pg. 162
[416] Lincoln 18 SP 135 pg. 162
[417] Lincoln 18 SP 135, pgs. 39-52 (Affidavit of Non-Military Service), pgs. 53-95, 117-160 (FNB's Affidavit of Indebtedness), 97-116 (Affidavit of Service)

1185. Yet, STS as trustee did not withdraw any Hutchens documentation supporting the required elements of a foreclosure.

1186. Instead, on December 6, 2018, Patrick Harper Dixon Attorney Firm of Hickory claimed the position of successor trustee's attorney in 18 SP 135 and maintained all of Hutchens' previous filings.

1187. If PHD's client was STS, PHD still took orders from Hutchens as shown below.

1188. Therefore, since PHD executed Hutchens' drafted documents as shown below, PHD was as conflicted representing STS as was Hutchens in 18 SP 135.

## Pettit's Foreclosure Affidavits

1189. Pettit drafted and executed required foreclosure affidavits in this matter under statute before, during and after acting as trustee.

1190. On or about September 26, 2018, Pettit drafted and filed the Trustee's Affidavit of Non-Military Status for filing in 18 SP 135 as indicated from his document footer showing:

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Affidavit of Non-Military Service.docx
and at the top, Hutchens case No. "1237056".

1191. On September 26, 2018, Pettit attested that he was "an attorney duly licensed to practice and practicing law in the State of North Carolina[]" for his Trustee's Affidavit of Non-Military Status [418]

1192. On January 8, 2019, Pettit provided the Clerk an affidavit stating, "On March 8, 2018, Affiant [Pettit] prepared a certain letter to be forwarded to each entity/individual as noted thereon at the request of First National Bank of Pennsylvania. Affiant included three commercial term loan

---

[418] Lincoln 18 SP 135, pg. 39

sheets involving which are referenced in the civil action, Case #18-CVS-720, filed by First

National Bank of Pennsylvania and referenced in part in this foreclosure proceeding." Pettit

drafted this document and filed it in 18 SP 135 as indicated from his document footer showing:

U:\WWP Files\First National Bank\Bayport Holdings\FCL\Affidavit- WWP.docx
and with Hutchens case No. "1237056" on the first page.[419]

1193. Pettit's file location U:\WWP Files\First National Bank\Bayport Holdings\FCL also contained

his Motion and Order for withdrawal in Lincoln 18 SP 135.


## Offers to Purchase DPP's Range Property

1194. Pettit reviewed offers from non-foreclosure bidders and discussed them with other parties in this

case.

1195. On November 19, 2018, Drew Mulle offered to purchase DPP's Range Property in a note sale for

$2,000,000.00.[420]

1196. On November 28, 2018, Pettit sent the offer to Ward at Self-Help and stated,

"The Offer also provides that from this sum, the Bank would be paid the sum of $1.5M
and the SBA would receive the sum of $500K. The Bank has received other offers to
purchase its obligations but has declined to do so for a number of reasons. Please let me
know your thoughts on the offer."[421]

1197. On November 29, 2018, Ward responded to Pettit,

"this is the first I've heard of it, so will need to understand a little more of the background
(confirm it's arms length, understand the guarantor plans to pay the remaining SBA
balance, etc.). Do you know why they are setting it up as a note purchase as opposed to a
short sale?"[422]

---

[419] Lincoln 18 SP 135, pgs. 23-24 (emphasis added)
[420] Mo1528
[421] Mo1652
[422] Mo1848

185

1198. On November 29, 2018, Pettit responded to Ward,

"– I do not know why the buyer desires to purchase the obligations as shown in the Offer. I have consistently suggested that if the buyer wants to acquire the property, the buyer should submit a written offer for the property. This allows both the Bank and the SBA to pursue the guarantors. Otherwise, if the Notes were sold, the buyer would have the right to enforce payment of the same."[423]

1199. On December 21, 2018, Ward of Self-Help emailed DPP and Elliott,

"Again, you must keep us informed of status of the sale of the building or other workout proposals. It is not sufficient to share information with FNB and not with us for the SBA loan. These are separate debts and FNB cannot provide any SBA approval related to your 504 loan; SBA will have to agree to any sale of the building short of foreclosure by FNB. **FNB shared a potential offer with me on November 29,** for which I've asked Ms. Cordes and Mr. Elliott to provide information, but I have yet to receive any information from them. Hopefully you will be able to provide more details prior to the hearing on January 8."[424]

1200. On January 4, 2019, Pettit emailed Ward of Self-Help and stated,

"We have added you to the mailing list. The last thing that we prepared was a Notice of Continued Hearing for the hearing on December 6, 2018. This was sent to you. **The Clerk over our objection continued the hearing on December 6, 2018 to January 8, 2019 and did so in open Court.** An Order has not been entered to my knowledge which continued the hearing."[425]

1201. On January 4, 2019, Oots emailed Pettit,

"Bud Cesena called me at home the other night. He is a County Commissioner. He stated that the county was interested in buying the range for law enforcement training. He wanted to know what we would sell it for. I tried to explain that we cannot sell the property

---

[423] Mo1848
[424] Mo1659 (emphasis added)
[425] Mo1726 (emphasis added)

as we don't own it. **I told him that the Bank will place a protective bid at the foreclosure sale.** I told him we had not determined our bid yet but he could get some idea by looking at the court records which show what is owed. I told him that I did not know if Self Help had determined id [sic] they would bid or at what level. The county would need to just wait and see the bid amount. Personally I think it would be an extravagant purchase for a rural county government but what do I know… Apparently there is a new sheriff in town. Nevertheless, I hope they buy it but I'm not going to count on it."[426]

1202. On May 7, 2019, Pettit emailed Ward,

"As an update, we have received a number of calls from interested buyers for the property. We have informed each interested buyer that the Bank does not own the property and thus is not able to sell the same and conveyed the name and contact information for each one to counsel for the Defendants. It is my understanding that a number of offers have been made and these were in the range of $1.5-$2M. **Obviously this would not generate sufficient proceeds to extinguish the Bank's liens and the SBA's lien. At this point, I am waiting on an appraisal of the property and once I receive the same, my sense is that the Bank will want to start the sale process**."[427]

## Foreclosure Hearing

1203. On January 8, 2019, at the DPP foreclosure hearing, DPP's debt was noted as $2,000,000 by the Clerk of Lincoln County.[428]



---

[426] Mo1799 (emphasis added)
[427] Mo1896 (emphasis added)
[428] Mo1076

1204. Pettit attended the Clerk's January 8, 2019 foreclosure hearing on behalf of FNB, while Colton Sexton of Patrick, Harper, Dixon attended as the neutral trustee on behalf of STS.[429]

1205. On January 9, 2019, Oots cited in his SACC report that its strategy if "[t]he [DPP] debt is not paid off by 10/1/18 then [Pettit's] foreclosure and [Pettit's] suits against the Guarantors will continue."[430]



**Current Strategy:**
Exit - Denver Property Partners is being liquidated. A foreclosure hearing is scheduled.

**General Action Plan:**
+ IF The guarantors are able to pay-off the debt obligation BY 10/1/18 THEN Freclosure will not continue and lawsuits against guarantors will cease.
- IF The debt is not paid off. BY 10/1/18 THEN Foreclosure and suits against the guarantors will continue.
**Additional Comments:**

**Meeting Minutes:**
FNB has moved against all Guarantors and seeking judgments. A foreclosure hearing is scheduled for 1/8/19 and a deposition hearing is scheduled for 1/9/19.

1206. On January 12, 2019, after the hearing Pettit emailed Ward of Self-Help and stated,

"At the conclusion of the hearing, the Clerk decided that the Bank was entitled to foreclose on the property and entered an Order allowing foreclosure. I have attached a copy of the Order. To accommodate the Clerk's request to allow the borrowers additional time to try and sell the property and to avoid the hearing being continued yet again, **the Bank agreed not to file, post, publish a Notice of Sale until after March 1, 2019. Thus, we will start the sale process on March 2, 2019. I anticipate that the sale will be held on April 1 or 2 and will send a Notice of Sale to you once this has been determined**."[431]

1207. On April 24, 2019, Ward emailed Oots asking, "Is there any further update on this loan?" Oots replied, "**I need to defer to Walt [Pettit]. We need to schedule the foreclosure sale**."[432]

---

[429] Mo1076
[430] Mo2219
[431] Mo1986 (emphasis added)
[432] Mo1994

## Banks' Valuation of DPP's Range Property

1208. Both FNB and Self-Help appraised DPP's Range Property prior to the foreclosure sale to assess if each would bid at the sale.

1209. On November 14, 2013, Effird Appraisals provided Yadkin (FNB) its appraisal ("Efird1") for DPP's prospective Range construction project and valued the land and range at $3,865,000.00 inclusive of $375,000.00 of yet installed equipment.[433]

1210. On June 6, 2017, Effird Appraisals provided Yadkin (FNB) its appraisal ("Efird2") for DPP's existing Range construction project and valued the land and range at $4,110,000.00 inclusive of all installed equipment.[434]

1211. On July 9 2018, Oots has Earl Tunstall of FNB order a new appraisal now with his requirement he emailed Hunter on November 27, 2017 stating "It's a special use building that would require a lot of modification to be repurposed."[435]

1212. However, Oots stated in his August 13, 2018 email to Tracy Ward, "I specifically requested a [appraisal] value based on the property being re-purposed as continuing operations as a gun range doesn't seem feasible to me."[436]

1213. And on August 2, 2018, Oots has his new appraisal of DPP's collateral now indicating a value of $2,780,000 ("Beck Appraisal") and a higher alternative use value and range equipment disposition differing from prior appraisals:[437]

---

[433] Mo702
[434] Mo126, pg. 5
[435] Mo 950 (November 27, 2017 2:00 PM Oots to Hunter email)
[436] Mo1712
[437] Mo990 (August 2, 2018 Beck Appraisal pg. 74, 77)

189

**VALUE BY SALES COMPARISION APPROACH**
**"UPON COMPLETION" as of NOVEMBER 1, 2018**
**$2,840,000**

**FF&E DEPRECIATION ANALYSIS SUMMARY**

| Targeting Equipment | | | | |
|---|---|---|---|---|
| 2014 Cost | | | $ | 617,205 |
| Time Adjustment Factor - Equipment | 4 Years | 2.0% | | 8.0% |
| Adjusted Cost New | | | $ | 666,581 |
| | | Economic Life | | |
| Depreciation | 4 Years | 40 Years | $ | (66,658) |
| Depreciated FF&E - Targeting Equipment | | | $ | 599,923 |
| Estimated Value by Cost Approach | | | | $600,000 |

The Depreciated FF&E for the subject property is estimated at $600,000 and will be included with the real estate "As-Is". A salvage value of such items is difficult to ascertain for the FF&E due to the targeting equipment requiring dis-assembly.

**FF&E DEPRECIATION ANALYSIS SUMMARY**

| Targeting Equipment | | | | |
|---|---|---|---|---|
| 2014 Cost | | | $ | 617,205 |
| Time Adjustment Factor - Equipment | 4 Years | 2.0% | | 8.0% |
| Adjusted Cost New | | | $ | 666,581 |
| | | Economic Life | | |
| Depreciation | 4 Years | 40 Years | $ | (66,658) |
| Depreciated FF&E - Targeting Equipment | | | $ | 599,923 |
| Estimated Value by Cost Approach | | | | $600,000 |

The Depreciated FF&E for the subject property is estimated at $600,000 and will be included with the real estate "As-Is". A salvage value of such items is difficult to ascertain for the FF&E due to the targeting equipment requiring dis-assembly.

1214. The August 2, 2018 Beck appraisal of DPP's Range Property at $2,840,000 was greater than Stolar's October 23, 2017, DPP outstanding Loans balances of #4313, #6980 and #7028 totalling $2,270,093.00.[438]

---

[438] Mo2196

1215. On August 6, 2018, Self Help CDC for the SBA's third position loan with DPP sought out and gathered its own appraisal of DPP's Range Project from Valbridge Appraisals ("Valbridge") for a value of $3,600,000.00. [439]



| Value Indications | |
| --- | --- |
| Approach to Value | As Is |
| Land Only - Sales Comparison | $360,000 |
| Cost | $3,520,000 |
| Sales Comparison | $3,600,000 |
| Income Capitalization | Not Developed |
| **Value Conclusions** | |
| Component | As Is |
| Value Type | Market Value |
| Property Rights Appraised | Fee Simple |
| Effective Date of Value | July 24, 2018 |
| **Value Conclusion** | **$3,600,000** |
| | **$209.57 psf** |

1216. Self-Help's August 6, 2018 Valbridge appraisal included the range equipment "considering the custom design of the equipment and that the equipment is physically attached to the building, it is considered to be real property."[440]

FF&E - Firing Range Equipment
The subject property is used as a retail store for fire arms and as a firing range. There are 12 pistol lanes and 6 rifle lanes. The firing lanes each have computerized targeting equipment that is state of the art and was specifically manufactured to fit the subject's firing range. The equipment is physically attached to the building and due to the specific design to fit the subject's firing range, it would not be economically feasible to remove the targeting equipment for use at another location. Therefore, considering the custom design of the equipment and that the equipment is physically attached to the building, it is considered to be real property. The subject's equipment cost estimate provided by

the property owner was $617,205. Therefore, the appraisers included a rounded value of $617,000 in this analysis.

---

[439] Mo987 (8/6/2018 Valbridge SBA Appraisal)
[440] Mo987 (8/6/2018 Valbridge SBA Appraisal pg. 55-6)

1217. Self-Help's August 6, 2018 Valbridge appraisal agrees with FNB's own earlier Comprehensive Review Checklist where it noted" [t]he equipment is physically attached to the building and due to the specific design to fit the subject's firing range, it would not be economically feasible to remove the targeting equipment for use at another location. Therefore, considering the custom design of the equipment and that the equipment is physically attached to the building, it is considered to be real property." [441]

1218. The Valbridge appraisal of DPP's Range Property at $3,600,000 was greater than Stolar's October 23, 2017, DPP outstanding Loans balances of #4313, #6980 and #7028 totalling $2,270,093.00.[442]

1219. On August 29, 2018, contrary to Oots' most recent 8/2/18 Beck appraisal devaluing the Range Property to $2,780,000.00[443] , FNB still valued DPP's Range Property and Building collateral at $4,110,000.00 on FNB's books[444].

**Collateral Description / Comments:**
1st DOT (FNB has the 2nd DOT, Loan #1017028) on 1387 North Highway 16 in Denver, North Carolina. Subject property is 4.94 acres used as a gun and ammunition store and shooting range. Appraisal dated 5/22/17 states a market value of $4,110,000.

## Pettit's Appraisals of DPP's Range Property

1220. On July 29, 2019 IRR appraisals wrote Pettit recounting what appraisal Pettit requested IRR to perform. [445]

---

[441] Mo985 (FNB Comprehensive Review Checklist, pg. 2)
[442] Mo2196
[443] Mo987 (8/6/2018 Valbridge SBA Appraisal)
[444] Mo1034 (SACC using Efird2 - $4,110,000.00)
[445] Mo986 (IRR1) pgs.3, 110-112

192



July 29, 2019

First National Bank of Pennsylvania
c/o Walt Pettit
Hutchins Law Firm
6230 Fairview Road
Suite 315                          Telephone: (704) 362-3255 ext. 2313
Charlotte, NC 28210                Email: Walt.Pettit@hutchenslawfirm.com

SUBJECT:     Proposal/Authorization for Valuation and Consulting Services
             Gun Range
             1417 N NC 16 Address
             Denver, NC (the "Subject Property")

Dear Mr. Pettit:

Upon your acceptance of this letter agreement, Integra Realty Resources – Charlotte ("IRR – Charlotte"),
will prepare an appraisal of the Subject Property.

The purpose of the appraisal is to provide an opinion of the market value of the fee simple interest in
the Subject Property. The intended use of the appraisal is for asset valuation. The use of the appraisal
by anyone other than you is prohibited. The appraisal will be prepared in conformance with and subject

1221. On July 31, 2019 Pettit accepted IRR's appraisal contract ("IRR1"): [446]

AGREED & ACCEPTED THIS _31_ DAY OF _July_____, 2018.

BY:     Client Company

_____
AUTHORIZED SIGNATURE

_____
NAME (PRINT)

1222. IRR charged Hutchens $3500 for the Appraisal.[447]

---

[446] Mo986 (IRR1) pg.112
[447] Mo986 pg.111 (IRR1)

> The total fee for this assignment will be $3,500 (including expenses) and the delivery date will be 2 weeks from authorization, but subject to extension based upon late delivery of the requested data and scheduled access for inspection. The fees will be due and payable within 30 days of the delivery of the reports. It is understood that simple interest of 15% per annum will accrue on any unpaid balance for

1223. The IRR1 appraisal did not include the range equipment contrary to Self-Help's appraisal's claim that the "equipment collateral became fixtures (shooting range equipment designed and built into the facility), and the building is special purpose so value does not justify bidding if TPL [FNB] forecloses."[448]

1224. On or about August 7, 2019, IRR delivered its IRR1 appraisal to Hutchens, not FNB.[449]

> 8/7/2019     Joe Oots
>
> A new appraisal has been obtained through FNB's attorney. It is subject to attorney client privilege and the value should not be disclosed at this time because a review of that appraisal raised some questions. We are working through those questions and will update the collateral record and strategy once we are confident we have a valid appraisal. The foreclosure process is underway and we are attempting to develop a bid strategy that will result in a sale of the collateral rather than a transfer to OREO and preserve the Bank's deficiency claim on the guarantors.
>
> A foreclosure is underway with Bob's Carwash and the calculated impairment has been charged-off..

1225. Hutchens acted independent of FNB as Joe Oots indicated in his August 7, 2019 SACC report to FNB stating, "A new appraisal has been obtained through FNB's attorney [Hutchens]. It is subject to attorney client privilege".[450]

1226. In this same SACC report, Oots admitted that Hutchens' IRR1 appraisal's "value should not be disclosed at this time because a review of that appraisal **raised some questions**."[451]

---

[448] Mo1550
[449] Mo1033, pg. 14
[450] Mo1033, pg. 14
[451] Mo1033, pg. 14 (emphasis added)

1227. One of FNB's questions was how could FNB maintain a deficiency against DPP and its Guarantors if all of the last four appraisals confirmed that DPP's Range Property market value was higher than DPP's debt?

1228. So, on or about September 11, 2019, Pettit ordered a second IRR appraisal.[452]

1229. IRR charged Hutchens $3500 again for the second Appraisal.[453]

1230. However, this time, IRR's second appraisal was a Liquidation Value Letter ("LVA") of DPP's Range Property.[454]

1231. In the LVA, Pettit requested the appraiser deviate from the Appraisal Institute's definition of Liquidation Value and eliminate required criteria.[455]

**Definition of Liquidation Value**

Liquidation Value is defined as:

The most probable price which a specified interest in real estate is likely to bring under the following circumstances: (a) sale will occur within a severely limited marketing period assumed to be less than 90 days; and, (b) the seller is under extreme compulsion to sell.

Source: Hutchins Law Firm

1232. Hutchens' required definition of Liquidation Value on the LVA removed seven of nine required criteria to qualify for a liquidation value from the Appraisal Institute's definition as "[t]he most probable price that a specified interest in real estate property is likely to bring under all of the following conditions:

    1)     Consummation of a sale within a short time period.

---

[452] Mo991 pg.3 (LVA)
[453] Mo991 pg.20 (LVA)
[454] Mo991 pg.1 (LVA)
[455] Mo991 pg.4 (LVA)

195

2) The property is subjected to market conditions prevailing as of the date of valuation.

3) Both the buyer and the seller are acting prudently and knowledgeably.

4) The seller is under extreme compulsion to sell.

5) The buyer is typically motivated.

6) Both parties are acting in what they consider their best interests.

7) A normal marketing effort is not possible due to the brief exposure time.

8) Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.

9) The price represents the normal consideration for the property sold, unaffected by special or creative financing concessions granted by anyone associated with the sale."[456]

206. On or about September 11, 2019, IRR delivered its IRR1 appraisal to Hutchens, not FNB.[457]

1233. Pettit's LVA required the IRR1 appraisal for context, so the LVA stated its, "opinions and conclusions set forth in this letter may not be understood without reference to the full (IRR1) appraisal",[458]

## Hutchens' Bid Strategy

1234. If DPP's foreclosure sale in 18 SP 135 yielded no deficiency, Hutchens could not collect its 15% in 18 CVS 720.

1235. If FNB was the only bidder with a protective bid of $1,195,051.72 that created deficiency of $817,268.83 so, Hutchens 18 CVS 720's 15% fee would be $122,590.32.

---

[456] https://www.appraisalinstitute.org/assets/1/7/AI_-_801.04_Liquidation_Value_Addendum_%28Legal%29.pdf (Hutchens kept only the two highlighted requirements in its IRR LVA definition)
[457] Mo991 pg.3 (LVA)
[458] Mo991 pg.3 (LVA)

1236. STS' 5% trustee's commission would have been $59,752.59 if Hutchens did not remove the trustee's commission entry from Hutchens altered AOC-SP-400 form Hutchens filed at the end of 18 SP 135.[459]

1237. \Instead, Hutchens would collect its fee, in lieu of STS' 18 SP 135 commission, from Hutchens' collection action against DPP in 18 CVS 720.

1238. Then after the sale, FNB could simply revert its bid value to Pettit's IRR1 value when FNB placed DPP's Range Property into FNB's OREO's assets.

1239. Prior to providing DPP discovery in 18 CVS 720, Pettit claimed the Doctrine of Merger justified the first lien amount deduction from FNB's bid above.[460]

1240. Pettit claimed that "the first claim for relief [loan 6980 Pettit deducted from the Bank's bid] was going to be dismissed simply because of the doctrine of merger. . . Doctrine of Merger of North Carolina makes sense that the fee interest and the lien interest merge, the fee interest is the senior interest hence that was dismissed. . . The bank was the [only] high bidder on the second [foreclosed FNB loan #7028] at that foreclosure sale and took title to it."[461]

1241. Pettit claiming use of the Doctrine of Merger to create FNB's Bid at Hutchens' 18 SP 135 foreclosure sale increased DPP's deficiency, despite the market value and the debt owed.

1242. FNB used a "Sherriff Sale Bid Authorization & OREO Analysis" form approved by Joe Oots and FNB's director of Special Assets prior to bidding at Hutchens' October 18, 2019 foreclosure sale.[462]

---

[459] Lincoln 18 SP 135, pg. 1
[460] 7/21/21. Thornburg Hrg. Pg. 27 para. 5 Mot18
[461] 7/21/21. Thornburg Hrg. Pg. 27 para. 5 Mot18
[462] Mo2226, pg. 1

1243. DPP's current payoff to FNB was a principal balance of $2,102,320.55 plus costs and interest.[463]



1244. FNB used Pettit's two IRR appraisals, not any of approved FNB appraisals (Effird1 or Efird2) to calculate its Bid at foreclosure.[464]

1245. FNB used solely Pettit's IRR and LVA appraisals to create a deficiency.[465]

| Source of Value: | Liquidation Value Appraisal dated 8/19 |
| --- | --- |
| Market Value | 2,650,000.00 |
| OREO Value | 2,318,750.00 |

1246. FNB did not bid IRR1's market value of $2,650,000.00

1247. Nor did FNB bid the claimed amount of DPP's debt in the OREO value of $2,318,750.00

1248. Instead, Pettit bid $1,195,051.72 at his foreclosure sale; a value even under his LVA amount of $1,330,000.00. [466]

---

463 Mo2226
464 Mo2226
465 Mo2226, pg. 3
466 Lincoln 18 SP 135 pg. 6

1249. FNB's October 18, 2019 bid strategy showed only Pettit's IRR1 Market Value and the LVA liquidation value in FNB's "Sherriff Sale Bid Authorization & OREO Analysis" form.[467]

1250. On October 18, 2019, **after withdrawing**, Hutchens modified and filed its Report of Foreclosure

> The all in recommended bid is $1.7MM: however, we are foreclosing the second mortgage because of the SBA 504 3rd Mtg and thus the recommended bid is $1.7MM minus the first mortgage ($455,210.16). The $1.7MM amount was suggested as there was a strategic buyer (Lincoln County) for the property which was indicating they would pay between $1.6MM and $1.8MM. The buyer did not bid and opted to not take assignmet of the Bank's bid. note the Market value is listed at $2,650M and the liquidation value is $1,330M.

Sale SP-400 form for 18 SP 135 to direct upset bidders to the Hutchens law firm, not Substitute Trustee Services, Inc., citing "Please fax upset bids to: 704-362-9227" and typed on the bottom, the "Attorney Case No: 1237056 in its footer.[468]

> Name And Address of Purchaser And Highest Bidder
> First National Bank of Pennsylvania
> c/o Hutchens Law Firm LLP
> 6230 Fairview Road, Suite 315
> Charlotte, NC 28210
> **Please fax upset bids to:**
> **704-362-9277**

1251. Since Pettit retained full control of the role of Trustee, there remained no true neutral Trustee to question the unreasonable amount of the bid placed by Pettit on behalf of FNB.[469]

---

[467] Mo2226, pg. 1
[468] Lincoln 18 SP 135 pg. 6
[469] *Compare* Mo1076 (Hatley's own 1/8/19 foreclosure hrg. notes on debt and property values)

## Foreclosure Sale

1252. On September 10, 2019 Pettit, **after withdrawing,** drafted his NOTICE OF SUBSTITUTE

TRUSTEE'S FORECLOSURE SALE OF REAL PROPERTY and emailed it to Colton Sexton

of Patrick, Harper Dixon, LLP.[470]

1253. Colton Sexton of Patrick, Harper Dixon, LLP opened Pettit's NOTICE OF SUBSTITUTE

TRUSTEE'S FORECLOSURE SALE OF REAL PROPERTY in Outlook on his computer and

printed it along with Pettit's file locator tag at the bottom showing Pettit's drafted document was

printed on another's computer:[471]

C:\Users\csexton\AppData\Local\Microsoft\Windows\Temporary Internet
Files\Content.Outlook\L56SLT6N\Notice of Sale (002).docx
and at the top, Hutchens case No. "1237056".  Pettit's footer here showing another computer
opening his word file is *just like* Pettit's March 8, 2018 default demand letter to DPP footer above.

---

[470] Lincoln 18 SP 135, pgs. 11-13
[471] Lincoln 18 SP 135, pgs. 11-13

200

1254. Then on September 13, 2019, Pettit's paralegal, Darlene R. Snee (of Hutchens Law firm, not STS Inc., and not Patrick Harper & Dixon, LLP) transmitted the following filed letter to the Clerk of Superior Court for filing and requested return of the filed copies to Hutchens (not STS Inc. and not Patrick Harper & Dixon, LLP):[472]

## HUTCHENS
— LAW FIRM —

HIGH PERFORMANCE LAW™

Darlene R. Snee
Phone: 704-362-9255
Fax: 704-362-9277
Email: Darlene.Snee@HutchensLawFirm.com

HUTCHENS LAW FIRM LLP
6230 Fairview Rd, Suite 315 | Charlotte, NC 28210
PO Box 12497 | Charlotte, NC 28220-2497

September 13, 2019

Clerk of Superior Court
Lincoln County Courthouse
PO Box 8
1 Courthouse Square
Lincolnton, NC 28093

RE:     In the matter of the foreclosure of the Deed of Trust executed by Denver Property
        Partners, LLC
        Lincoln County Case No.: 18-SP-135

Dear Sir/Madam:

Please find enclosed an original and two (2) copies of a Notice of Substitute Trustee's Foreclosure Sale of Real Property for the above referenced file. Please post and file this document and return the "filed" copies to our office in the enclosed envelope.

If you have any questions, please contact our office. Thank you for your assistance.

With best regards, I am

Very truly yours,
HUTCHENS LAW FIRM LLP

Darlene R. Snee

/drs

---

[472] Lincoln 18 SP 135, pg. 10

1255. Hutchens' letter and Pettit's NOTICE OF SUBSTITUTE TRUSTEE'S FORECLOSURE SALE OF REAL PROPERTY are not addressed from STS nor does it refer to the trustee STS Inc. nor STS' claimed attorney representative Colton Sexton of Patrick Harper & Dixon, LLP.[473]

1256. Hutchens sent this letter because it controlled the delivery and return of signed documents to back to Hutchens, not STS Inc. nor STS' claimed representative Colton Sexton of Patrick Harper & Dixon, LLP.

1257. Hutchens did not serve the September 13, 2019 NOTICE OF SUBSTITUTE TRUSTEE'S FORECLOSURE SALE OF REAL PROPERTY to the parties.

1258. On September 27, 2019, Pettit drafted, filed and served his Notification of Disposition of Collateral in 18 CVS 720 to comply with NCGS §25-9-611 for an October 10, 2018 sale date.[474]

1259. Pettit's document source footer for his September 27, 2019 Notification of Disposition of Collateral in 18 CVS 720 cited his file storage location as

U:\WWP Files\First National Bank\Bayport Holdings\CVL\Notification of Disposition of Collateral (Commercial).docx

1260. On October 2, 2019, Hutchens caused the Lincoln Times-News to issue an affidavit for its publication for DPP's foreclosure in 18 SP 135 for September 25, 2019 and October 2, 2019.[475]

1261. On or about October 10, 2019, **after withdrawing**, Pettit drafted his NOTICE OF SALE POSTPONEMENT[476]. Pettit drafted this document for filing in Lincoln 18 SP 135 as indicated from his document footer showing:

U:\ WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Postponement 10-17-2019.docx

---

[473] *See* Lincoln 18 SP 135, pgs. 10-13
[474] Mo1558
[475] Lincoln 18 SP 135 pg. 5
[476] Lincoln 18 SP 135, pg. 9

202

and at the top, Hutchens case No. "1237056".[477]

1262. Pettit's file location U:\WWP Files\First National Bank\Bayport Holdings\FCL for his NOTICE OF SALE POSTPONEMENT also contained his Motion and Order for withdrawal in Lincoln 18 SP 135.

1263. Moreover, on or about October 10, 2019, **after withdrawing Hutchens and making no notice of appearance on behalf of the noteholder**, Pettit *drafted and signed* his own Certificate Of Service[478] for his NOTICE OF SALE POSTPONEMENT on behalf of Hutchens Law Firm.

1264. Pettit drafted his Certificate of Service for the Notice of Sale Postponement for filing in Lincoln 18 SP 135 as indicated from his same document footer as the Notice of Sale above showing:

U:\ WWP Files\First National Bank\Bayport Holdings\FCL\Notice of Postponement 10-17-2019.docx
and at the top, Hutchens case No. "1237056".[479]

HUTCHENS LAW FIRM LLP
Counsel for First National Bank of Pennsylvania

By: _____

William Walt Pettit
N.C. Bar No. 9407
6230 Fairview Road, Suite 315
Charlotte, N.C. 28210
Telephone: (704) 362-9255
Telecopier: (704) 362-9268

1265. Pettit's file location U:\WWP Files\First National Bank\Bayport Holdings\FCL for his Certificate of Service for his NOTICE OF SALE POSTPONEMENT also contained his Motion and Order for withdrawal in Lincoln 18 SP 135.

1266. On October 10, 2019 several bidders appeared at the Lincoln County Courthouse for the DPP sale.

---

[477] Lincoln 18 SP 135, pg. 9
[478] Lincoln 18 SP 135, pgs. 7-8
[479] Lincoln 18 SP 135, pg. 9

203

1267. At 10:40 a.m. on October 10, 2019 Hutchens Employee Angelo S. Hatchell filed Pettit's NOTICE OF SALE POSTPONEMENT and his Certificate of Service 40 minutes after the sale was to proceed.[480]

1268. Hutchens employee Angelo S. Hatchell signed as AGENT of Patrick Harper & Dixon, LLP.[481]

1269. Yet Angelo S. Hatchell was never an employee or agent for Patrick Harper Dixon.



SUBSTITUTE TRUSTEE SERVICES, INC.
SUBSTITUTE TRUSTEE

By: _____
Trustee/Attorney/Agent
Patrick, Harper & Dixon, LLP

1270. Angelo S. Hatchell still works for Hutchens today.[482]



| Date: February 23, 2022 | Time Of Sale: 11:30 AM |
| --- | --- |

Date Of Report: February 23, 2022

Name Of Mortgagee-Trustee, Attorney-Agent:
Substitute Trustee Services, Inc., Substitute Trustee

Signature Of Mortgagee-Trustee, Attorney-Agent

1271. Pettit postponed the October 10, 2019 sale because Darlene Snee of Hutchens did not serve the September 13, 2019 NOTICE OF SUBSTITUTE TRUSTEE'S FORECLOSURE SALE OF REAL PROPERTY to the parties.

---

[480] Lincoln 18 SP 135, pg. 9
[481] Lincoln 18 SP 135, pg. 9
[482] Davidson 21 SP 069

Case 5:24-cv-00165-KDB-DCK   Document 1   Filed 07/15/24   Page 204 of 236

1272. Pettit's October 10, 2019 service of NOTICE OF SUBSTITUTE TRUSTEE'S FORECLOSURE SALE OF REAL PROPERTY was its first service to the parties of a notice of sale.

1273. Also on October 10, 2019, Pettit drafted, filed and served his Notification of Disposition of Collateral in 18 CVS 720 to comply with NCGS §25-9-611 for an October 18, 2018 sale date citing Hutchens' postponement reason as "to try and locate additional buyers for the property".[483]

1274. Pettit's document source footer for his October 10, 2019 Notification of Postponement of Disposition of Collateral in 18 CVS 720 cited his file storage location as:[484]

U:\WWP Files\First National Bank\Bayport Holdings\CVL\Notice of Postponement of Disposition of Collateral (Commercial).docx.

1275. On October 16, 2019, Ward emails Pettit and demanded a foreclosure accounting in response to Pettit's email containing his first Notice of Sale of Bayport Personal Property.[485]

1276. Neither STS, PHD nor Hutchens readvertised the DPP's foreclosure sale in the local newspaper for October 18, 2019.

1277. Therefore, there were no bidders at the 18 SP 135 sale on October 18, 2019.

## Pettit's Post Foreclosure

1278. Patrick Harper Dixon had no role in post-sale trustee requirements, yet still did not withdraw.

1279. Upon information and belief, FNB paid no consideration to STS as indicated below in the Trustee's deed reciting consideration received.[486]

---

[483] Mo1558
[484] Mo1558
[485] Mo1559 *referencing* Mo1560
[486] Lincoln County ROD Book 2870, Page 347.

205

> NOW, THEREFORE, in consideration of the premises and the sum of One Million One Hundred Ninety-Five Thousand Fifty-One Dollars and 72/100 ($1,195,051.72), paid to the said party of the first part by the said parties of the second part, the receipt of which is hereby acknowledged and under and by virtue of the power and authority by said Deed of Trust conferred, the said Substitute Trustee, as aforesaid, does hereby bargain, sell and convey unto First National Bank of Pennsylvania, its successors and assigns, all that certain parcel, lot or tract of land lying and being in the County of Lincoln, State of North Carolina, and being more particularly described as follows:

1280. FNB had to pay the foreclosure fees in cash as the Trustee accepted FNB's bid as the highest.[487]

1281. FNB paid Hutchens, not STS, since Hutchens' name was on all the receipts associated with its

| Foreclosure Costs | 59,637.74 |
|---|---|
| Acquisition Costs | 16,576.34 |

affidavit of costs.[488]

1282. Hutchens paid all costs associated with DPP's foreclosure as Hutchens' affidavit does not detail any other payors.[489]

1283. On or about December 19, 2019, Hutchens, not PHD, drafted STS' trustee deed for the Range Property with Hutchens case No. "1237056" at the top right corner.[490]

| TRUSTEE'S DEED | |
|---|---|
| NORTH CAROLINA | Prepared by/Return to: |
| | Hutchens Law Firm |
| LINCOLN COUNTY | 6230 Fairview Road, Suite 315, Charlotte, NC 28210 |
| | Firm Case No: 1237056 (CFC.CH) |
| REVENUE: $2,391.00 | |
| TAX ID: 02300 | Not the primary residence of the Grantor herein |

1284. On or about May 26, 2020, Hutchens drafted AFFIDAVIT OF: POSTING OF NOTICE OF FORECLOSURE SALE, OF EXPENSES AND DISBURSEMENTS, AND OF ATTORNEY'S FEES[491] for Lincoln 18 SP 135 indicated by Hutchens case No. "1237056" at the top left corner.

---

[487] Mo2226

[488] *See* Lincoln 18 SP 135, pgs. 2-3

[489] Lincoln 18 SP 135, pgs. 2-3

[490] Lincoln County ROD Book 2870, Page 347.

[491] Lincoln 18 SP 135 pg. 3

206

1285. However, at the bottom of Hutchens' AFFIDAVIT OF: POSTING OF NOTICE OF FORECLOSURE SALE, OF EXPENSES AND DISBURSEMENTS, AND OF ATTORNEY'S FEES, <u>Pettit's Palm National Action in Buncombe County against Rand Case No. 18 SP 201 with Hutchens' 1125308 (CFC.CH)</u> Case number appears in STS' recycled Rand case document.[492]



By: _J.W. Beck_
Substitute Trustee Services, Inc.
Substitute Trustee
201 South McPherson Church Road, Suite 232
Fayetteville, NC 28303

Sworn to and subscribed before me
this 26th day of May, 2020.

_Jo Anne Henderson_
Notary Public
My Commission Expires: 01/09/2023

Firm Case No: 1125308 (CFC.CH)

1286. This report of sale was not executed by Hutchens, but by an officer of STS Inc.

1287. STS' filing of Lincoln County 18 SP 135's Affidavit claimed on that day STS paid $500 as follows:

**B. EXPENSES AND DISBURSEMENTS**

The Substitute Trustee has paid or has evidence that the following expenses have been invoiced or an in the process of being paid:

5. Funds in the amount of $500.00 will be paid to the Clerk of Court for the court assessment fee contemporaneously with the filing of this affidavit.

1288. Hutchens managed STS' claimed disbursements as indicated from the Payor of the $500.00 fee STS claimed in its affidavit.[493]

---

[492] Hutchens Case No. 1125308 (CFC.CH), Buncombe County Special Proceeding 18 SP 201
[493] Lincoln 18 SP 135 pg. 3

LINCOLN COUNTY CLERK OF COURT

G210014        07/13/20   14:41:57

PAYOR: HUTCHENS LAW
PAYEE: DENVER PROPERTY PARTNERS
CASE#: 18SP 000135 VCAP:N
CITA#:

21445 FORECLOSURE FEE        500.00

TOTAL PAID      500.00
CO TENDERED     500.00
CHANGE            .00

5558   ID C54BJJ

**THIS COST SHEET WILL BE FOR SPECIAL PROCEEDINGS AND ESTATES AND WILL ALWAYS BE (NO)**

**COST SHEET**

File # **18SP135**

Payor **Hutchens Law**

Payee **Denver Property Partners**

Comments _____

_____

Codes: Please Circle One

21130 Special Proceedings $_____

21140 Estate $_____
(Years Allowance $20, Filing of a Will not probated $1 first page, each additional page .25 cents, Limited PR, Assessment fees, Inventory of Safe Deposits of Decedent $15 per day, Caveat $200)
ESTC

SPSC

21445 Foreclosure $ **500.00**

1289. Hutchens paid the Clerk's $500 foreclosure cost when filing its Final Affidavit.[494]

1290. Hutchens asserted to this court that it was the noteholders' attorney in Lincoln 18 SP 135 after withdrawing as trustee on December 6, 2018 under N.C. Gen. Stat. § 45-10(a)

1291. Hutchens could not have access to disburse DPP's foreclosure proceeds since PHD was on record as STS' counsel.

1292. If Hutchens was trustee after its withdrawal on December 6, 2018, it conflicted with the duties of a Trustee by N. C. Gen. Stat. § 45.10.

---

[494] *See also* Guilford 19 SP 1590,

208

1293. Since Hutchens claimed to represent the noteholder FNB after its withdrawal on December 6, 2018, FNB could not transfer funds to Hutchens for the foreclosure expenses.

1294. And after withdrawal, Hutchens could not pay for any of STS' foreclosure expenses.

1295. Yet Hutchens' Trustee's Deed recited that "the sum of One Million One Hundred Ninety-Five Thousand Fifty-One Dollars and 72/ 100 ($1,195,051.72), paid to the said party of the first part [STS] by the said parties of the second part [FNB], the receipt of which is hereby acknowledged[.]"[495]

1296. This could not be true as STS received no money from FNB at all, including no commission to STS.[496]

1297. Moreover, on December 30, 2019, Hutchens, not PHD in Lincoln 18 SP 135, drafted FNB's Range Property Trustee's Deed out to FNB for $1,195,051.72 with Hutchens case No. "1237056" at the top right corner.[497]

| TRUSTEE'S DEED | |
|---|---|
| NORTH CAROLINA | Prepared by/Return to:<br>Hutchens Law Firm<br>6230 Fairview Road, Suite 315, Charlotte, NC 28210 |
| LINCOLN COUNTY | Firm Case No: 1237056 (CFC.CH) |
| REVENUE: $2,391.00<br>TAX ID: 02300 | Not the primary residence of the Grantor herein |

1298. And FNB's protective bid of $1,119,051.72 had no actual money changing hands, but still created a revenue stamp charge for recording the deed between the trustee and FNB.[498]

---

[495] Lincoln County ROD Book 2870 Page 347
[496] Lincoln 18 SP 135 pg. 1
[497] Lincoln County ROD Book 2870 Page 347
[498] Lincoln County ROD Book 2870 Page 347 pg. 1

209

REVENUE: $2,391.00
TAX ID: 02300

1299. This is the same "Documentary stamps" of $2,391.00 on the 18 SP 135 Final Report and in

Hutchens' Affidavit of Costs.[499]

> 7. Funds in the amount of $86.00 will be paid to the Register of Deeds to record the Substitution of Trustee, the Substitute Trustee's Deed and Notice of Foreclosure, and $2,391.00 was paid for the excise tax for the Substitute Trustee's Deed.

1300. On December 19, 2019 at 3:23:20 P.M., Hutchens, not STS or PHD, efiled Hutchens' Trustee's

deed and **Hutchens paid the $2,391.00 in excise tax** to Simplifile, LC (Lincoln County) along with

its $26.00 to record its deed in the Lincoln County Register of Deeds.[500]

**Receipt For Services**

Cashier: PENNY C. SHERRILL
Receipt #: 20191219152320-9

Receipt Started: 12/19/2019 03:23:20 PM
Reprinted: 04/28/2023 01:27:51 PM

SIMPLIFILE, LC
Hutchens Law Firm LLP

TRUSTEES DEED
Party 1: SUBSTITUTE TRUSTEE SERVICES, INC.
Party 2: FIRST NATIONAL BANK OF PENNSYLVANIA
Book / Page: 2870 / 347 - 2 Page(s)
Time: 12/19/2019 03:26:47 PM
Recording Fee: $26.00
Excise Tax: $2,391.00

SUBTOTAL: $2,417.00

1301. Moreover, on December 30, 2019, Hutchens drafted FNB's Range Property Special Warranty Deed

out to PSA-Denver for $1,900,000.[501]

---

[499] Lincoln 18 SP 135 pg. 3
[500] Mo2442
[501] Lincoln County ROD Book 2990 Page 634

1302. On July 13, 2020, Hutchens filed its the Lincoln Times-News' affidavit for its publication for DPP's foreclosure in 18 SP 135 for September 25, 2019 and October 2, 2019.[502]

1303. On July 13, 2020, Hutchens filed its final report for 18 SP 135 deleting out the row for STS' commissions as shown:

| Name of Purchaser | First National Bank of Pennsylvania | | |
|---|---|---|---|
| DATE | ITEM | DISBURSEMENTS | RECEIPTS |
| | Proceeds of Sale | | 1,195,051.72 |
| | Court Costs | 300.00 | |
| | Cost of publication of notice of sale | 656.00 | |
| | Attorney Fees (counsel for Substitute Trustee) | 1,732.38 | |
| | Register of Deeds - Record Sub. Tr. Agreement | 30.00 | |
| | Documentary stamps | 2,391.00 | |
| | Secured Obligations | 1,188,113.50 | |
| | Register of Deeds: Record Notice of Foreclosure | 26.00 | |
| | Certified Mail $84.00; Postage $18.79; Copies $100.00; UPS $530.05; Process Server $260.00 | 992.84 | |
| | Sheriff's Dept - Serve Notice $240.00; NCSOS $40.00 | 280.00 | |
| | Clerk of Superior Court Fee | 500.00 | |
| | Register of Deed – Trustees Deed | 30.00 | |
| | Surplus sale proceeds paid to CSC* | 0.00 | |
| | TOTALS | $1,195,051.72 | $1,195,051.72 |

*List reason paid to CSC [G.S. 45-21.31(b)]
I hereby certify that the above is a true and complete account of my receipts and disbursements and the notices of hearing, sale and resale were served upon all parties entitled to such notice by statute

Date Audited and Recorded 7 | 13 | 2020    Date of Report 5·26·2020

Signature  *Johnye Baucom*    Substitute Trustee Services, Inc., Substitute Trustee

☒ Assistant CSC    ☐ Clerk of Superior Court

By: Substitute Trustee Services, Inc.
Substitute Trustee
Firm Case No: 1125308 (CFC.CH)

---

[502] Lincoln 18 SP 135 pg. 5

1304. In 18 SP 135's final report signature line, Pettit used Hutchens' Case No. 1125308 (CFC.CH) from

his Buncombe County Case No. 18 SP 201 (Allegation #46 above) in his recycled SP-400 Hutchens

form Final Report and Account of Foreclosure Sale[503] as follows:



1305. However, on Pettit's Affidavit of: Posting of Notice of Foreclosure Sale, of Expenses and

Disbursements, and of Attorney's Fees, at the bottom left is Pettit's Case No. 1125308 (CFC.CH)

from his Buncombe County Case No. 18 SP 201, but at the top right of the affidavit is Hutchens

case No. "1237056".[504]

1306. This affidavit in 18 SP 135 was identical to Pettit's own foreclosure affidavit, where he attested to

the costs, except for the first line, removal of the Attorney's fees section and the signature.[505]

---

[503] Lincoln 18 SP 135 pg. 1

[504] Lincoln 18 SP 135 pg. 2

[505] *Compare* Lincoln 18 SP 135, pgs. 2-3 *with* Guilford 18 SP 262, *see also* Hutchens' affidavits in Mecklenburg 18 SP 200, Buncombe 18 SP 520, Cabarrus 17 SP 161, 18 SP 715, Davidson 17 SP 73, 17, SP 367, 17 SP 470, 17 SP 498, 21 SP 69, Guilford 19 SP 1590, 19 SP 2071, Lincoln 17 SP 175, 18 SP 86, 18 SP 207

212

1237056

STATE OF NORTH CAROLINA

COUNTY OF LINCOLN

IN THE GENERAL COURT OF JUSTICE
BEFORE THE CLERK
18-SP-135

FILED

2020 JUL 13 A II: 48

LINCOLN COUNTY C.S.C.

IN THE MATTER OF THE FORECLOSURE
by Substitute Trustee Services, Inc., Substitute
Trustee, of a Commercial Construction Deed
of Trust executed by Denver Property Partners,
LLC dated June 13, 2014 and recorded on June
16, 2014 in Book 2461 at Page 510 of the
Lincoln County Public Registry.

### AFFIDAVIT OF: POSTING OF NOTICE OF FORECLOSURE SALE, OF EXPENSES AND DISBURSEMENTS, AND OF ATTORNEY'S FEES

Substitute Trustee Services, Inc., the Substitute Trustee in this foreclosure proceeding, deposes and states that Substitute Trustee Services, Inc. was properly substituted as Trustee in the above-mentioned Deed of Trust and has conducted the foreclosure of the Note and Deed of Trust as required by law.

**A. POSTING OF NOTICE OF FORECLOSURE SALE**

At least twenty (20) days prior to the date of the foreclosure sale a copy of the Notice of Foreclosure Sale was mailed by First Class Mail, postage prepaid, to the debtors and any other parties entitled to receive a copy of the same under applicable law, and the Notice of Foreclosure Sale was posted at the designated place for posting notices of foreclosure sale at the courthouse in the county in which the property is located. Copies of any postponement(s) of foreclosure sale were also posted at said designated place and mailed to all parties entitled to the same.

**B. EXPENSES AND DISBURSEMENTS**

The Substitute Trustee has paid or has evidence that the following expenses have been invoiced or an in the process of being paid:

1. Funds in the amount of $300.00 were paid to the Clerk of Court for filing this special proceeding.

2. Funds in the amount of $240.00 were paid to the Sheriff and funds in the amount of $40.00 were paid to the N.C. Secretary of State for service of process.

3. Funds in the amount of $84.00 were paid to the U.S. Postal Service for service via certified mail return, receipt requested, funds in the amount of $18.79 were paid to the U.S. Postal Service for first class mail, funds in the amount of $100.00 were paid for copies, funds in the amount of $530.05 for United Parcel Service and funds in the amount of $260.00 were paid to a private process server for service. Since a postage meter is used, there are not individual checks for postage used.

4. Funds in the amount of $656.00 were paid for the cost of publication of the Notice of Foreclosure Sale.

5. Funds in the amount of $500.00 will be paid to the Clerk of Court for the court assessment fee contemporaneously with the filing of this affidavit.

6. Attorneys' fees for the Substitute Trustee in the amount of $1,732.38 were incurred and have been paid.

7. Funds in the amount of $86.00 will be paid to the Register of Deeds to record the Substitution of Trustee, the Substitute Trustee's Deed and Notice of Foreclosure, and $2,391.00 was paid for the excise tax for the Substitute Trustee's Deed.

8. Funds in the amount of $1,188,113.50 have been credited toward the secured obligation.

This 2ᵈ day of May, 2020.

By: _Jwbesh_
Substitute Trustee Services, Inc.
Substitute Trustee
201 South McPherson Church Road, Suite 232
Fayetteville, NC 28303

Sworn to and subscribed before me
this 2ᵈ day of May, 2020.

_Jo Anne Henderson_
Notary Public
My Commission Expires: 01/09/2023

Firm Case No: 1125308 (CFC.CH)

---

STATE OF NORTH CAROLINA

COUNTY OF GUILFORD

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
BEFORE THE CLERK
18 SP 262

IN THE MATTER OF THE FORECLOSURE
by Substitute Trustee Services, Inc.,
Substitute Trustee, of a Deed of Trust
executed by C and M Investments of High
Point, Inc. a/k/a C&M Investments of High
Point, Inc. recorded June 18, 1993, in Book
4084 at Page 425 of the Guilford County
Public Registry as modified, amended or
supplemented from time to time.

AFFIDAVIT OF: POSTING OF NOTICE OF
FORECLOSURE SALE, OF EXPENSES
AND DISBURSEMENTS, AND OF
ATTORNEY'S FEES

I, the undersigned Attorney at Law employed by Hutchens Law Firm, who first being duly sworn, deposes and states that (i) Hutchens Law Firm represents Substitute Trustee Services, Inc., the Substitute Trustee in this foreclosure proceeding, (ii) that I am competent to testify to the information contained in this affidavit, (iii) that I have access to the business records of Hutchens Law Firm which are maintained in the course of the firm's regularly conducted business activities serving as counsel for Substitute Trustee Services, Inc., and (iv) that this affidavit is made based on my review of those records and from my personal knowledge of how the records are kept and maintained.

**A. POSTING OF NOTICE OF FORECLOSURE SALE**

At least twenty (20) days prior to the date of the foreclosure sale a copy of the Notice of Foreclosure Sale was mailed by First Class Mail, postage prepaid, to the debtors and any other parties entitled to receive a copy of the same under applicable law; and the Notice of Foreclosure Sale was posted at the designated place for posting notices of foreclosure sale at the courthouse in the county in which the property is located. Copies of any postponement(s) of foreclosure sale were also posted at said designated place and mailed to all parties entitled to the same.

**B. EXPENSES AND DISBURSEMENTS**

As set forth on the Final Report and Account of Foreclosure Sale filed in this proceeding, Hutchens Law Firm, in its capacity as counsel for Substitute Trustee Services, Inc., has paid or has evidence that the following expenses have been invoiced or are in the process of being paid:

1. Funds in the amount of $300.00 were paid to the Clerk of Court for filing this special proceeding.

2. Funds in the amount of $240.00 were paid to the Sheriff for service of process and $30.00 was paid to the North Carolina Secretary of State.

3. Funds in the amount of $47.72 were paid to the U.S. Postal Service for service via certified mail return, receipt requested and $11.70 for first class mail.

4. Funds in the amount of $697.00 were paid for the cost of publication of the Notice of Foreclosure Sale.

5. Funds in the amount of $304.56 will be paid to the Clerk of Court for the court assessment fee contemporaneously with the filing of this affidavit.

6. Attorney fees in the amount of $2,983.75 were incurred and have been invoiced for the above referenced foreclosure proceeding.

7. Funds in the amount of $56.00 will be paid to the Register of Deeds to record the Substitute Trustee's Deed and Notice of Foreclosure, and $136.00 will be paid for the excise tax for the Substitute Trustee's Deed.

8. Funds in the amount of $62,672.22 have been credited toward the secured obligation.

9. Funds in the amount of $300.00 will be paid for the title updates for the above referenced foreclosure proceeding.

**C. ATTORNEY'S FEES**

Since the inception of this proceeding, Hutchens Law Firm has assumed responsibility for the prosecution of this proceeding. Attorneys employed or retained by Hutchens Law Firm have been responsible for the preparation, review, supervision and/or execution of various documents, as well as, the provision of other legal services necessary to complete this foreclosure proceeding. At a minimum this includes the following:

- Review of the title search of the subject property;
- Review of Note and Deed of Trust;
- Review of PACER searches for each party to the foreclosure proceeding;
- Review of Department of Defense Manpower database searches for each party to the foreclosure proceeding;
- Review and execution of Notice of Foreclosure Hearing on Deed of Trust;
- Review and execution of Military Affidavit;
- Review and execution of Affidavit of Service;
- Review of Order Allowing Foreclosure Sale;
- Review and execution of Notice of Foreclosure Sale;
- Review of the Trustee's Deed;
- Review and execution of the Final Report and Accounting and corresponding affidavits; and
- Review and execution of Notice of Foreclosure.

This is a proceeding to foreclose a Deed of Trust secured by real property located in the county listed in the caption above. The subject Deed of Trust specifically provides that the Beneficiary is entitled to recover attorneys' fees and costs associated with the collection of sums due under the Promissory Note. Attorneys' fees in the sum of $2,983.75 have been incurred in this proceeding.

As Hutchens Law Firm is not serving as the Substitute Trustee in this proceeding, no approval of attorneys' fees by the clerk is required by N.C.G.S. § 45-21.31.

This 21ʰ day of September, 2018.

By: ___
William Walt Pettit
Attorney at Law
Hutchens Law Firm
Attorneys for Substitute Trustee Services, Inc.
Substitute Trustee
P.O. Box 12497, Charlotte, NC 28220-2497
Firm Case No: 1112205 (CFC.CH)

Sworn to and subscribed before me
This 21ʰ day of September, 2018.

___
Paulette R. Meyers, Notary Public

My Commission Expires: May 19, 2021

Firm Case No: 1112205 (CFC.CH)

1307. On November 8, 2020, Hutchens drafted FNB's release deeds for Loans 6980-1, 7028 and 4313.[506]

> This instrument was prepared by: Hutchens Law Firm LLP
> whose address is: 6230 Fairview Rd., Suite 315, Charlotte, NC 28210

1308. On or about November 30, 2020, Pettit drafted a Purchase and Sales Agreement between FNB and

Free Range Farm, LLC, a South Carolina Limited liability Company.[507]

1309. In Pettit's Free Range Farm LLC Purchase and Sales Agreement he personally named representing

FNB under the Notice's provision as follows:

| If to Seller: | First National Bank of Pennsylvania<br>3014 E. State Bank, Mail Code: 982 / SAS-Vickie Trippy<br>Hermitage, PA 16148<br>Attn: Vickie Trippy<br>Email Address: TrippyV@fnb-corp.com<br>Attn: Joe Oots<br>Email: OotsJ@fnb-corp.com |
|---|---|
| With copy to: | Hutchens Law Firm LLP<br>Attn: William Walt Pettit<br>6230 Fairview Road, Suite 315<br>Charlotte, NC 28210<br>Fax Number: (704) 362-9268<br>Email Address: walt.pettit@hutchenslawfirm.com |

## Hutchens Represents STS

1310. Even after withdrawing in 18 SP 135, Hutchens still represents STS to this day.

---

[506] Lincoln County ROD Book 2990 Page 637, Book 2990 Page 641, and Book 2990 Page 639.
[507] Mo1083

214

1311. On March 7, 2023, in Lincoln 18 CVS 720, Attorney Elliott issued two subpoenas to STS: one to L.W. Blake as the final report signor, and the second to STS corporation of North Carolina.[508]

1312. On March 9, 2023, Pettit emailed Elliott, "Mike – I received the attached Subpoena in the mail late yesterday.  As previously noted in the email below, I am not available on March 22, 2023.  Thus, I would ask that you reschedule the same but first check with Stacy Cordes and me before doing so for availability.  I talked with Stacy late yesterday and she was not asked if she was available on March 22, 2023 either.  If you want to depose Substitute Trustee Services, Inc., please send me some proposed dates.  As to Substitute Trustee Services, Inc., please let me know if you have talked with anyone at that company and if so, has the person being deposed agreed to attend the deposition at your office.  l believe that the deposition must be taken in Cumberland County, NC absent consent.  Also, I would ask that you otherwise comply with Rules of Civil Procedure on **noticing the deposition of a non-party**."[509]

1313. On March 9, 2023, Elliott had not served Pettit's copy of STS' subpoenas yet.

1314. On March 16, 2023, Pettit served an STS Protective Order on Elliott.[510]

1315. Pettit's document source footer for his March 16, 2023 Protective Order cited his file storage location as

<span style="color:red">U:\WWP Files\First National Bank\Bayport Holdings\CVL\Motion for Protective Order - STS.docx</span>

1316. On Friday, March 17, 2023 at 10:38 A.M., Darlene Snee of Hutchens emailed Ms. Craig, the Trial Court Administrator in Lincoln County and filed Pettit's Request to Calendar Remote

---

[508] Mo2444
[509] Mo2443 (emphasis added)
[510] Mo2445

Case 5:24-cv-00165-KDB-DCK   Document 1   Filed 07/15/24   Page 215 of 236

Hearing/Video Conference for the April 20, 2023 Civil Superior Session of Lincoln County Superior Court.[511]

1317. On Friday March 17, 2023 at 11:42 A.M., Darlene Snee of Hutchens emailed Ms. Craig again changing the hearing date to April 10, 2023.[512]

1318. On Friday March 17, 2023 at 4:57 P.M., Hutchens filed his motion to Quash STS' Subpoena in Cumberland County with the new Cumberland Case number 23 CVS 1642.

1319. On Friday March 17, 2023 at 5:34 P.M., Kim Martuscelli from Hutchens Law Firm emailed Elliott, "Please see attached filed Objection and Motion to Quash Subpoena Issued to Substitute Trustee Services, Inc. and L.W. Blake in the above matter. Also attached is a Notice of Hearing on the Motion."[513]

1320. Hutchens now represented STS as a non-party.

1321. Prior to notifying Elliott, Hutchens had already scheduled a hearing on a Cumberland County Motion to Quash in Cumberland County for that Tuesday, March 21, 2023.[514]

| Date Of Hearing: 03/21/2023 | Time Of Hearing: To be set by TCA and will appear on the posted calendar the Thursday before the session at nccourts.gov under Civil Superior Calendars for Courtroom 3B (see hyperlink below) http://www1.aoc.state.nc.us/www/calendars/Civil.jsp?county=CUMBERLAND | | Estimated Length of Hearing 1 hour |
|---|---|---|---|
| Information: A motion calendar will be posted on nccourts.gov under Civil Calendars for Cumberland County Courtroom 3B If you have any Civil Superior questions, please contact our office at the email listed above or by phone at 910-475-3261. | | | Place of Hearing Courtroom 3B |
| Date 03/17/2023 | Name of Attorney/Party H. Terry Hutchens | | Address, email and Telephone Number P.O. Box 2505, Fayetteville, NC 28302/terry.hutchens@hutchenslawfirm.com/910-864- |

---

[511] Mo2446
[512] Mo2447
[513] Mo2448
[514] Mo2448

216

1322. Then Hutchens served its motion to Counsel by email after working hours on Friday for a Cumberland County Motion, not Pettit's served Lincoln County Motion for Protective Order.[515]

1323. Hutchens' Certificate of Service dictated service was by U.S. Mail.[516]

> **CERTIFICATE OF SERVICE**
>
> I, as attorney for L.W. Blake and Substitute Trustee Services, Inc., hereby certify that on the date set forth below, I served a copy of the foregoing Objection and Motion to Quash Subpoena by first class mail, by depositing same in a postpaid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service, said envelope being addressed as follows:

1324. Before the parties were served, on Monday March 20, 2023, Ellen B. Hancox, Cumberland Trial Court Administrator emailed Elliott, "The hearing on Mr. Hutchens motion to quash will be heard **on Tuesday, March 21st at 9:30 am in courtroom 3B in person."[517]**

1325. With no service, notice within the rules, and having to litigate in person the next day in Cumberland County, Elliott agreed to cancel the subpoena.

## Hutchens' August 8, 2019, Integra Realty Resources Appraisal of the Denver Defense Gun Range Property

1326. FNB could not have relied upon the August 8, 2019 IRR1 appraisal of the Denver Defense Gun Range Property ("Range Property") to determine the Range Property's market value for a number of reasons.

1327. Attorney Walt Pettit of the Hutchins Law Firm ordered the IRR1 appraisal, not FNB.[518]

---

[515] Mo2448
[516] Mo2448
[517] Mo2449 (emphasis in original)
[518] Mo986 (August 8, 2019 IRR1 appraisal)

Case 5:24-cv-00165-KDB-DCK   Document 1   Filed 07/15/24   Page 217 of 236



July 29, 2019

First National Bank of Pennsylvania
c/o Walt Pettit
Hutchins Law Firm
6230 Fairview Road
Suite 315                                  Telephone: (704) 362-3255 ext. 2313
Charlotte, NC 28210                        Email: Walt.Pettit@hutchenslawfirm.com

SUBJECT:     Proposal/Authorization for Valuation and Consulting Services
             Gun Range
             1417 N NC 16 Address
             Denver, NC (the "Subject Property")

Dear Mr. Pettit:

Upon your acceptance of this letter agreement, Integra Realty Resources – Charlotte ("IRR – Charlotte"),
will prepare an appraisal of the Subject Property.

The purpose of the appraisal is to provide an opinion of the market value of the fee simple interest in
the Subject Property. The intended use of the appraisal is for asset valuation. The use of the appraisal
by anyone other than you is prohibited. The appraisal will be prepared in conformance with and subject

AGREED & ACCEPTED THIS 31 DAY OF July , 2018.

BY:     Client Company

_____
AUTHORIZED SIGNATURE

_____
NAME (PRINT)

1328. The IRR1 appraisal was addressed to the Hutchens Law Firm.

1329. Page 4 of the IRR1 appraisal clearly stated that:

1330. "the client and intended user is Hutchens Law Firm",

1331. and that "the appraisal is not intended for any other use or user,"

218

1332. and that "No party or parties other than Hutchens Law Firm may use or rely on the information, opinions, and conclusions contained in this report."[519]

1333. There is no evidence that FNB Bank ordered the appraisal as required by its own July 16, 2019, OREO Procedures (1600 Other Real Estate Owned).[520]

1334. I have seen no FNB Policy that addresses the Bank's acceptance of an appraisal ordered by an attorney.

1335. Section I (Overview) of the Bank's OREO Procedures states that "OREO Analysts in the Special Lending and Loan Adjustments Departments will be responsible for administering the OREO portfolio in accordance with policies and procedures established." [521]

1336. It is unknown whether Integra Realty Resources was on FNB's list of approved appraisers.

1337. Further, there is no evidence that FNB performed a review of the IRR1 appraisal as required by Section III (Appraisals and Evaluations) of the OREO Procedures[522] and by federal or state regulatory law.[523]

1338. Even if FNB could have procedurally accepted and used the IRR1 appraisal, which it could not according to its own policies and procedures[524], the IRR1 appraisal contains some significant flaws that would require FNB to reject the IRR1 appraisal. [525] Such flaws include, but may not be limited to:

---

[519] Exhibit 2 sub exhibit "A", Mo986 (August 8, 2019 IRR1 appraisal)
[520] Mo2367 pg. 3 (July 16, 2019 FNB 1600 OREO Policy)
[521] Mo2367 pg. 1 (July 16, 2019 FNB 1600 OREO Policy)
[522] Mo2379 pg. 3 (July 16, 2019 FNB 1600 OREO Policy)
[523] 12 C.F.R Part 34 Real Estate Lending and Appraisal Standards
[524] Mo2379 pg. 3 (July 16, 2019 FNB 1600 OREO Policy)
[525] Mo1033 (October 23, 2019 FNB SACC pg.14)

219

1) The IRR1 appraisal was performed on a property of 4.94 total acres with 15,000 square feet of improvements (building).

2) The Range Property securing FNB's loans, and previously appraised several times by other appraisers as supported by the Facts, was 6.72 acres with 17,178 square feet of improvements (building and specialized shooting range equipment). [526]

3) Further, the Range Property had 18 shooting lanes (12 pistol and 6 rifle), but the IRR1 appraisal attributes only 16 lanes to the Property.

1339. These glaring foundational errors are evidence of why banks may not use appraisals ordered by other parties.

1340. The IRR1 appraisal stated that the Range Property's highest and best use is for retail use, but is based solely on its value as a shooting range, "a special purpose property."

1341. The appraiser did not employ an Income Approach to determine market value because as the appraisal stated, "there is not an active rental market that would permit us to develop a reliable estimate."

1342. This is flawed, as the facts show that prior appraisals[527] were able to develop and use the Income Approach either as a shooting range or a general use retail property.

1343. To support the IRR1 appraisal's Cost Approach, the appraiser provided a cost to construct "by shooting lane" analysis of six comparable shooting range properties as identified in a nationwide survey of IRR's other offices. [528]  That analysis contains several flaws.

---

[526] Mo702 (Efird1 appraisal, 6.1679 acres, 20,275 sq. ft., $3,875,000), Mo207 (Efird2 appraisal, 6.1679 acres, 17,178 sq. ft., $4,110,000), Mo990 (Beck appraisal, 6.7 acres, 17,183 sq. ft., no targeting or range HVAC, $2,780,000)
[527] Mo702 pg. 18 (Efird1 appraisal), Mo207 pg. 15 (Efird2 appraisal), Mo990 pg. 5 (Beck appraisal)
[528] Exhibit 2 sub exhibit "A" pgs. 48, Mo986 (August 8, 2019 IRR1 appraisal)

1344. First, the Appraisal states "the following table summarizes construction cost of four facilities." The referenced table contains construction costs for six properties.[529]

1345. The IRR1 appraisal provides no discussion or analysis as to which of the four facilities were used and why, or which two facilities were excluded and why.

1346. Such is fundamental to the identification and/or exclusion of comparable properties in a property appraisal.

1347. Second, the IRR1 appraisal provided no reconciliation or justification for the cost per shooting lane assigned to the Range Property, how it was derived, or whether it was adjusted up or down relative to the comparable facilities.

1348. Third, the IRR1 appraisal attributes only sixteen lanes to the Range Property when, in fact, the Range Property had eighteen shooting lanes.[530]

1349. Fourth, the IRR1 appraisal did not provide any analysis, discussion, justification, or rationale as to if and how the derived cost per lane analysis affected its cost per square foot value.

1350. Finally, the IRR1 appraisal states that it does not include the costs for the firing ranges or FF&E in the analysis.[531] No support was provided for such a statement about the comparable properties.

1351. The IRR1 appraisal's Sales Comparison Approach, which compared the Range Property to four shooting range sales transacted in 2017 or after, has similar flaws.

1352. The IRR1 appraisal did not include the value of the Range Property's firing ranges equipment, or other specialized equipment necessary to operate a shooting range.[532]

---

[529] Exhibit 2 sub exhibit "A" pgs. 48-49, Mo986 (August 8, 2019 IRR1 appraisal)
[530] Exhibit 2 sub exhibit "A" pgs. 47, Mo986 (August 8, 2019 IRR1 appraisal)
[531] Exhibit 2 sub exhibit "A" pgs. 52, 54, 103, 104, 105, 106, Mo986 (August 8, 2019 IRR1 appraisal)
[532] Exhibit 2 sub exhibit "A" pg. 53, Mo986 (August 8, 2019 IRR1 appraisal)

221

1353. However, the four comparable sales were existing shooting ranges and, as such, their sale values should have included equipment necessary to operate them as shooting ranges.

1354. The appraiser would have no way to verify whether the comparable property sales values included or excluded their specialized shooting range equipment.

1355. Finally, the IRR1 appraisal entirely excluded any value for the existing equipment required for the Range Property to operate as a shooting range, but compares the property to operating shooting ranges that could not possibly operate without such equipment.

1356. Since the Range Property's targeting and HVAC were considered real property once they were attached permanently, the IRR1 appraisal should not have omitted this value completely.[533]

Furniture, Fixtures and Equipment (FF&E) was not included in the value estimates contained in this report. The subject property is used as a retail store for fire arms and as a firing range. There are 12 pistol lanes and 6 rifle lanes. The firing lanes each have specialized firing range equipment including computerized targeting equipment that is state of the art and was specifically manufactured to fit the subject's firing range. Additional firing range equipment includes a rubber berm trap, and overhead baffles. The equipment is physically attached to the building and due to the specific design to fit the subject's firing range, it would not be economically feasible to remove the targeting equipment for use at another location. Therefore, considering the custom design of the equipment and that the equipment is physically attached to the building, it is considered to be real property."

1357. In doing so the IRR1 appraisal is fundamentally comparing an empty building to operating shooting ranges in its Cost and Sales approaches.

1358. The IRR1 appraisal should have ascribed some value, as other prior appraisals did, to the Range Property's shooting range equipment in its Sales Approach value.[534]

---

[533] FNB Comprehensive Review Checklist, pg. 2, Mo985
[534] Mo702 pg. 5 (Efird1 appraisal), Mo207 pg. 4 (Efird2 appraisal), Mo990 pg. 75 (Beck appraisal)

1359. If not, then the Range Property should have been compared to general purpose retail properties as did a prior appraisal. Interestingly, FNB's Special Asset Officer Joseph Oots had previously, and purposefully, ordered an appraisal of the Property based on its use as a general-purpose retail property.[535]

## Hutchens' September 11, 2019, Integra Realty Resources Liquidation Value Appraisal of the Denver Defense Gun Range Property

1360. FNB could not rely on the IRR Liquidation Value Appraisal ("LVA") dated September 11, 2019, as it is based on an even more seriously flawed methodology and could not have been accepted for use by FNB.

1361. The LVA appraisal was ordered by, and addressed to, the Hutchins Law Firm, Walt Pettit, the same attorney that ordered the IRR1 appraisal and not FNB. [536]

---

[535] Mo1973 – August 13, 2018 Oots Email
[536] September 11, 2019 IRR letter to Pettit pg. 3, Mo986



September 11, 2019

Walt Pettit
Hutchins Law Firm
6230 Fairview
Charlotte, NC 28210

SUBJECT:     Market Value Appraisal
            Former Denver Defense Gun Range
            1417 N. NC Highway 16
            Denver, Lincoln County, North Carolina 28037
            IRR - Charlotte File No. 105-2019-1186

Dear Mr. Pettit:

Integra Realty Resources – Charlotte is pleased to submit the following Liquidation Value Letter. The
opinions and conclusions set forth in this letter may not be understood without reference to the full
appraisal IRR File No. 105-2019-1186. Use of the letter is restricted to the client.

1362. Hutchins Law Firm had crafted its own definition of "Liquidation Value" and required IRR to use

it in the LVA. [537]

**Purpose of the Letter**

The purpose of the letter is to develop an opinion of the 90-day liquidation value of the fee simple
interest in the property as of the effective date of the letter, August 8, 2019. The date of the report is
September 11, 2019. The letter is valid only as of the stated effective date or dates.

**Intended Use and User**

The intended use of the letter is for 90-Day Liquidation Value. The client and sole intended user is
Hutchins Law Firm.

**Definition of Liquidation Value**

Liquidation Value is defined as:

The most probable price which a specified interest in real estate is likely to bring under the following
circumstances: (a) sale will occur within a severely limited marketing period assumed to be less than
90 days; and, (b) the seller is under extreme compulsion to sell.

Source: Hutchins Law Firm

---

[537] Mo991 pgs. 4- 5 (LVA - September 11, 2019 IRR letter to Pettit)

224

1363. Hutchins Law Firm paid $3,500.00 to IRR for this LVA appraisal.[538]

| Hutchins Law Firm
6230 Fairview
Charlotte, North Carolina 28210 | | |
| | | |
| Reference: 1417 N NC 16 | | |
| Project No.   105-2019-1186 | Project Name:   Gun Range | |
| 1417 North NC Highway 16
Denver, North Caroilna 28037
Appraisal Services | | $3,500.00 |

1364. It also clearly states that its "use is restricted to the client" and that the LVA appraisal "opinions and conclusions set forth in this therein may not be understood without reference to the full IRR1 appraisal of August 8, 2019."

1365. As discussed above, the IRR1 appraisal contained several significant flaws.

1366. To determine the LVA appraisal on the Range Property, the appraiser phone-surveyed property brokers to seek their opinions as to what discount would be required to sell the property within a three-month time frame (90 days).

1367. The LVA appraiser received responses from three of the five brokers he attempted to contact.

1368. Of the three brokers contacted, one indicated a discount of 50% for a "guaranteed 90-day sale", one indicated a discount of 10% and one indicated a discount of 0% for a 90-day sale.

1369. The appraiser, with no methodology, justification, or other analysis or explanation chose the highest of the three discount indications (50%) of the surveyed brokers and applied that discount to arrive at the value in the LVA appraisal of the Range Property.

---

[538] Exhibit 2 sub exhibit "A", Mo986 pg. 20 (August 8, 2019 IRR1 appraisal)

1370. It does not appear that the appraiser vetted the surveyed brokers for possible conflicts. The broker that provided the 50% discount (David Dupree) had previously been an interested party regarding the Range Property business and its partners.

1371. Given the several significant flaws in the IRR1 appraisal, upon which the LVA appraisal was based, and the fact that both were ordered by, and their use restricted only to, the Hutchins Law Firm, FNB could not have accepted or used either.

1372. The LVA appraisal did not qualify as an appraisal under banking appraisal regulations.

1373. According to the Appraisal Institute's Liquidation Value Addendum, dated January 2013, one factor out of nine required to use liquidation value, as opposed to fair or market value, is that "the seller is under extreme compulsion to sell."[539]

1374. This condition was not applicable to the Range Property. FNB was in the process of foreclosing on the Range Property and booking it on its balance sheet as OREO. As such, FNB was "in substance" acting as owner and seller of the Range Property.

1375. Generally, banks have five years to dispose of OREO, and can request extensions from their regulators when circumstances warrant.[540]

---

[539] Exhibit 2 sub exhibit "A", Mo986 pg. 83 (August 8, 2019 IRR1 appraisal) *citing* https://www.appraisalinstitute.org/assets/1/7/AI_-_801.04_Liquidation_Value_Addendum_%28Legal%29.pdf
(The term liquidation value is defined in *The Dictionary of Real Estate Appraisal*, Fifth Edition as follows: The most probable price that a specified interest in real estate property is likely to bring under all of the following conditions: 1. Consummation of a sale within a short time period. 2. The property is subjected to market conditions prevailing as of the date of valuation. 3. Both the buyer and the seller are acting prudently and knowledgeably. 4. The seller is under extreme compulsion to sell. 5. The buyer is typically motivated. 6. Both parties are acting in what they consider their best interests. 7. A normal marketing effort is not possible due to the brief exposure time. 8. Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto. 9. The price represents the normal consideration for the property sold, unaffected by special or creative financing concessions granted by anyone associated with the sale.)
[540] Mo2367 pg. 5 (July 16, 2019 FNB 1600 OREO Policy)

1376. Given this timeframe, it is inconceivable that FNB would consider itself to be "under extreme compulsion to sell." [541]

1377. There was no banking rule or regulation that would have required FNB to use a liquidation value on the Range Property, nor is there a safety and soundness reason.

1378. Neither Yadkin's or FNB's own policies and procedures required the use of a liquidation value, and FNB's Lender Liability Policy (June 2011) states that "lending personnel should act in a commercially reasonable manner" [542] and that the Uniform Commercial Code requires "good faith and fair dealing" [543] and that a secured party dispose of collateral in a commercially reasonable manner. [544]

1379. There is no evidence of good faith or fair dealing in the Bank's use of the LVA appraisal.

1380. The liquidation value in the flawed LVA appraisal was significantly below the Range Property's market value, even as determined by the flawed IRR1 appraisal, and by all the appraisals that preceded it.

1381. The amount was also well below the amount owed to FNB by the borrowers.

1382. As a result, it appears that FNB and/or its attorney used the LVA appraisal in determining FNB's foreclosure bid for the Range Property that was below the amount owed to FNB by the borrowers in order to preserve FNB's rights to actively pursue collection of any deficiency should the Range Property Collateral ultimately sell for an amount less than what was owed on the Range Property.

---

[541] Exhibit 2 sub exhibit "A", Mo986 pg. 83 (August 8, 2019 IRR1 appraisal)
[542] Mo2380 pg. 1 (FNB Lender Liability Policy)
[543] Mo2380 pg. 1 (FNB Lender Liability Policy), UCC § 1-304. Obligation of Good Faith, N.C. Gen. Stat. §25-1-304
[544] Mo2380 pg. 1 (FNB Lender Liability Policy)

1383. Alternatively, FNB and/or its attorney used the LVA appraisal amount to justify a quick sale of the property, knowing that such would create a deficiency balance.

1384. As it turned out, FNB did sell the property, creating a substantial deficiency balance which it actively sued the borrowers to collect in Lincoln County 18 CVS 720.

1385. In doing so, the Bank did not act in good faith or deal fairly with the borrowers.

1386. In conclusion, at no point during the entire foreclosure process were Pettit or Hutchens Law Firm acting with neutrality.

# EIGHTEEN:  Breach of a Duty to Negotiate in Good Faith

## (7028 DOT neutral trustee)

1387. Under Yadkin's recorded Deed of Trust and under N.C. Gen. Stat. §45-10a, FNB is required to work within a neutral trustee framework to statutorily and contractually comply with its foreclosure activities.

1388. Likewise, FNB in following Yadkin's deed of trust must proceed to negotiate with DPP/Bayport as borrowers on any proposed collateral deficiency and subsequent collection.

1389. FNB's use of Hutchens' The LVA appraisal did not qualify as an appraisal under banking appraisal regulations.

1390. This appraisal did not offer a valid or commercially reasonable value to FNB or DPP/Bayport in light of its inherent flaws and bias.

1391. FNB had no honesty in belief or purpose as:

    1) Oot's stated unequivocally that "we want these people out of my bank";

    2) FNB's consideration on examining Bayport's repay ability or prior DPP underwriting including appraisals were irrelevant to a fair valuation and foreclosure sale;

228

3)  Knowingly providing unacceptable or overreaching loan repairs to DPP/Bayport.

1392. FNB had no faithfulness to its duty or obligation to DPP and the commercial reasonableness standard:

1)  45-10a violation using FNB's attorney as trustee's attorney sharing FCL obligations with deficiency suit using same Oot's contact
2)  Continuing to control neutral trustee to maintain or increase deficiency
3)  After withdrawal, concealing FNB's attorney-controlled STS at the foreclosure action and the deficiency action

1393. FNB failed in its observance of reasonable commercial standards of fair dealing in the banking business.

1394. FNB failed in its observance of reasonable commercial standards of fair dealing by concealing from DPP that:

1)  Yadkin's knowledge of bad conduct with inventory cash destroying Bayport's repay ability;
2)  FNB wants whole portfolio out of the bank.

1395. FNB was not commercially reasonable where its:

1)  IRR appraisals not reasonable based upon actual facts compared to all other appraisals including equipment;
2)  LVA is based upon IRR other appraisal that was not reasonable based upon actual facts compared to all other appraisals including equipment;
3)  FNB's attorney did not sell equipment separately from its UCC over SBA's claim.

1396. FNB had an agreement with its own attorney to violate N.C. Gen. Stat. §45-10a evidencing an intent to defraud or to seek unconscionable advantage over DPP's collateral.

1397. Further, FNB overreached aggressively in collapsing DPP's entire portfolio at FNB to cover up or obfuscate its own inherent 7028 loan noncompliance's.

229

1398. FNB claimed an Attorney Client Privilege to circumvent FNB's own appraisal policy to disguise a gerrymandered appraisal as commercially reasonable.

1399. FNB created an unconscionable advantage making an agreement with Hutchens to eliminate a neutral FCL while attacking guarantors with a deficiency suit

1400. Both DPP and Bayport's damages were proximately caused by Yadkin and Hansen's actions enumerated above.

1401. Without Yadkin and Hansen's actions, Bayport's Denver Defense Range would still be operating under Bayport today and not under PSA Denver LLC.

1402. DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

# NINETEEN:  Breach of Contract

### DOT for DPP/Bayport Loans FCL 45-10a violation

1403. This claim incorporates all allegations within this complaint as if each were realleged below.

1404. FNB and DPP had a valid and enforceable deed of trust on the Range Property.

1405. FNB's use of its own attorney at act as attorney for STS was a breach of this deed of trust's enforcement terms that required statutory compliance to such statutes as N.C. Gen. Stat. §45-10a.

1406. FNB's breach was intentional as it has had many other foreclosures with Hutchens under similar representation contracts.

1407. FNB's and Hutchens representations contract is void as it intentionally violated N.C. Gen. Stat. §45-10a and prevented a neutral trustee to preside over DPP's foreclosure sale.

1408.  DPP was directly injured from FNB's violation of DPP's deed of trust as FNB prevented a neutral sale.

1409. FNB was party to aggravating circumstances as its own attorney falsely withdrew, yet still controlled the foreclosure sale under another attorney firm Patrick Harper Dixon.

230

1410. As a result of FNB's breach of contract, DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

# TWENTY:  Unjust Enrichment

1411. This claim incorporates all allegations within this complaint as if each were realleged below.

1412. Through all actions in this complaint, Yadkin was wrongfully enriched by foreclosing upon DPP for its Range Property Collateral with its own attorney causing damages in excess of $4,110,000.

1413. Yadkin/FNB also benefitted having its attorney Hutchens attack DPP's whole portfolio pressuring accrual loans to pay DPP's debt thereby increasing the banks respective value.

1414.  Without Yadkin foreclosing upon DPP's Range Property collateral, Yadkin would not have been unjustly enriched.

1415. Yadkin knowingly and intentionally sought to "get these people out of my bank" and accelerate other portfolio loans to pressure DPP to provide payment before exiting FNB.

1416. FNB had no right under Yadkin's prior performance placing DPP/Bayport in a nonpayment situation through wanton and intentional lack of sound banking actions.

# TWENTY-ONE:  Creation and Breach of Fiduciary Duty
### DUAL REPRESENTATIVE NEUTRAL TRUSTEE

1417. This claim incorporates all allegations within this complaint as if each were realleged below.

1418. Using and maintaining FNB's own Attorney Hutchens as agent/attorney for a N.C. Gen. Stat. §45-10a Neutral trustee, Hutchens' dual role as attorney for FNB and attorney for the neutral trustee, STS, attributed STS' fiduciary duty to DPP/Bayport onto FNB.

1419. If FNB's attorney wields the power of a neutral trustee, then Hutchens attributed its dual representation onto its master FNB.

231

1420. Therefore FNB owed Hutchens' same fiduciary duty to DPP/Bayport.

1421. However Yadkin violated its fiduciary obligation by maintaining a deficiency suit while foreclosing upon DPP in violation of N.C. Gen. Stat. §45-10a.

1422. DPP/Bayport suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages when FNB violated of its fiduciary obligation through its own attorney acting in violation of N.C. Gen. Stat. §45-10a.

# TWENTY-ONE:  Breach of Covenant of Good Faith and Fair Dealing

1423. This claim incorporates all allegations within this complaint as if each were realleged below.

1424. Each of 6980's and 7028's DPP construction loan deeds of trust required a commercially reasonable collateral foreclosure under NC state laws, regulations and statutory procedures

1425. DPP had a mandatory right to the benefit of its deed of trust agreement proscribing a sale had to comply with N.C. statutes such as N.C. Gen. Stat. §45-10a.

1426. FNB intentionally contracted with Hutchens law firm who appointed its own alter-ego, STS, to conceal Hutchens' dual representation with FNB's attorney which avoided a neutral trustee under 45-10a.

1427. DPP/Bayport believed and justifiably relied upon Yadkin's following NC state laws, regulations and statutory procedures when DPP executed 7028's DOT encumbering DPP's Range Property and providing Yadkin collateral as consideration for 7028.

1428. DPP/Bayport suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages when FNB violated of its fiduciary obligation through its own attorney acting in violation of N.C. Gen. Stat. §45-10a.

## TWENTY-TWO:  NC UDTPA

1429. This claim incorporates all allegations within this complaint as if each were realleged below.

1430. FNB, a fiduciary under its own agreement to use its own attorney as the trustee's attorney in violation of N.C. Gen. Stat. §45-10a acted unfairly to DPP/Bayport and the citizens of Lincoln County North Carolina.

1431. All of FNB's actions through its attorney Hutchens were in or affecting commerce both in North Carolina and the United States.

1432. DPP/Bayport suffered the following damages as a proximate result of Yadkin's violation of its fiduciary obligation

1433. Without Yadkin and Hansen's actions, Bayport's Denver Defense Rang would still be operating under Bayport today and not under PSA Denver LLC.

1434. DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

1435. DPP/Bayport requests treble damages and its attorney's fees under this statute.


## TWENTY-THREE:  Violation of NC 75-1

### (STS alter ego of FNB's Attorney)

1436. This claim incorporates all allegations within this complaint as if each were realleged below.

1437. The actions of Pettit and Hutchens Law Firm were an egregious violation of the prohibitions prescribed by N.C.G.S. §45-10.

1438. Therefore, the combination of Hutchens using STS as its alter ego in an agreement with FNB to pursue DPP's collateral and a deficiency action simultaneously while filing a foreclosure, maintaining that foreclosure after withdrawing are actions that Hutchens Law Firm created a unfair

233

and deceptive restraint on trade affecting the Clerk's bid integrity though Hutchens'/STS' egregious violation of N.C.G.S. §75-1.

1439. All of FNB's actions through its attorney Hutchens were in or affecting commerce both in North Carolina and the United States.

1440. DPP/Bayport suffered the following damages as a proximate result of Yadkin's violation of its fiduciary obligation

1441. Without Yadkin and Hansen's actions, Bayport's Denver Defense Rang would still be operating under Bayport today and not under PSA Denver LLC.

1442. DPP suffered the loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

1443. DPP/Bayport requests treble damages and its attorney's fees under this statute.

# TWENTY-FOUR:  Punitive Damages

1444. This claim incorporates all allegations within this complaint as if each were realleged below.

1445. FNB through using its attorney Hutchens proximately caused DPP's actual or compensatory damages.

1446. Yadkin's contract with Hutchens as dual representative for both FNB and STS willfully and intentional violated N.C. Gen. Stat. §45-10a.

1447. FNB's agreement with Hutchens proximately caused DPP's actual injury of its loss of its range that Yadkin valued in 2016 at least $4,110,000 in damages.

1448. FNB's injuries to DPP/Bayport were wanton and reckless with a callous disregard of, indifference to the rights of DPP/Bayport and the bidding participant's of Lincoln County North Carolina.

1449. Likewise in conjunction with FNB's and Hutchens deficiency suit, their joint actions were done in an oppressive way or manner which injured, damages or otherwise violated the rights DPP

unnecessary harshness or severity, as by misuse or abuse of authority or power in violation of N.C. Gen. Stat. §45-10a.

1450. FNB contributed aggravating factors where its choice of using its attorney to violate N.C. Gen. Stat. §45-10a just for reduced cost demonstrated a genuine lack of calm discretion and sound reason. where:

1451. DPP seeks punitive damages in the amount of four times its damages awarded at trial or $16,440,000.

# TWENTY-FIVE: RICO 1962(d)

1452. This claim incorporates all allegations within this complaint as if each were realleged below.

1453. Oots and FNB "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise."

1454. Oots and FNB then agreed with Pettit and Hutchens for an attorney representation agreement to violate N.C. Gen. Stat. §45-10a and in turn antitrust N.C. Gen. Stat. §75-1, which is detailed in the allegations above.

1455. FNB and Hutchens' agreement sought directly to violate the following federal and North Caolina Statutes where each directly operated, participated, and controlled the racketeering activity of:

7) fraud in the sale of securities (6980 pool loan) Yadkin sale to FNB

8) 18 U.S.C. § 1343 (wire fraud)

9) 18 U.S.C. § 1344 (bank fraud)

10) 18 U.S.C. § 1341 (mail fraud)

11) 18 U.S.C. §§ 891-894 (loansharking) attempting to collect through demands of 6980 which had captured $202,000 of DPP's collateral equity on Yadkin's 90-day note and created a N.C. APR over 16%.

12) N.C Gen. Stat. §75-1 (antitrust felony)

1456. FNB's activities continue today as a regular way of conducting the Yadkin/FNB's ongoing legitimate business.

1457. Moreover, FNB's activities are a regular way of conducting or participating in FNB's ongoing and legitimate Banking enterprise.

1458. DPP/Bayport requests treble damages and its attorney's fees under this statute.

**WHEREFORE the Plaintiffs respectfully request the court provide the following relief,**

1) Grant Plaintiffs all damage requests enumerated above that are not duplicative;

2) Grant treble damages under the requested statutes above;

3) Grant punitive damages as requested above or at least for times the Plaintiff's recoverable damages enumerated above;

4) Attorney's fees and costs under the requested statutes above; and

5) Any other relief this Court deems Appropriate.

This the 15th day of July, 2024.

**ELLIOTT LAW FIRM, PC**
14421 S. Old Statesville Road
P.O. Box 1821
Huntersville, NC 28078
(704) 947-3838 – Phone
(704) 947-6547 – Fax
mike@elliottlawfirm.net

By: s/Michael K. Elliott_____
    Michael K. Elliott
    State Bar No. 31505

**STEPHEN F. WALLACE**
200 Shadow Valley Road
High Point, NC 27262
(336) 882-4940 – Phone
Steve@Pretty-Clever.com

By: s/Stephen F. Wallace_____
    NC Bar No. 30691
    SC Bar No. 72930
    USPTO No. 77,863

Attorneys for Plaintiffs